# 18-2404

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖❖

THE ESTATE OF STANLEY KAUFFMANN,

*Plaintiff-Appellant,*

—against—

ROCHESTER INSTITUTE OF TECHNOLOGY,

*Defendant-Third-Party-*
*Plaintiff-Appellee,*

—against—

ROBERT J. CARDULLO,

*Third-Party-Defendant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## VOLUME II OF III
### (Pages A-201 to A-393)

JEREMY P. OCZEK
BOND, SCHOENECK & KING, PLLC
Avant Building
200 Delaware Avenue, Suite 900
Buffalo, New York 14202
(716) 416-7000

MARY P. MOORE
BOND, SCHOENECK & KING, PLLC
350 Linden Oaks, Third Floor
Rochester, New York 14625
(585) 362-4700

*Attorneys for Defendant-Appellee*

KENNETH P. NORWICK
NORWICK & SCHAD
110 East 59th Street
New York, New York 10022
(212) 751-4440

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

PAGE

District Court Docket Entries ........................................... A-1

Complaint for Copyright Infringement, dated April 5, 2016 ............. A-12

    Exhibit A to Complaint—
    Biography of Stanley Kauffmann .................................. A-19

    Exhibit B to Complaint—
    Press Release issued by RIT, dated October 23, 2015 .............. A-22

    Exhibit C to Complaint—
    Table of Contents, along with other "Front Matter" of
    "The Millennial Critic Stanley Kauffmann on Film 1999-2000" ..... A-25

    Exhibit D to Complaint—
    Article, "Film Review by Noted Critic a Rerun, Retracted" ......... A-35

    Exhibit E to Complaint—
    Article, "Where Did I Read That Before?", dated April 18, 2012 .... A-39

    Exhibit F to Complaint—
    Article, "A Fake is a Fake", dated April 3, 2015 .................... A-44

    Exhibit G to Complaint—
    Retraction, "Whose Life Is It, Anyway?: Shaw, *The Doctor's
    Dilemma* and Modern Tragedy" .................................. A-47

    Exhibit H to Complaint—
    Retraction, "Play Doctor, Doctor Death: Shaw, Ibsen, and
    Modern Tragedy" ............................................... A-50

    Exhibit I to Complaint—
    Retraction: Married to the Job: Ermanno Olmi's "Il Posto" and
    "I Fidanzati" Reconsidered ...................................... A-53

    Exhibit J to Complaint—
    Apology, "The Hudson Review"
    (Hudson Review Table of Contents) ............................... A-56

ii

PAGE

Exhibit K to Complaint—
Email from Bruce Austin to Henry Thayer,
dated November 30, 2015 .......................................... A-59

Exhibit L to Complaint—
Letter from Christine A. McGuinness to Robert Cardullo,
dated February 12, 2014 .......................................... A-61

Exhibit M to Complaint—
Email from Robert Cardullo to Henry Thayer,
dated December 3, 2015............................................ A-63

Answer and Third-Party Complaint, dated February 10, 2017 ............ A-65

Summons on a Third-Party Complaint, dated February 10, 2017 ......... A-79

Defendant and Third-Party Plaintiff Rochester Institute of
    Technology's Notice of Motion for Summary Judgment,
    dated December 4, 2017........................................... A-81

Defendant and Third-Party Plaintiff Rochester Institute of
    Technology's Local Rule 56 Statement of Undisputed
    Material Facts, dated December 4, 2017 .......................... A-83

Appendix to Defendant's Local Rule 56 Statement of Undisputed
    Material Facts, dated December 4, 2017 .......................... A-87

Declaration of Mary P. Moore, Defendant and Third-Party Plaintiff
    Rochester Institute of Technology, in Support of Motion for
    Summary Judgment, dated December 4, 2017 ..................... A-90

Exhibit 1 to Moore Declaration—
Complaint for Copyright Infringement, dated April 5, 2016,
without Exhibits .................................................. A-96

Exhibit 2 to Moore Declaration—
Answer and Third-Party Complaint, dated February 10, 2017 ..... A-104

Exhibit 3 to Moore Declaration—
Certificate of Registration....................................... A-119

iii

PAGE

Exhibit 4 to Moore Declaration—
Subpoena Duces Tecum served on The New Republic ............ A-128

Exhibit 5 to Moore Declaration—
Subpoena Duces Tecum served on Brandt & Hochman............ A-133

Exhibit 6 to Moore Declaration—
Email from Bruce Austin to Henry Thayer,
dated November 30, 2015 ........................................ A-139

Exhibit 7 to Moore Declaration—
Email from Henry Thayer to Bruce Austin,
dated November 24, 2015 ........................................ A-142

Exhibit 8 to Moore Declaration—
Transfer Documents produced by Brandt & Hochman............. A-144

Exhibit 9 to Moore Declaration—
Transfer Documents produced by Brandt & Hochman
in Response to the Subpoena .................................... A-158

Exhibit 10 to Moore Declaration—
Email produced by Brandt & Hochman containing
Mr. Kauffmann's Obituary ....................................... A-191

Exhibit 11 to Moore Declaration—
Letter produced by  Plaintiff ................................... A-198

Declaration of David Myer, Controller for The New Republic,
in Support of Motion for Summary Judgment,
executed on November 30, 2017 ................................. A-201

Exhibit A to Myer Declaration—
Letter Agreement, dated March 22, 2004 ........................ A-203

Exhibit B to Myer Declaration—
Letter from Laura Obolensky to Stanley Kauffmann,
dated April 2, 1993 ............................................ A-205

iv

PAGE

Defendant and Third-Party Plaintiff Rochester Institute of
    Technology's Memorandum of Law in Support of Its Motion for
    Summary Judgment, dated December 4, 2017 . . . . . . . . . . . . . . . . . . . . . A-207

Notice of Withdrawal of Certain Affirmative Defenses,
    dated December 13, 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-225

Plaintiff's Notice of Cross-Motion for an Order Granting Partial
    Summary Judgment to it Establishing Defendant's Liability for
    Copyright Infringement, dated January 12, 2018 . . . . . . . . . . . . . . . . . A-227

Plaintiff's Rule 56 Statement of Undisputed Material Facts,
    dated January 12, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-229

Declaration of Kenneth P. Norwick in Support of Cross-Motion for
    an Order Granting Partial Summary Judgment to it Establishing
    Defendant's Liability for Copyright Infringement,
    dated January 12, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-242

    Exhibit A to Norwick Declaration—
    Front and Back Covers of the Infringing Book . . . . . . . . . . . . . . . . . . . A-258

    Exhibit B to Norwick Declaration—
    The New Republic's Eight-Page Tribute to Stanley Kauffmann . . . . A-261

    Exhibit C to Norwick Declaration—
    The New York Times' Obituary for Stanley Kauffmann . . . . . . . . . . . A-270

    Exhibit D to Norwick Declaration—
    Referenced: Complaint for Copyright Infringement,
    dated April 5, 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-276

    Exhibit E to Norwick Declaration—
    Letter from Christine A. McGuinness to Robert Cardullo,
    dated February 12, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-277

    Exhibit F to Norwick Declaration—
    Email from Stanley Kauffmann to Robert Cardullo,
    dated April 22, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-279

v

PAGE

Exhibit G to Norwick Declaration—
Letter from Kenneth P. Norwick, Esq. to Marilyn Schleyer,
dated January 4, 2016, with attachments ......................... A-281

Exhibit H to Norwick Declaration—
Email from Robert Cardullo to Henry Thayer,
dated December 3, 2015......................................... A-292

Exhibit I to Norwick Declaration—
Email from Robert Cardullo to Kenneth P. Norwick, Esq.,
dated March 4, 2017 ............................................ A-294

Exhibit J to Norwick Declaration—
Email from Robert Cardullo to Jeremy Oczek,
dated March 3, 2017 ............................................ A-296

Exhibit K to Norwick Declaration—
Letter Agreement, dated March 22, 2004........................ A-298

Exhibit L to Norwick Declaration—
Author Agreement for Back of the Book, dated March 9, 2007 .... A-300

Declaration of Robert Marx, Executor of the Estate of Stanley
Kauffmann, in Support of Cross-Motion for an Order Granting
Partial Summary Judgment to it Establishing Defendant's
Liability for Copyright Infringement, dated January 2, 2018 ...... A-305

Exhibit A to Marx Declaration—
Relevant Documents ........................................... A-311

Exhibit B to Marx Declaration—
Email from Stanley Kauffmann to Robert Cardullo,
dated April 22, 2013 ........................................... A-318

Declaration of Henry Thayer in Support of Cross-Motion for an
Order Granting Partial Summary Judgment to it Establishing
Defendant's Liability for Copyright Infringement,
dated December 20, 2017 ....................................... A-320

vi

PAGE

Declaration of Leon Wieseltier in Support of Cross-Motion for an
Order Granting Partial Summary Judgment to it Establishing
Defendant and Third-Party Plaintiff Rochester Institute of
Technology's Liability for Copyright Infringement,
dated December 15, 2017, with attachment ....................... A-322

Plaintiff's Memorandum of Law in Opposition to Defendant and
Third-Party Plaintiff Rochester Institute of Technology's Motion
for Summary Judgment and in Support of Its Cross-Motion for
Partial Summary Judgment on Liability, dated January 12, 2018 ... A-325

Defendant and Third-Party Plaintiff Rochester Institute of
Technology's Memorandum of Law in Further Support
of Its Motion for Summary Judgment & in Opposition to
Plaintiff's Cross-Motion for Partial Summary Judgment,
dated February 26, 2018 ........................................ A-361

Declaration of Mary P. Moore, for Defendant and Third-Party
Plaintiff Rochester Institute of Technology, in Further
Support of Motion for Summary Judgment and in Opposition
to Plaintiff's Cross-Motion for Partial Summary Judgment,
executed on February 26, 2018 ................................. A-394

Exhibit 1 to Moore Declaration—
Plaintiff's Initial Disclosures, dated July 26, 2017 ................ A-398

Exhibit 2 to Moore Declaration—
License Agreements Produced by Brandt & Hochman that
Purport to License Articles that were Published by The New
Republic between the years 1959-1965 and 1967-1979 ........... A-403

Exhibit 3 to Moore Declaration—
License Agreements produced by Brandt & Hochman Licensing
Articles that were First Published by The New Republic
in the 1980s ................................................... A-457

Exhibit 4 to Moore Declaration—
Publication Agreement for Distinguishing Features ............... A-470

vii

PAGE

Exhibit 5 to Moore Declaration—
Publication Agreement for *Regarding Film*....................... A-475

Exhibit 6 to Moore Declaration—
Cover Pages, Copyright Notices, and Prefaces contained in
*A World On Film*, *Figures of Light*, *Living Images*,
*Persons of the Drama*, and *Before My Eyes* ...................... A-480

Exhibit 7 to Moore Declaration—
Cover Pages, Copyright Notices, and Prefaces contained in
*Theatre Criticisms*, *Field of View*, *Distinguishing Features*,
and *Regarding Film*............................................. A-501

Defendant and Third-Party Plaintiff Rochester Institute of
Technology's Opposing Statement in Response to
Plaintiff's Rule 56 Statement of Undisputed Material
Facts, dated February 26, 2018 ................................... A-515

Plaintiff's Reply Memorandum of Law in Support of Its
Cross-Motion for Partial Summary Judgment on Liability,
dated March 26, 2018 ........................................... A-533

Transcript of Proceedings, dated July 26, 2018 ...................... A-561

Decision and Order of the Honorable Charles J. Siragusa,
dated August 6, 2018 ........................................... A-598

Judgment Appealed From, dated August 7, 2018 ..................... A-607

Plaintiff's Notice of Appeal, dated August 14, 2018.................. A-608

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE ESTATE OF STANLEY KAUFFMANN,

           Plaintiff,

    v.

ROCHESTER INSTITUTE OF TECHNOLOGY,

           Defendant and
           Third-Party Plaintiff,

    v.

ROBERT J. CARDULLO,

           Third-Party Defendant.

**DECLARATION OF DAVID MYER,
THE NEW REPUBLIC**

Case No. 6:17-cv-06061-CJS-MWP

    **David Myer**, declares, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

    1.    I am employed as the Controller for The New Republic, which publishes a periodical magazine.

    2.    This declaration is based upon my personal knowledge and in my capacity as Controller and as the custodian of certain records maintained by The New Republic.  I am authorized to make this declaration.

    3.    The documents annexed hereto as Exhibits A and B were produced by The New Republic to Defendant and Third Party Plaintiff Rochester Institute of Technology in the above-referenced matter in response to a subpoena that was served on November 1, 2017.

    4.    The documents annexed hereto as Exhibits A and B were made and/or maintained by the personnel or staff of The New Republic, or persons acting under its control, with

knowledge of the act, transaction, occurrence, or event recorded therein and in the regular course of the business, at the time of the act, transaction, occurrence or event recorded therein, or within a reasonable time thereafter, and it was in the regular course of the business to make and keep such records.

5.      Attached hereto as Exhibit A is a letter agreement between Stanley Kauffmann and The New Republic dated March 22, 2004.

6.      Attached hereto as Exhibit B is a letter from The New Republic to Stanley Kauffmann dated April 2, 1993.

7.      Stanley Kauffmann wrote articles for and at the request of The New Republic for decades.

8.      Mr. Kauffmann was paid a flat monthly fee for his contributions to The New Republic, in exchange for which Mr. Kauffmann was expected to write one or more articles for The New Republic each month.

9.      From January 1998 through February 1999, Mr. Kauffmann was paid a flat fee of $3,000 per month in exchange for his contributions to The New Republic.

10.     Beginning in March 1999, this flat amount increased to $3,750 per month for Mr. Kauffmann's contributions to The New Republic for the remainder of 1999.

11.     Mr. Kauffmann was paid $4,000 per month in exchange for his contributions to The New Republic in 2000 and 2001.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on November 30th, 2017.

_____
David Myer

2

3054752.1

# EXHIBIT A



Leon Wieseltier

March 22, 2004

10081

Stanley Kauffmann
Penthouse C
10 West 15th Street
New York, NY 10011

Dear Stanley,

Like many publishing companies, *The New Republic* is working to expand into the web and
related technologies, and in so doing, afford you maximum exposure. We've had a wonderful
relationship with you over the years and see this expansion as a great opportunity to further
promote you and your talents for our mutual benefit. Recent Supreme Court decisions have made
it necessary that we explicitly confirm the terms under which you write for *The New Republic*.

Thus, in the interest of responsibly managing our business, we are making efforts to memorialize
in writing all of our agreements with our writers, including freelance contributors. Our agreement
with you has always been an oral understanding, and among other things we do want to ensure
that we are not violating your rights in any way. To that end, we'd like to confirm with you our
understanding of our past relationship with you, as well as our relationship with you and your
contributions to *The New Republic* going forward.

We have always understood that you have been writing articles for *The New Republic* as a
freelance contributor. We have also always understood in doing business with you that, in light of
our regular monthly compensation arrangement with you, all articles you have written for *The
New Republic* have been "works made for hire," as that term is defined under the US Copyright
laws. We'd like to confirm with you that the above understanding of our business relationship
with you is correct, but also that the above understanding will remain in effect as to any future
articles you write for *The New Republic*, unless and until we and you both agree otherwise in
writing.

Please acknowledge your agreement with us about this by so indicating with your signature
below.

Many thanks.

Date: _Marcl 24, 2004_

Agreed: _____

Sincerely,

Leon Wieseltier
Literary Editor

Author Signature _____

13138

1331 H STREET   SUITE 700   WASHINGTON, D.C. 20005   202-508-4444   F 202-508-4477   lwieseltier@tnr.com

# EXHIBIT B

03/01/2007  12:57   212-2421659                S_KAUFFMANN                                    PAGE  01

*FOR CHLOE*

**NEW REPUBLIC**

1220 19th St. NW
Washington, DC 20036
202-331-7494

April 2, 1993

Mr. Stanley Kauffmann
Penthouse C
10 West 15th Street
New York, N.Y. 10011

Dear Mr. Kauffmann:

**This is to confirm our telephone call this
morning.  You may, of course, reprint any
or all the film reviews you have done for
TNR in your forthcoming anthology.  We'd
simply request that there be some indica-
tion that the essays first appeared in
our pages.**

Sincerely,

Laura Obolensky
Rights & Permissions

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE ESTATE OF STANLEY KAUFFMANN,

                Plaintiff,

    v.

ROCHESTER INSTITUTE OF TECHNOLOGY,

             Defendant and
             Third-Party Plaintiff,

    v.

ROBERT J. CARDULLO,

             Third-Party Defendant.

Case No. 6:17-cv-06061-CJS-MWP

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

BOND, SCHOENECK & KING, PLLC
Mary P. Moore, Esq.
350 Linden Oaks, Third Floor
Rochester, New York 14625
Telephone: (585) 362-4700

Jeremy P. Oczek, Esq.
200 Delaware Avenue
Buffalo, New York 14202
Telephone: (716) 416-7037

*Attorneys for Defendant/Third-Party
Plaintiff Rochester Institute of Technology*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................1

RELEVANT PROCEDURAL HISTORY ......................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................3

SUMMARY JUDGMENT STANDARD .......................................................5

ARGUMENT ..................................................................................................5

    Defendant RIT is Entitled to Judgment As A Matter of Law On Plaintiff's Single
    Cause of Action For Copyright Infringement Because Plaintiff Cannot Prove That
    It Owns The Copyrights for The Works At Issue. ..............................................5

CONCLUSION ............................................................................................13

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Boisson v. Banian, Ltd.*,
273 F.3d 262 (2d Cir. 2001) ...................................................6

*Buday v. N.Y. Yankees P'ship*,
486 F. App'x 894 (2d Cir. 2012) ...........................................14

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*,
342 F.3d 149 (2d Cir. 2003) .................................................14

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .................................................................5

*Compaq Comput. Corp. v. Ergonome Inc.*,
210 F. Supp. 2d 839 (S.D. Tex. 2001) ................................7, 8

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) .................................................................6

*Fogerty v. Fantasy, Inc.*,
510 U.S. 517 (1994) ...............................................................14

*Homeowner Options for Mass. Elders, Inc. v. Brookline Bancorp, Inc.*,
754 F. Supp. 2d 201 (D. Mass. 2010) .....................................7

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
153 F.3d 82 (2d Cir. 1988) ...................................................14

*Kid Stuff Mktg., Inc. v. Creative Consumer Concepts, Inc.*,
223 F. Supp. 3d 1168 (D. Kan. 2016)..................................7, 8

*Looney Ricks Kiss Architects, Inc. v. Bryan*,
2010 U.S. Dist. LEXIS 110100 (W.D. La. Oct. 14, 2010) ......7

*Lynch v. Nat'l Fuel Gas Distrib. Corp.*,
25 F. Supp. 3d 358 (W.D.N.Y. 2014) (Larimer, J.)............5, 6

*Mahan v. ROC Nation, LLC*,
634 F. App'x 329 (2d Cir. 2016) ...........................................14

*Marvel Characters, Inc. v. Kirby*,
726 F.3d 119 (2d Cir. 2013) ....................................10, 11, 12

*Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.*,
673 F.3d 84 (2d Cir. 2012) .....................................................6

*O'Well Novelty Co. v. Offenbacher, Inc.*,
   2000 U.S. App. LEXIS 18526 (4th Cir. Aug. 1, 2000)...........................................................14

*Playboy Enters. v. Dumas*,
   53 F.3d 549 (2d Cir. 1995), *cert denied*, 516 U.S. 1010 (1995) ....................................*passim*

*Playboy Enters. v. Dumas*,
   960 F. Supp. 710 (S.D.N.Y. 1997) ...................................................................................12

*Ramos v. Baldor Specialty Foods, Inc.*,
   687 F.3d 554 (2d Cir. 2012) ...............................................................................................5

*Stanacard, LLC v. Rubard, LLC*,
   2016 U.S. Dist. LEXIS 15721 (S.D.N.Y. Feb. 3, 2016) ....................................................8

*TMTV, Corp. v. Mass Prods., Inc.*,
   345 F. Supp. 2d 196 (D.P.R. 2004) ....................................................................................7

*Troll Co. v. Uneeda Doll Co.*,
   483 F.3d 150 (2d Cir. 2007) .............................................................................................13

*Urbont v. Sony Music Entm't*,
   831 F.3d 80 (2d Cir. 2016) ..........................................................................................8, 12

## Statutes

17 U.S.C. § 101 ...............................................................................................................8

17 U.S.C. § 101(2)..................................................................................................6, 7, 10

17 U.S.C. § 201(a) ...........................................................................................................6

17 U.S.C. § 204(a) ...........................................................................................................9

17 U.S.C. § 412 .............................................................................................................14

17 U.S.C. § 505 .......................................................................................................14, 15

17 USC § 201(b)...............................................................................................................6

17 USC § 410(c) ............................................................................................................13

## Other Authorities

Fed. R. Civ. P. 1 ...............................................................................................................5

Fed. R. Civ. P. 56(c).........................................................................................................5

## PRELIMINARY STATEMENT

Defendant and Third-Party Plaintiff Rochester Institute of Technology ("RIT" or "Defendant") hereby moves, through undersigned counsel, for judgment as a matter of law on Plaintiff The Estate of Stanley Kauffmann's ("Plaintiff" or the "Estate") sole cause of action for copyright infringement.  Plaintiff alleges that RIT's publication of <u>The Millennial Critic: Stanley Kauffmann on Film, 1999-2009</u> ("The Millennial Critic") infringed upon copyrights owned by Plaintiff that are registered with the U.S. Copyright Office (a perquisite to sue for infringement). But the indisputable documentary evidence produced in discovery shows that Plaintiff cannot meet its burden to prove that it owns valid copyrights for the works allegedly infringed by RIT (as it must).

The articles that RIT allegedly infringed were all written by Mr. Kauffmann and first published in various issues of The New Republic (a periodical magazine) in 1999.  But the articles that Mr. Kauffmann wrote for The New Republic in 1999 (and other years) were "works made for hire" under the Copyright Act of 1976, as amended, meaning that The New Republic originally owned the copyrights for these articles—not Mr. Kauffmann.  Plaintiff has not produced any documentary evidence showing that The New Republic ever transferred its copyrights for the 1999 articles to Mr. Kauffmann or any other documents showing that Mr. Kauffmann (or his Estate) ever came to own the copyrights.  As a result, RIT is entitled to summary judgment dismissing this action because Plaintiff cannot show it is the valid owner of the copyrights allegedly infringed.

## RELEVANT PROCEDURAL HISTORY

Plaintiff commenced this action by the filing of a complaint on April 5, 2016 in the Southern District of New York [ECF #1].  (*See* Declaration of Mary P. Moore, Esq., executed on

December 4, 2017 ("Moore Decl."), Exhibit 1.)  This action was then transferred to the Western District of New York on January 20, 2017 [ECF #25].  (Moore Decl. ¶ 4.)

Plaintiff has alleged that it is "the successor owner of all copyrights owned in his lifetime by Stanley Kauffmann."  (Compl. ¶ 1.)  It further asserts that RIT (including RIT Press, its scholarly publishing enterprise) infringed upon its copyrights by the unauthorized publication of 44 articles listed in paragraph 7 of the complaint that are contained in The Millennial Critic, which was published by RIT.  (*Id.* ¶ 2, 3, 7, 21.)  Plaintiff also alleged that the copyrights for the works allegedly infringed "have been duly registered with the United States Copyright Office, a prerequisite to suing for infringement."  (Id. ¶ 7.)

RIT answered the complaint on February 10, 2017, wherein it denied liability and asserted a third-party complaint against Third-Party Defendant Robert J. Cardullo ("Cardullo") [ECF #29].  (Moore Decl., Exhibit 2.)  RIT admitted that it published The Millennial Critic, but otherwise denied that it had infringed upon Plaintiff's copyrights.  (*Id.* at p. 3 ¶ 6, p. 8 ¶ 21.)  It further alleged that Cardullo and RIT entered into a Publication Agreement in April 2015, wherein Cardullo (as editor of The Millennial Critic) represented that he was the sole and exclusive owner of the works contained The Millennial Critic and that he would obtain any permissions needed to quote from copyrighted work, and further agreed to indemnify RIT from any and all claims arising out of The Millennial Critic.  (*Id.* at p. 11-12 ¶ 9-12.)

RIT served Mr. Cardullo with the third party complaint on March 3, 2017 [ECF #37].  (Moore Decl. ¶ 11.)  Failing to appear in this action, RIT obtained an entry of default against Mr. Cardullo on May 16, 2017 [ECF #40].  (*Id.* ¶ 12.)

After a Rule 16 conference held on July 12, 2017, the parties proceeded to mediation and discovery.  (*Id.* ¶ 13.)  During discovery, RIT served subpoenas duces tecum upon two non-

parties—The New Republic and Brandt & Hochman Literary Agents ("Brandt & Hochman"). (Moore Decl. ¶ 16, 20, Exhibits 4 and 5.)  RIT now moves for summary judgment based upon documents produced by The New Republic and Brandt & Hochman, which demonstrate that Mr. Kauffmann never owned the copyrights for the works at issue.  (Moore Decl. ¶ 27.)

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Stanley Kauffmann was the film critic for The New Republic (a periodical magazine) from 1958 until the last months of his life in 2013, with a break in 1966.  (Moore Decl. ¶ 25-27, Exhibits 10 and 11.)  The works at issue in this litigation (*i.e.* the works that RIT allegedly infringed by its publication of The Millennial Critic) are all film reviews that were written by Stanley Kauffmann as contributions to The New Republic and were first published in various issues of The New Republic in 1999.  (Moore Decl. ¶ 14, Exhibit 3.)  Plaintiff produced one Certificate of Registration for the works allegedly infringed by RIT, which has an effective date of March 7, 2016 and lists the Estate of Stanley Kauffmann as the copyright claimant.  (*Id.*)

A letter produced by The New Republic from it to Stanley Kauffmann, dated March 22, 2004, states the following:

> Our agreement with you has always been an oral understanding, and among other things we do want to ensure that we are not violating your rights in any way.  To that end, we'd like to confirm with you our understanding of our past relationship with you, as well as our relationship with you and your contributions to *The New Republic* going forward.

> We have always understood that you have been writing articles for *The New Republic* as a freelance contributor.  We have also always understood in doing business with you that, in light of our regular monthly compensation arrangement with you, all articles you have written for *The New Republic* have been "works made for hire," as that term is defined under the US Copyright laws.  We'd like to confirm with you that the above understanding of our business relationship with you is correct . . .

> Please acknowledge your agreement with us about this by so indicating with your signature below . . .

(Myer Decl. ¶ 5, Exhibit A.)   This letter was signed by Leon Wieseltier on behalf of The New Republic and it was signed and dated by Stanley Kauffmann on March 22, 2004.  (*Id.*)

A letter from The New Republic to Stanley Kauffmann dated April 2, 1993 states the following:

> This is to confirm our telephone call this morning.  You may, of course, reprint any or all the film reviews you have done for TNR in your forthcoming anthology.  We'd simply request that there be some indication that the essays first appeared in our pages.

(Myer Decl. ¶ 6, Exhibit B.)

The New Republic sold, assigned, and/or transferred to Stanley Kauffmann all right, title and interest in and to the copyrights for all works by Stanley Kauffmann that were published by The New Republic in the following years: 1959-1965, 1967-1969, 1970-1979.  (Moore Decl., Exhibit 8.)  The New Republic also sold, assigned, and/or transferred to Stanley Kauffmann all right, title and interest in and to the copyrights for particular works by Stanley Kauffmann that were published by The New Republic on various particular dates in the years 1962, 1965, 1966, 1970, 1973-1977, 1979, 1981-1982, 1984, and 1986.  (Moore Decl., Exhibit 9.)

When Stanley Kauffmann was formally invited to become the film critic for The New Republic in 1958, it offered to pay Mr. Kauffmann $50 per column.  (Moore Decl. ¶ 27, Exhibit 11.)  Between at least 1998 and 2001, Mr. Kauffmann was paid a flat fee each month for his contributions to The New Republic.  (Myer Decl. ¶ 8-11.)  From January 1998 through February 1999, Mr. Kauffmann was paid a flat fee of $3,000 per month in exchange for his contributions to The New Republic.  (*Id.* ¶ 9.)  Beginning in March 1999, this flat amount increased to $3,750 per month for Mr. Kauffmann's contributions to The New Republic for the remainder of 1999.  (*Id.* ¶ 10.)  Mr. Kauffmann was paid $4,000 per month in exchange for his contributions to The New Republic in 2000 and 2001.  (*Id.* ¶ 11.)  Mr. Kauffmann was expected

4

to write one or more articles for The New Republic each month in exchange for the flat monthly fee paid to him by The New Republic. (*Id.* ¶ 8.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). A party is entitled to summary judgment when the record shows there "is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Lynch v. Nat'l Fuel Gas Distrib. Corp.*, 25 F. Supp. 3d 358, 362 (W.D.N.Y. 2014) (Larimer, J.) (quoting Fed. R. Civ. P. 56(c)). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (quoting *Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.*, 673 F.3d 84, 94 (2d Cir. 2012)).

To defeat summary judgment, "[t]he non-movant must present more than a 'scintilla of evidence,' or 'some metaphysical doubt as to the material facts,' and cannot rely on the allegations in his or her pleadings, conclusory statements, or on 'mere assertions that affidavits supporting the motion are not credible.'" *Lynch*, 2014 WL 2047890, at *2 (citations omitted).

## ARGUMENT

**Defendant RIT is Entitled to Judgment As A Matter of Law On Plaintiff's Single Cause of Action For Copyright Infringement Because Plaintiff Cannot Prove That It Owns The Copyrights for The Works At Issue.**

In order to prevail on a claim for copyright infringement, Plaintiff must prove the following: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991);

*Boisson v. Banian, Ltd.*, 273 F.3d 262, 267 (2d Cir. 2001).  But documentary evidence recently produced in discovery shows that it will be impossible for Plaintiff to do so.  RIT is entitled to judgment as a matter of law because the documentary evidence indisputably shows that Plaintiff does not own a valid copyright with respect to the works at issue in this litigation.

Under 17 U.S.C. § 201(a), "[c]opyright in a work protected under this title vests initially in the author or authors of the work."  "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."  17 USC § 201(b).  Under 17 U.S.C. § 101(2), a "work made for hire" is defined to include ". . . (2) a work specially ordered or commissioned for use as a contribution to a collective work [defined therein to include a "periodical issue"] . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."

The required writing must consist of an agreement that the work is a "work made for hire" and be signed by both the party commissioning the work (*i.e.* the hiring party) and the party who prepared the work pursuant to such commission.  *Playboy Enters. v. Dumas*, 53 F.3d 549, 559 (2d Cir. 1995), *cert denied*, 516 U.S. 1010 (1995).  "[T]he writing requirement of § 101(2) can be met by a writing executed after the work is created, if the writing confirms a prior agreement, either explicit or implicit, made before the creation of the work."  *Id.* at 559 (citing Nimmers on Copyright § 5.03(B)(2)(b)); *see also Homeowner Options for Mass. Elders, Inc. v. Brookline Bancorp, Inc.*, 754 F. Supp. 2d 201, 208 (D. Mass. 2010) (same); *TMTV, Corp. v. Mass Prods., Inc.*, 345 F. Supp. 2d 196, 206 (D.P.R. 2004) (same); *Compaq Comput. Corp. v. Ergonome Inc.*, 210 F. Supp. 2d 839, 843 (S.D. Tex. 2001) (adopting Second Circuit approach);

6

*Looney Ricks Kiss Architects, Inc. v. Bryan*, 2010 U.S. Dist. LEXIS 110100, at *23 (W.D. La. Oct. 14, 2010) (same); *Kid Stuff Mktg., Inc. v. Creative Consumer Concepts, Inc.*, 223 F. Supp. 3d 1168, 1180 (D. Kan. 2016) (adopting Second Circuit approach).

Here, The New Republic produced a written agreement between it and Stanley Kauffmann dated March 22, 2004, which states that the parties "always understood" that Mr. Kauffmann wrote articles for it as a freelance contributor and that, in light of the "monthly compensation arrangement" between The New Republic and Mr. Kauffmann, "all articles [Mr. Kauffmann had] written for *The New Republic* [were] 'works made for hire,' as that term is defined under the US Copyright laws." (*See* Myer Decl., Exhibit A.)  It further states that the writing "confirm[s]" what had "always been an oral understanding" between The New Republic and Mr. Kauffmann, and is then signed by The New Republic and Mr. Kauffmann. (*Id.*)  This letter (on its face) meets the writing requirement of 17 U.S.C. § 101(2) because it expressly states that all articles written by Stanley Kauffmann for The New Republic were "works made for hire" and it is signed by both parties.  Thus The New Republic, at whose instance and expense the works were prepared (as further described below), owned the copyrights for all contributions by Mr. Kauffmann for The New Republic.[1]

This written agreement, although dated after the articles at issue were first published by The New Republic in 1999, demonstrates that the parties intended, even prior to creation of the articles, that they were "works made for hire." (*See* Myer Decl., Exhibit A.)  This prior agreement is expressly demonstrated by the plain language of the March 22, 2004 letter, signed by The New Republic and Mr. Kauffmann, confirming that the parties "always understood" that articles written by Mr. Kauffmann for The New Republic were "works made for hire" and that

---

[1] *Urbont v. Sony Music Entm't*, 831 F.3d 80, 86 (2d Cir. 2016) (concluding that third parties to an alleged "work for hire" relationship have standing to raise a "work for hire" defense against a claim of copyright infringement).

this "had always been an oral understanding" between the parties.  *See Kid Stuff Mktg.*, 223 F. Supp. 3d at 1180-81 (D. Kan. 2016) (holding, as a matter of law, that the hiring party owned illustrations made by the artist based on "the plain language of the agreement," which "memorialize[d] the parties' understanding at the time the illustrations were created because "the agreement confirm[ed] in writing that for 'prior work completed,' KSM is, 'as agreed at the time,' the sole owner of the works"); *Compaq*, 210 F. Supp. 2d at 844 (concluding "[f]rom the agreement's language . . . that both parties understood that the work was in fact made for hire"); *cf. Stanacard, LLC v. Rubard, LLC*, 2016 U.S. Dist. LEXIS 15721, at *23 (S.D.N.Y. Feb. 3, 2016) (later written agreement, while "certainly some evidence of what the parties understood all along,"  was not dispositive because it was silent on the issue of precreation intent, unlike the agreement between Mr. Kauffmann and The New Republic).

Even if the written agreement between The New Republic and Mr. Kauffmann itself did not explicitly state the parties' precreation intent (as it does), the parties' intent that the film reviews Mr. Kauffmann wrote for The New Republic were "works made for hire" is implicitly demonstrated by other documentary evidence produced by The New Republic and by Brandt & Hochman.  The New Republic produced a letter from it to Mr. Kauffmann dated April 2, 1993, granting permission to Mr. Kauffmann to "reprint any or all the film reviews" he had "done for The New Republic" in a then-forthcoming anthology.  (*See* Myer Decl., Exhibit B.)  If it had not been the parties' understanding that the articles Mr. Kauffmann wrote for The New Republic were "works made for hire," then there would not have been any need for Mr. Kauffmann to request permission to reprint these articles.  *See Playboy Enters.*, 53 F.3d at 560 (precreation intent inferred from the parties' continuous relationship over time).

8

Brandt & Hochman also produced a number of writings signed by The New Republic in the 1960s, 1970s, and 1980s, transferring ownership of the copyrights for works by Stanley Kauffmann that had been published by The New Republic in various entire years and in particular issues of the periodical.  (Moore Decl. ¶ 22, Exhibits 8 and 9.)  *See also* 17 U.S.C. § 204(a) ("A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.")  Again, this documentary evidence implicitly demonstrates that The New Republic and Mr. Kauffmann always intended, even well before 1999, that copyrights for articles Mr. Kauffmann contributed to The New Republic were to be owned by The New Republic, as "works made for hire."  And neither Brandt & Hochman, nor Plaintiff or The New Republic, has produced any documents showing that The New Republic transferred copyright ownership for Mr. Kauffmann's 1999 articles to either Mr. Kauffmann or Plaintiff or any other contrary agreement.  (Moore Decl. ¶ 23.)  *See Playboy Enters.*, 53 F.3d at 554-56 (once it is determined that a work is made for hire, the independent contractor bears the burden by a preponderance of the evidence of overcoming this presumption with evidence that a contrary agreement was reached).

In addition to the writing requirement (*i.e.* that "the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire"), to constitute a "work made for hire," the work must have been "specially ordered or commissioned for use as a contribution to a collective work," such as a periodical issue.  17 U.S.C. § 101(2).  Whether the contribution was "specially ordered or commissioned" depends upon whether the articles were written at the hiring party's "instance and expense."  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 139 (2d Cir. 2013); *Playboy Enters.*, 53 F.3d 549 at 562 ("the phrase 'specially ordered or

commissioned' has essentially the same meaning as the 'instance and expense'" test of the predecessor Copyright Act of 1909).

To establish that the work was made at the hiring party's "instance," the key question is whether the hiring party "was the 'motivating factor' in the creation of the works." *Playboy Enters.*, 53 F.3d at 563. Although Second Circuit case law suggests that "[a]ctual creative contributions or direction strongly suggest that the work is made at the hiring party's instance," *Marvel Characters*, 726 F.3d at 139, the Second Circuit has also made clear that a hiring party need not exercise "artistic control over the product for a work to be 'specially ordered or commissioned' within the meaning of § 101(2)." *Playboy Enters.*, 53 F.3d at 562 (noting that even if a hiring party did not specifically order the creation of particular paintings, the parties' course of conduct whereby the artist submitted at least one painting per month to the magazine could establish that the magazine induced creation of paintings). As for the "expense" requirement, the Second Circuit has clearly stated that this requirement is met "where a hiring party simply pays an independent contractor a sum certain for his or her work," rather than a royalty. *Id.* at 555; *see also Marvel Characters*, 726 F.3d at 140 (while "payment of a sum certain suggests a work-for-hire arrangement," the Second Circuit cautioned against a "rigid application" of the instance and expense test in favor of examining "the parties' creative and financial arrangement as revealed by the record in each case").

For example, in *Marvel Characters*, the Second Circuit affirmed the district court's grant of summary judgment in favor of a defendant that had asserted that a third party (not the plaintiff) was the owner of the disputed copyrights because the works had been done by plaintiff as "works made for hire" for the third party. The Second Circuit found, as a matter of law, that the works were created at the "instance" of the hiring party (*i.e.* comic book publisher Marvel

Comics) because the evidence showed that the artist (Kirby) and Marvel Comics "had a standing engagement whereby . . . [w]hen Kirby sat down to draw . . . it was not in the hope that Marvel or some other publisher might one day be interested enough in them to buy, but with the expectation, established through their ongoing, mutually beneficial relationship, that Marvel would pay him." *Id.* at 142-43; *Playboy Enters.*, 53 F.3d at 563 ("the question is whether under this course of conduct Playboy was the motivating factor behind the creation of the paintings").

Here, like in *Marvel Characters*, the undisputed evidence shows that The New Republic induced creation of the film reviews by Mr. Kauffmann and published therein.  Mr. Kauffmann contributed film reviews to The New Republic on a weekly basis for more than fifty years, except for a brief hiatus in 1966.  (Moore Decl. ¶ 25-27, Exhibits 10 and 11.)  He had a monthly compensation arrangement pursuant to which he was paid a sum certain monthly for contributing at least one film review per month to The New Republic.  (Myer Decl. ¶ 8-11.)  It is thus fair to infer, based upon this longstanding relationship, that Mr. Kauffmann wrote the film reviews published by The New Republic in 1999 knowing and expecting that they would be published by it (rather than that he wrote the articles on speculation), and that The New Republic thereby induced him to create such articles.  *See Marvel Characters*, 726 F.3d at 141 (longstanding relationship between the parties supported the conclusion that the artist "did not work on 'spec' (speculation)," thus supporting the conclusion that work was for hire as a matter of law); *Playboy Enters. v. Dumas*, 960 F. Supp. 710, 714 (S.D.N.Y. 1997) (on remand, concluded that evidence showing the artist "felt obligated to create at least one painting a month specifically for Playboy" and that the content of those paintings was motivated by Playboy's need for particular material supported the conclusion that painting were motivated by Playboy); *cf. Urbont v. Sony Music Entm't*, 831 F.3d 80, 90-91 (2d Cir. 2016) (finding issue of fact as to whether works were created

at the hiring party's instance where "there was no prior working relationship between" them). That would have been true for any film reviews written by Mr. Kauffmann for The New Republic, including those from 1999 that are at issue in this litigation.

Moreover, as stated in the letter agreement between The New Republic and Mr. Kauffmann, he wrote articles for The New Republic pursuant to a "regular monthly compensation arrangement." (Myer Decl., Exhibit A.)  Initially, when Mr. Kauffmann began as the film critic for The New Republic in 1958, he was paid a flat fee of $50 per column.  (Moore Decl., Exhibit 9.)  By at least 1998 (and likely prior), the compensation arrangement was that The New Republic paid Mr. Kauffmann $3,000 per month in exchange for his monthly contributions to the periodical.  (Myer Decl. ¶ 9.)  In March 1999, this amount increased to $3,750 monthly.  (*Id.* ¶ 10.)  Thus because Mr. Kauffmann was paid a sum certain for the works he created for The New Republic in 1999, and not royalties, the articles were made at The New Republic's expense.  *See Playboy Enters.*, 53 F.3d at 555 ("The simple fact that Playboy paid Nagel a fixed sum for each of the works published . . . is sufficient to meet the requirement that the works be made at Playboy's expense.").  These undisputed facts further demonstrate that Mr. Kauffmann wrote the articles at issue here at The New Republic's "instance and expense."

Although Plaintiff has produced a Certificate of Registration for the works at issue, wherein it claims to be the copyright owner, this certificate carries no weight in light of the clear documentary evidence showing the "work for hire" relationship between Mr. Kauffmann and The New Republic.  A certificate of registration "constitute[s] prima facie evidence of the validity of the copyright and of the facts stated in the certificate" only where it was "made before or within five years after first publication of the work."  17 USC § 410(c).  Here, the Certificate of Registration produced by Plaintiff has an effective date of March 7, 2016 (more than five

years after first publication of the work).  As a result, the certificate does not constitute prima facie evidence of the validity of the copyrights claimed or the facts stated therein.

The weight to be accorded a certificate of a registration made more than five years after first publication of the work, thereafter shall be within the discretion of the court."  *Id.*; *see also Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 154 n.5 (2d Cir. 2007) (a registration made more than five years after first publication "is not prima facie evidence of ownership," though "it may carry some evidentiary weight" within the discretion of the trial court).  However, "a certificate of registration creates no irrebuttable presumption of copyright validity," and "where other evidence in the record casts doubt on the question, validity will not be assumed."  *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 166 (2d Cir. 2003) (internal quotation marks and citation omitted).  Because the articles allegedly infringed were actually "works made for hire" and therefore Mr. Kauffmann (nor his Estate) owns the copyrights for them, Mr. Kauffmann's Estate may not pursue a claim for infringement against RIT.  *See Buday v. N.Y. Yankees P'ship*, 486 F. App'x 894, 899 (2d Cir. 2012) (citing *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 91 (2d Cir. 1988) (noting that only the legal or beneficial owner of an exclusive right may assert an infringement claim).

## CONCLUSION

For the foregoing reasons, RIT respectfully requests that summary judgment be awarded in its favor dismissing Plaintiff's complaint, and awarding any further or other relief as the Court deems just and proper.

If the Court grants RIT's request for summary judgment in its favor, RIT intends to move, pursuant to 17 U.S.C. § 505, for an award of the costs it has incurred to defend itself in

this action, including its reasonable attorneys' fees.[2]   Such an application seems appropriate in light of the apparent baseless nature of Plaintiff's assertion in this action that it owns the copyrights for the works allegedly infringed and its failure to do even minimal diligence on that issue prior to instituting this action.   *See Mahan v. ROC Nation, LLC*, 634 F. App'x 329, 331 (2d Cir. 2016) (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)) (affirming grant of attorneys' fees to prevailing defendant under 17 U.S.C. § 505 because Plaintiff's position was objectively unreasonable and in order to deter similar frivolous suits from being filed by others).

December 4, 2017                                             BOND, SCHOENECK & KING, PLLC

                                                                          /s/ Mary P. Moore_____
                                                                          Mary P. Moore, Esq.
                                                                          Jeremy P. Oczek, Esq.

                                                                          350 Linden Oaks, Third Floor
                                                                          Rochester, New York 14625
                                                                          Telephone: (585) 362-4724
                                                                          Email: mmoore@bsk.com

                                                                          200 Delaware Avenue
                                                                          Buffalo, New York 14202
                                                                          Telephone: (716) 416-7037
                                                                          Email: jpoczek@bsk.com

                                                                          *Attorneys for Defendant/Third-Party Plaintiff*
                                                                          *Rochester Institute of Technology*

To:      Ken Norwick
         Norwick & Schad
         110 East 59th Street
         New York, NY 10022
         Telephone: (212) 751-4440

         *Attorney for Plaintiff*

---

[2] While Plaintiff would not be eligible to seek its attorneys' fees if it were to prevail in this action because the works were not registered prior to the alleged infringement, *see* 17 U.S.C. § 412, a prevailing defendant may seek attorneys' fees regardless of whether the plaintiff had a timely registration.   *See*, *e.g.*, *O'Well Novelty Co. v. Offenbacher, Inc.*, 2000 U.S. App. LEXIS 18526, at *24 (4th Cir. Aug. 1, 2000)

3053919.1

**A-225**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE ESTATE OF STANLEY KAUFFMANN,

                          Plaintiff,

           v.                                          **NOTICE OF WITHDRAWAL OF
                                                       CERTAIN AFFIRMATIVE
                                                       DEFENSES**

ROCHESTER INSTITUTE OF TECHNOLOGY,

                          Defendant and
                          Third-Party Plaintiff,       Case No. 6:17-cv-06061-CJS-MWP

           v.

ROBERT J. CARDULLO,

                          Third-Party Defendant.

In the interest of efficiency and in order to limit the issues in this case going forward, Defendant and Third-Party Plaintiff Rochester Institute of Technology ("Defendant"), by and through the undersigned counsel, hereby withdraws the following affirmative defenses set forth in its Answer and Third-Party Complaint [ECF #29], with prejudice:

1.     The fourth affirmative defense for statute of limitations;

2.     The fifth affirmative defense for fair use;

3.     The sixth affirmative defense for laches;

4.     The seventh affirmative defense for estoppel; and

5.     The eighth affirmative defense for waiver.

December 13, 2017                          BOND, SCHOENECK & KING, PLLC

                                           _/s/Mary P. Moore_____
                                           Mary P. Moore, Esq.
                                           Jeremy P. Oczek, Esq.

                                           350 Linden Oaks, Third Floor
                                           Rochester, New York 14625
                                           Telephone: (585) 362-4724
                                           Email: mmoore@bsk.com

                                           200 Delaware Avenue
                                           Buffalo, New York 14202
                                           Telephone: (716) 416-7037
                                           Email: jpoczek@bsk.com

                                           *Attorneys for Defendant/Third-Party Plaintiff*
                                           *Rochester Institute of Technology*

To:    Ken Norwick
       Norwick & Schad
       110 East 59th Street
       New York, New York 10022
       Telephone: (212) 751-4440

       *Attorney for Plaintiff*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
THE ESTATE OF STANLEY KAUFFMANN,

                         Plaintiff,

            - against -                                17 Civ. 6061 (CJS)(MWP)

ROCHESTER INSTITUTE OF TECHNOLOGY,

                       Defendant and
                       Third-Party Plaintiff,

            - against -

ROBERT J. CARDULLO,

                       Third Party Defendant .
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

           PLAINTIFF'S NOTICE OF CROSS-MOTION FOR AN ORDER
       GRANTING PARTIAL SUMMARY JUDGMENT TO IT ESTABLISHING
         DEFENDANT'S LIABILITY FOR COPYRIGHT INFRINGEMENT

        Upon all of the papers heretofore submitted by defendant in support of its motion for sum-

mary judgment and upon a) this Notice of Cross-Motion; b) plaintiff's Rule 56 Statement; c) the

Declarations of Kenneth P. Norwick, Robert Marx, Henry Thayer, and Leon Wieseltier, together

with the exhibits annexed thereto; and d) plaintiff's Memorandum of Law, all submitted herewith,

plaintiff Estate of Stanley Kauffmann will cross-move this Court at a time and place to be set by

the Court for an order pursuant to Rules 56 of the FRCP and the Local Rules of this Court grant-

ing to it a) partial summary judgment establishing defendant's liability for copyright infringement

**A-228**

as alleged in plaintiff's Complaint, and b) such other relief as the Court deems just.

Plaintiff intends to file and serve reply papers.

Dated: January 12,  2018

NORWICK & SCHAD

By: s/ Kenneth P. Norwick
110 East 59th Street
New York, New York 10022
(212) 751-4440
 ken@norwickschad.com
Attorneys for Plaintiff

TO: Jeremy P. Oczek
Mary P. Moore
Bond Schoeneck & King
50 Linden Oaks, Third Floor
Rochester , NY 14625
(585) 362-4724
oczekjp@bsk.com
mmoore@bsk.com
Attorneys for Defendant

**A-229**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
THE ESTATE OF STANLEY KAUFFMANN,

                    Plaintiff,

          - against -                                    17 Civ. 6061 (CJS)(MWP)

ROCHESTER INSTITUTE OF TECHNOLOGY,

                              Defendant and
                              Third-Party Plaintiff,

          - against -

ROBERT J. CARDULLO,

                         Third Party Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PLAINTIFF'S RULE 56 STATEMENT
OF UNDISPUTED MATERIAL FACTS

          Pursuant to Rules 56 of the Federal Rules of Civil Procedure and the Local Rules of this

Court, plaintiff Estate of Stanley Kauffmann ("Estate") respectfully submits this Statement a) in

response to defendant's Rule 56 Statement in support of its motion for summary judgment and b)

in support of the Estate's cross-motion for partial summary judgment establishing defendant's

liability for copyright infringement as alleged in plaintiff's Complaint.

The Estate's Response to Defendant's Statement

          The Estate does not dispute any of the 16 statements set forth by defendant ("RIT") and

incorporates and discusses some of them in its papers on these motions.

**A-230**

<u>The Estate's Statement of Undisputed Material Facts</u>

1.  This case concerns the publication and dissemination by RIT – actually, by its "enterprise" RIT Press -- of a book entitled <u>The Millennial Critic: Stanley Kauffmann on Film 1999-2009</u> ("the Infringing Book").  The front cover of the Infringing Book contains the byline "Edited by Bert Cardullo" ("Cardullo").   (Copies of the front and back covers of the Infringing Book are annexed to the Declaration of Kenneth P. Norwick.  ("Norwick Dec.")  ¶3)

2.  The Infringing Book consists of 141 separate articles written by Mr. Kauffmann, but this action only concerns the infringement of 44 of those articles.  The Infringing Book was in no way authorized by Mr. Kauffmann or the Estate or by anyone else with authority to do so and thus constitutes infringements of the underlying copyrights therein.  The issue of who owns those rights, and who can therefor sue for those infringements, is the subject of RIT's motion, which motion claims that the copyrights are not owned by the Estate but instead by The New Republic magazine, which is not a party to this case and which has asserted no such claim.  The Estate's cross-motion seeks partial summary judgment establishing that RIT infringed the Estate's copyrights in those 44 separate articles.  (Norwick Dec., ¶3)

<u>The Parties and the Players</u>

3.  <u>Stanley Kauffmann</u> (1916-2013) was a distinguished and highly respected (by many revered) critic, author, teacher, and what is now called a "public intellectual."  During his seven-decade career he authored numerous books, hosted a public television program, and contributed countless articles and columns to numerous publications, including Harper's, Saturday Review, Commentary, Partisan Review, Yale Review, Horizon, and (most prolifically) The New Republic.  (Norwick Dec., ¶4; Declaration of Robert Marx ("Marx Dec."),  ¶5)

2

4. <u>The Estate</u> was created by Mr. Kauffmann's Will.  Its only significant assets are the copyrights in his works and his reputation and legacy.  (Norwick Dec., ¶5)

5. <u>Robert Marx</u> was for the last five decades of Mr. Kauffmann's life his close friend and confidant.  As such, he was intimately familiar with Mr. Kauffmann's oeuvre and career.  Mr. Kauffmann's Will named Mr. Marx the Executor of his Estate.  In that capacity, Mr. Marx authorized the commencement of this action.  (Norwick Dec., ¶6; Marx Dec., ¶1)

6. <u>Robert J. (Bert) Cardullo</u> was at one time a student and colleague of Mr. Kauffmann.  In 2003, Mr. Kauffmann discovered that Cardullo had forged a letter ostensibly from him addressed to the University of Michigan vouching for Cardullo in an attempt to forestall the University firing Cardullo for plagiarism.  Mr. Kauffmann advised the University that the letter was a forgery and Cardullo's employment there was then terminated.  Then, in 2007, Mr. Kauffmann learned that Hudson Review fired Cardullo as its film critic because he was caught plagiarizing Mr. Kauffmann, for which it issued a public retraction and apology.  At that point, Mr. Kauffmann severed all contact with Cardullo.   (Norwick Dec., ¶¶ 7-11; Marx Dec., ¶¶11-12)

7. Cardullo is now and has been for many years a notorious (and now self-confessed) plagiarist and liar (and worse, someone who has almost certainly committed federal felonies in perpetrating the fraud that underlies this action).  A brief review of Cardullo's notorious public reputation as a loathsome and widely shunned reprobate is set forth in the Complaint in this case, which is a part of the record on these motions, and in the Declarations of Kenneth P. Norwick and Robert Marx submitted herewith.  Cardullo's written confessions concerning the book that is the subject of this case -- "I am fully guilty of all the charges against me" -- are also part of the record on these motions.  (Norwick Dec., ¶¶7-11, 14-18)

Case 18-2404, Document 45, 10/01/2018, 2400477, Page40 of 201

8.  The New Republic was, during the period relevant to this case, a respected magazine of comment and criticism on such subjects as politics and the arts.  From 1958 until his death at 97 in 2013 -- a period of 55 years -- Mr. Kauffmann contributed a wide variety of pieces to it, including but not limited to a regular column of film criticism.  (Norwick Dec., ¶19; Marx Dec., ¶¶4, 9)

9.  Leon Wieseltier was from 1983 to 2014 the Literary Editor of The New Republic.  As such, he was Mr. Kauffmann's editor for work submitted by him to the magazine during that period.  He has executed a Declaration under penalty of perjury that is part of the record on these motions.  (Norwick Dec., ¶20; Wieseltier Dec., ¶1)

10.  RIT is an institution of higher learning based in Rochester, New York.  It maintains and operates what it calls an "enterprise" called "RIT Press" that engages in the business of publishing books.  In November 2015 it proudly published the book submitted to it by Cardullo that is the subject of this case.  Cardullo, but not yet RIT, has publicly admitted that the book was a complete fraud – and egregious copyright infringement.  (Norwick Dec., ¶8; RIT's Answer, ¶2)

11.  The Millennial Critic: Stanley Kauffmann on Film: 1999-2009 ("the Infringing Book") is the book that Cardullo submitted to RIT and that RIT proudly published.  (Norwick Dec., ¶3)

12.  Robert (Bobby) Colon was at relevant times the General Counsel of RIT.  In response to the Estate's early request for the documents RIT claimed it relied on in publishing the Infringing Book, he rejected the request, declaring that he would only provide those documents in response to a "validly issued subpoena" for them, thus forcing the Estate to bring this action. (Norwick Dec., ¶15)

4

<u>The Relevant Factual Background</u>

13.  Mr. Kauffmann submitted pieces, including but not limited to a regular column of film criticism, to The New Republic from 1958 until he died in 2013.  During that entire 55-year period, at least as the record on these motions reveals, The New Republic and Mr. Kauffmann never discussed much less reached agreement concerning the copyright ownership of those pieces.  As a result, under both the Copyright Act of 1909 (in effect through December 31, 1977) and the Copyright Act of 1976 (effective January 1, 1978) Mr. Kauffmann was and is the undisputed owner of all those copyrights.  (Norwick Dec., ¶4; Marx Dec., ¶5)

14.  Mr. Wieseltier has sworn: "I never discussed with Mr. Kauffmann (orally or in writing) the copyright ownership of his contributions to the Magazine."  (Wieseltier Dec., ¶3)

15.  Mr. Marx has sworn: "I can confirm that Stanley always understood -- and proceeded to act on that understanding -- that he owned and controlled all his writings.  Specifically, over all those decades, he repeatedly authorized numerous re-publications of much of his writings, including especially his writings for The New Republic magazine, and to my knowledge he never doubted that he had the full legal right to do so and never hesitated (or sought permission of anyone else) to grant those authorizations."  (Marx Dec., ¶3)

16.  Beginning in 1966, eight years after he began submitting pieces to The New Republic, Mr. Kauffmann regularly authorized the republication in book form of such pieces.  Among those books were:

A WORLD ON FILM,  Harper & Row, 1966.

FIGURES OF LIGHT, Harper & Row, 1971.

LIVING IMAGES, Harper & Row, 1975.

5

PERSONS OF THE DRAMA, Harper & Row, 1976.

BEFORE MY EYES: FILM CRITICISM AND COMMENT, Harper & Row, 1980.

THEATRE CRITICISMS, Performing Arts Journal Publications, 1983.

FIELD OF VIEW, Performing Arts Journal Publications, 1986.

DISTINGUISHING FEATURES, Johns Hopkins University Press, 1994.

REGARDING FILM, Johns Hopkins University Press, 2001.

(Marx Dec., ¶6)

17.  Each of those books contains a notice that the copyright owner of the contents of the

book is Stanley Kauffmann.  With one exception, none of those books contains any suggestion

that anyone else, including The New Republic, had any copyright ownership interest in any of

those contents.  The exception is that The New York Times required that the republication of

pieces that originally appeared in The Times contain notices that the copyright owner of the

pieces was The Times.   Otherwise, none of those books contains any suggestion that anyone

else, including The New Republic, had any copyright ownership interest in any of those contents.

The New Republic never imposed any such requirement or request.  (Marx Dec., ¶7)

18.  During most if not all of Mr. Kauffmann's career as a writer, he was represented by

the Brandt & Brandt (later Brandt & Hochman) literary agency.  (Declaration of Henry Thayer

("Thayer Dec.," ¶2)

19.  Henry Thayer, an agent at that agency, has sworn: "Based on my review of B&H's

files, my work with Mr. Brandt, my own interactions with Mr. Kauffmann, and my service as his

agent, I can state that B&H always understood that Mr. Kauffmann owned the copyrights in all

his contributions to The New Republic magazine ('TNR') and that it consistently acted on that

understanding.  For example, B&H handled for Mr. Kauffmann numerous book contracts and

licenses for the publication (and other use) of his TNR pieces and in all those dealings Mr.

Kauffmann was treated as the sole copyright owner of all that work.  Based on our files and my

own direct involvement, I can state that B&H never received any indication from anyone else,

including TNR,  inconsistent with that understanding or that we needed to clear any of those

dealings with anyone else, including TNR."  (Thayer Dec., ¶3)

20.  RIT has proffered as its only "evidence" in this case a 2004 form letter on the

letterhead of The New Republic that was sent and signed by Mr. Wieseltier to Mr. Kauffmann

and countersigned by him ("the 2004 Form Letter").  (Norwick Dec., ¶25)

21.  The second paragraph of the 2004 Form Letter states as follows (emphasis added):

"Thus, in the interest of responsibly managing our business, we are making efforts to memorial-

ize in writing all of our agreements with our writers, including freelance contributors.  Our agree-

ment with you has always been an oral understanding, and among other things we do want to

ensure that we are not violating your rights in any way. To that end, we'd like to confirm with

you our understanding of our past relationship with you, as well as our relationship with you and

your contributions to The New Republic going forward."  (Norwick Dec., ¶25)

22.  That paragraph uses the phrase "our agreement" twice and "our understanding" once.

The context of those uses makes clear that those phrases purport to speak only for The New

Republic and not for "our writers, including freelance contributors" who are the Form Letter's

intended recipients.  That paragraph contains not the slightest suggestion that those recipients in

any way shared or even understood whatever those phrases purport to refer to.  (Norwick Dec.,

¶25)

23.   The third paragraph of the 2004 Form Letter states as follows (emphasis added): "We have always understood that you have been writing articles for The New Republic as a freelance contributor.  We have also always understood in doing business with you that, in light of our regular monthly compensation arrangement with you, all articles you have written for The New Republic have been 'works made for hire,' as that term is defined under the US Copyright laws. We'd like to confirm with you that the above understanding of our business relationship with you is correct, but also that the above understanding will remain in effect as to any future articles you write for The New Republic, unless and until we and you both agree otherwise in writing." (Norwick Dec., ¶25)

24.   The 2004 Form Letter was presented as a routine paperwork request to confirm what it claimed was a pre-existing "understanding."  The letter does not contain even a hint that its real purpose was to usurp for The New Republic all the copyrights to Mr. Kauffmann's (then)  46-year body of contributions to the magazine.  (Norwick Dec., ¶25)

25.   The sender of the 2004 Form Letter for The New Republic, Leon Wieseltier, has stated under penalty of perjury: "with the apparent exception of that letter, I never used the phrase 'work made for hire' (or any variation of it) in any communication with Mr. Kauffmann; and in fact, the phrase 'work made for hire' (or any variation of it) is not in my vocabulary and I do not know what it means."  (Wieseltier Dec., ¶3)

26.   Mr. Marx -- Mr. Kauffmann's close confidant and friend – has similarly stated under penalty of perjury: "In all that time [four-plus decades], I can't remember [Mr. Kauffmann] ever uttering the word 'copyright,' much less the phrase 'work made for hire.'  I seriously doubt that he had any comprehension of what those terms entailed."  (Marx Dec., ¶2)

8

27.  Mr. Marx has declared under penalty of perjury that in 2004 Mr. Kauffmann was 88 years old and "trusted Mr. Wieseltier implicitly and would have signed anything he asked him to sign, even without reading or understanding it."  Further, "I am even more certain of that conclusion because -- based on my personal knowledge and direct contact with them -- in 2004 [Mr. Kauffmann's] wife Laura was entering the early stages of dementia and Stanley had no time for or interest in such (to him) unimportant matters as a letter that Mr. Wieseltier asked him to sign as a matter of routine paperwork."  (Marx Dec., ¶10)

28.  The "definition" of "work made for hire" was materially different as between the Copyright Act of 1909 (in effect though 1977) and the Copyright Act of 1976, effective January 1, 1978.  The 2004 Form Letter purports to span both statutes, but does not indicate which Act is referred to therein.  (Norwick Dec., ¶36)

29.  The 1909 Act contained no definition of "work made for hire."  The current Act's "definition" of that term is set forth at the very end of Section 101 of Title 17 of the United States Code.  That definition includes the phrase "specially ordered or commissioned for use as a contribution to a collective work . . ."  The term "collective work" has its own separate definition, and the phrase "specially ordered or commissioned" is not defined in the Act.  The definition of "work made for hire" in Section 101 of Title 17 does not provide any indication of the significance – the consequences – of a work meeting that definition, and neither does the 2004 Form Letter.  (Norwick Dec., ¶36)

30.  Mr. Kauffmann began submitting pieces to The New Republic in 1958, at which time the effective U.S. Copyright Act contained no definition of "work made for hire."  It remains for RIT to explain whether and why the Court should rule that the 2004 Form Letter applies to works

9

**A-238**

contributed while that Act governed, through December 31, 1977.  (Norwick Dec., ¶36)

31.  In addition to his regular column of film criticism in The New Republic, Mr. Kauffmann also frequently submitted to it miscellaneous other pieces -- essentially one-offs -- that he originated himself without the impetus or expectation of The New Republic.  .He also at various times submitted to it theater and book criticism.  (Marx Dec., ¶¶ 5, 9)

32.  Prior to the 2004 Form Letter, Mr. Kauffmann was indisputably the sole owner of all copyrights in his pieces in The New Republic.  (17 U.S.C. §201)

33.  Prior to the 2004 Form Letter, Mr. Kauffmann executed numerous agreements authorizing others to publish or otherwise use pieces he wrote for The New Republic.  The 2004 Form Letter does not state whether all those authorizations were retroactively rendered invalid and infringing of copyrights retroactively ostensibly claimed by The New Republic.  (Marx Dec., ¶¶ 3, 6)

34.  Fewer than three years after The New Republic's claimed corporate epiphany reflected in the 2004 Form Letter, The New Republic completely abandoned its claimed 2004 "understanding" that "all articles . . . written for The New Republic [are] 'works made for hire,' as that term is defined under the US Copyright laws."  Instead, The New Republic acknowledged that its contributors in fact owned the copyrights in their contributions and that those writers were only granting to the magazine specific limited rights to those contributions.  (Norwick Dec., ¶39)

35.  RIT has proffered evidence that The New Republic regularly – almost entirely while the Copyright Act of 1909, which was in effect through December 31, 1977, was the applicable law – transferred to Mr. Kauffmann the copyrights to his contributions that it obtained when it copyrighted the entire relevant issue of the magazine.  (Norwick Dec., ¶40)

10

**A-239**

36.  The New Republic's regular and routine -- on its own initiative -- practice of trans-ferring to Mr. Kauffmann the copyrights in his contributions flows from the "indivisibility" of copyright under the 1909 Copyright Act.  As explained by the Second Circuit in 2001, referring to its 1970 holding in <u>Goodis v. United Artists Television</u>, 425 F.2d 397, 400 (2d Cir. 1970): "In <u>Goodis</u>, we examined whether, under the prior Copyright Act of 1909, notice of copyright by a magazine was sufficient to obtain a valid copyright on behalf of the author of an individual work contained in the magazine, and concluded that it was. . . .  Unlike the current Copyright Act, the prior Act mandated indivisibility of copyright which meant that if the author did not obtain a copyright in his work, publication would put the work into the public domain.  We said in <u>Goodis</u> that we were 'loath to bring about the unnecessarily harsh result of thrusting the author's product into the public domain,' . . . when it was clear from the magazine's copyright notice that the author did not intend such a result."  <u>Morris v. Business Concepts, Inc.</u>, 259 F.3d 65, 72-73 (2d Cir. 2001), amended in unrelated ways, 283 F.2d 502 (2d Cir. 2002).  As approved by <u>Good-is</u> and as reiterated by <u>Morris</u>, The New Republic's practice of obtaining in its own name and then routinely transferring to its contributors the copyrights in their contributions served both to preserve for the contributors and to then transfer to them those copyrights.  That practice re-flected and was motivated by the magazine's recognition of and respect for the fact that those contributors were the rightful owners of those copyrights.  (Norwick Dec., ¶41)

37.  On April 2, 1993, an employee of The New Republic wrote a letter to Mr. Kauff-mann that stated as follows: "This is to confirm our telephone call this morning. You may, of course, reprint any or all the film reviews you have done for TNR in your forthcoming anthology. We'd simply request that there be some indication that the essays first appeared in our pages."

11

(Norwick Dec., ¶42)

38.   That letter was written almost three decades after Mr. Kauffmann first and repeatedly thereafter authorized, in his own name and as the sole copyright owner, republication of his contributions to The New Republic, without any indication in the record that he sought the permission of anyone else in so doing. That letter makes no mention of "copyright" and contains no suggestion that Mr. Kauffmann did not own the copyrights in his contributions to the magazine or that he should reference anyone but himself as the true owner of those copyrights.   (Norwick Dec., ¶43)

39.   That 1993 letter contains no indication of the underlying request apparently made by Mr. Kauffmann.   (Norwick Dec., ¶42)

40.   The only input from The New Republic on these motions is a Declaration of David Myer, an officer of the company.   That Declaration conspicuously a) makes no mention of and certainly does not endorse or ratify the 2004 Form Letter; b) makes no mention of and certainly does not disown the 2007 effective repudiation of the 2004 Form Letter; c) does not contain the word "copyright"; d) does not contain the phrase "work made for hire"; and e) does not mention, much less claim, any "understanding" or "agreement" between The New Republic and Mr. Kauffmann on any issue, including the copyright ownership of his (then) 46-year body of work in the magazine.   (Norwick Dec., ¶46)

41.   Notwithstanding having the obvious opportunity to do so, The New Republic in late 2017 did not stand behind or urge on this Court the 2004 Form Letter.   As a result, neither party

**A-241**

to that ostensible "agreement" endorses or claims it should be given any legal respect or viability.

(Norwick Dec., ¶46)

Dated: January 12, 2018

Respectfully submitted,

By: s/ Kenneth P. Norwick

Kenneth P. Norwick

NORWICK & SCHAD

110 East 59th Street

New York, NY  10022

Telephone: (212) 751-4440

Facsimile: (212) 604-9997

E-Mail: ken@norwickschad.com

*Attorney for Plaintiff Estate of Stanley Kauffmann*

**A-242**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
THE ESTATE OF STANLEY KAUFFMANN,

                                    Plaintiff,

            - against -                                   17 Civ. 6061 (CJS)(MWP)

ROCHESTER INSTITUTE OF TECHNOLOGY,

                                    Defendant and
                                    Third-Party Plaintiff,

            - against -

ROBERT J. CARDULLO,

                                    Third Party Defendant .
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>DECLARATION OF KENNETH P. NORWICK</u>

    1.  I am a member of the bar of the State of New York and of this Court and I represent

plaintiff Estate of Stanley Kauffmann ("Estate") in this action for copyright infringement.

    2.  I submit this Declaration under penalty of perjury in opposition to the motion of

defendant Rochester Institute of Technology ("RIT") for summary judgment and in support of

the Estate's cross-motion for partial summary judgment establishing RIT's liability for copyright

infringement as alleged in plaintiff's Complaint.   More specifically, I submit this Declaration to

place on the record of these motions information and materials  relevant to the Court's adjudi-

cation of them.  (The factual assertions that follow are derived from plaintiff's Rule 56 State-

ment, which contains references to the relevant parts of the record on these motions.)

The Alleged Infringements

3.   This case concerns the publication and dissemination by RIT – actually, by its "enter-prise" RIT Press -- of a book entitled The Millennial Critic: Stanley Kauffmann on Film 1999-2009 ("the Infringing Book").  The front cover of the Infringing Book contains the byline "Edited by Bert Cardullo" ("Cardullo").   (Copies of the front and back covers of the Infringing Book are annexed hereto as Exhibit "A.")  The Infringing Book consists of 141 separate articles written by Mr. Kauffmann, but this action only concerns the infringement of 44 of those articles.   It is un-disputed that the Infringing Book was in no way authorized by Mr. Kauffmann or the Estate or by anyone else with authority to do so, and thus constitutes infringements of the underlying copy-rights therein.  The issue of who owns those rights, and who can therefor sue for those infringe-ments, is the subject of RIT's motion, which motion claims that the copyrights are not owned by the Estate but instead by The New Republic magazine, which is not a party to this case and which has asserted no such claim.  The Estate's cross-motion seeks partial summary judgment establishing that RIT infringed the Estate's copyrights in those 44 separate articles.

Stanley Kauffmann and the Estate

4.   Stanley Kauffmann (1916-2013) was a distinguished and highly respected (by many revered) critic, author, teacher, and what is now called a "public intellectual."  During his seven-decade career he authored numerous books, hosted a public television program, and contributed countless articles and columns to many publications, including Harper's, Saturday Review, Com-mentary, Partisan Review, Yale Review, Horizon, and (most prolifically) The New Republic.  At one point he also served as the chief theater critic of The New York Times.  Annexed hereto as Exhibits "B" and "C" are copies of, respectively, The New Republic's eight-page tribute to him

2

**A-244**

and The New York Times' obituary of him.

5.  The Estate was created by Mr. Kauffmann's Will.  Its only significant assets are the copyrights in his works and his reputation and legacy.

6.  Robert Marx was for the last five decades of Mr. Kauffmann's life his close friend and confidant.  As such, he was intimately familiar with Mr. Kauffmann's oeuvre and career.  Mr. Kauffmann's Will named Mr. Marx the Executor of his Estate.  In that capacity, Mr. Marx authorized the commencement of this action.  A separate Declaration from Mr. Marx is submitted herewith.

<u>Robert J. (Bert) Cardullo</u>

7.  The Marx Declaration discusses the evolution of Mr. Kauffmann's relationship with Cardullo, including an instance in 2003 when Mr. Kauffmann learned that Cardullo forged an important letter ostensibly "from" Mr. Kauffmann and an instance in 2007 in which Cardullo was found to have egregiously plagiarized from Mr. Kauffmann, resulting in Cardullo being fired from that publication and a public retraction and apology to Mr. Kauffmann.

8.  The Estate's 52-page Complaint in this action -- already made part of the record on its motion by RIT -- contains a far-from-exhaustive presentation of examples of Cardullo's notorious history and reputation of plagiarism and other perfidy.  To be sure that presentation is made part of the factual record on the Estate's cross-motion, but to avoid unnecessary duplication, I hereby incorporate as if set forth in full here -- as factual assertions -- all of the factual allegations of the Complaint.   (Incorporated Exhibit "D.")

9.  I will not repeat here all of the examples in the Complaint of Cardullo's reputation as a plagiarist and worse.  But I will here mention two: In the course of perpetrating the "deception"

3

(Cardullo's word) that underlies this action, Cardullo a) forged a letter on the letterhead of a prominent national law firm, and b) forged an email ostensibly from Mr. Kauffmann to him authorizing his infringements, which forgeries were then sent through the mails to RIT, thus constituting (I believe) federal felonies. (Copies of those forged documents are annexed hereto as Exhibits "E" and "F.") Otherwise, I will here respectfully refer the Court to the entire Complaint for a fuller presentation of Cardullo's perfidy and well-earned reputation therefor.

10. Not in the Complaint, and as will be discussed more fully below, is this: In the course of this litigation Cardullo sent letters to me and to RIT's counsel Jeremy Oczek fully confessing his "deception" in inducing RIT's publication of the Infringing Book -- while conspicuously confirming RIT's own failures and derelictions in that connection -- conclusively establishing that the book was published by RIT without any legal right to do so, which means it indisputably infringed the copyrights therein. (Copies of those letters are annexed hereto as Exhibits "G" and "H.")

11. For present purposes, I will just summarize here that Cardullo is now and has been for many years a notorious (and now self-confessed) plagiarist and liar -- and worse, a repeat (albeit not yet convicted) federal felon. Apparently without making any effort to confirm its legitimacy, RIT proudly published his Infringing Book.

The Infringing Book

12. As set forth at Paragraphs 6 and 7 of the Complaint, in late 2015 RIT published the Infringing Book. (Annexed to the Complaint as Exhibit "B" is a copy of the press release issued by RIT in connection with its publication of the Infringing Book). The Table of Contents of the Infringing Book lists 141 separate works that it acknowledged were the copyright property

of Stanley Kauffmann (and now his Estate), and each of those works was included in the In-fringing Book as published by RIT.  (A copy of that Table of Contents, along with other "front matter," are annexed in full as Exhibit "C" to the Complaint.)  As of the date of the Complaint, only 44 of those works were duly registered with the United States Copyright Office, a prerequisite to suing for infringement.  Thus, at present, this action is limited to those 44 separate infringements.

.      13.  As set forth at Paragraph 11 of the Complaint, when the Estate first advised RIT that the Infringing Book was unauthorized and violated the rights of the Estate, RIT justified its publication of the book in part as follows:

> I can confirm that Mr. Cardullo did provide the RIT Press with a letter from ShiffHardin LLP [sic] which confirmed that Stanley Kauffmann's will did in fact assert that Mr. Cardullo, and only Mr. Cardullo, may anthologize any and all reviews by Mr.  Kauffmann, from the New Republic or any other journal, that are previously uncollected or un-anthologized in book form, however this letter is not information that the RIT Press would release to anyone absent a validly issued subpoena.

(A copy of that email is annexed to the Complaint as Exhibit "K.")

14.  As stated at Paragraph 12 of the Complaint, although RIT originally refused to provide a copy of that letter to the Estate without a "validly issued subpoena" for it, a copy of it was subsequently obtained by the Estate.  (A copy of that forged "letter" is annexed hereto as Exhibit "F.")  That letter is a crude and obvious forgery, and on information and belief RIT made no attempt to confirm its authenticity until after the Estate challenged the Infringing Book.

15.  As stated at Paragraph 18 of the Complaint, prior to commencing this action, the Estate sought to explore with RIT a pre-litigation resolution of this matter, and it asked RIT to provide to it any documents that were submitted to it by Cardullo.  However, RIT, through its

General Counsel, Robert A. Colon, flatly refused both of those requests, thus in effect daring and

forcing the Estate to bring this action.  (Copies of the relevant correspondence are annexed hereto

as Exhibit "G.")  However, several months later RIT's outside counsel apparently overruled Mr.

Colon's refusal and provided some, but not all, of the underlying documents requested by the

Estate.

16.   Further confirming Cardullo's loathsome character (and utter disdain for Mr. Kauff-

mann's work and legacy) is an email dated December 3, 2015 from Cardullo to the Estate's lit-

erary agent, Henry Thayer, in which Cardullo responded to Thayer's advising RIT that the book

was a wholly unauthorized infringement.  Cardullo wrote, in part:

> Unless you desist and give RIT Press authority to continue publishing *The Millen-
> nial Critic*--*and ,* by the way, let us see, in writing, *your* authority to act in Stanley
> Kauffmann's place--1 shall upload the attached pdf of the book to the Internet for
> anyone to read at his or her leisure, free of charge.
>
> You have until Friday, Dec. 4, 2015, by 5 PM EST to decide.  If, at that point, the
> book is not once again advertised on the RIT Press website, I shall promptly up-
> load it to multiple Internet sites. And there will be nothing you or anyone else can
> do about it.  (Agents like you, I trust you realize, are fast becoming dinosaurs in
> the Age of the Internet.)

(A copy of that email is annexed hereto as Exhibit "H.")

17.   Cardullo's email to me (Exhibit "I"  hereto) is dated March 4, 2017 and confessed as

follows:

> As I live in Finland and my resources are limited, I cannot appear in court in the
> state of New York. There is no real defense that I can make for my deception,
> except that I have not monetarily profited off my carefully edited editions of
> Stanley Kauffmann's work, and  believe that I have served his critical legacy well.
> RIT Press is also to blame, but they, or their university, have a lot more money
> than I do. So, if it's money you're after (and I suspect that this is the case), I"m
> not your man. If you simply want to defame and delimit me, you have succeeded.

I knew Kauffmann well and studied with him; if he were here, I think he would be proud of what I have done. My editions of his work speak for themselves, but, unfortunately, I don't think they will be allowed to speak at trial.

Please share this message with the court, as I could not find an email address on their website.

18.  Cardullo's email to RIT attorney Oczek (annexed hereto as Exhibit "J")

confessed as follows:

As you know I am living in retirement in Finland I cannot afford to travel to the U.S. for any jury trial.

So let me declare that I am fully guilty of all the charges against me and that RIT Press was duped by me in this affair. That said, I have made no money, nor do I wish to make any money, off the Kauffmann book. I did what I did as a service to Stanley's legacy; it seems now that others are trying merely to profit from that legacy.

I am guessing that a judgment will be found against me, since I cannot respond in any other way than this one. If so, all that I can tell you is that my resources are extremely limited and I hope that the court takes this into account.

I make all of these statements not to exonerate myself but to absolve RIT Press of most its responsibility in this matter. Yes, the Press could have checked on me and determined that I was a bad "investment," but I initiated the deception and must take responsibility for that.

Mr. Kauffmann's Copyrights

19.  The New Republic was, during the period relevant to this case, a respected

magazine of comment and criticism on such subjects as politics and the arts.  From 1958

until his death at 97 in 2013 -- a period of 55 years -- Mr. Kauffmann contributed a wide

variety of pieces to it, including but not limited to a regular column of film criticism.

20.  Leon Wieseltier was from 1983 to 2014 the Literary Editor of The New Repub-

lic.  As such, he was Mr. Kauffmann's editor for work submitted by him to the magazine

during that period.  He has executed a Declaration under penalty of perjury that is part of the record on these motions.

21.  During that entire 55-year period, at least as the record on these motions reveals, The New Republic and Mr. Kauffmann never discussed, either orally or in writing, much less reached agreement concerning, the copyright ownership of those pieces.

22.  Further, during that entire 55-year period The New Republic never once communicated to Mr. Kauffmann -- not orally, or in writing, or otherwise -- that it owned any copyrights in the pieces he submitted to it.

23.  Further, during that entire 55-year period, The New Republic never once objected to the countless times Mr. Kauffmann authorized the republication by others of any of those pieces in his own name and as the sole copyright owner thereof.

24.  Mr. Wieseltier has executed a Declaration that states in full as follows:

> 1. From 1983 to 2014, I was Literary Editor of The New Republic, and during that period I was Stanley Kauffmann's editor and principal contact with the Magazine.

> 2. I have been shown a 2004 letter from me to Mr. Kauffmann. Although I have no specific memory of that letter or of drafting or signing or sending it, I do recall that I was asked by my superiors at the Magazine to send such letters and that I did so as requested as a matter of course.

> 3. With respect to that letter, and more generally, a) I never discussed with Mr. Kauffmann (orally or in writing) the copyright ownership of his contributions to the Magazine; b) with the apparent exception of that letter, I never used the phrase "work made for hire" (or any variation of it) in any communication with Mr. Kauffmann; and c) in fact, the phrase "work made for hire" (or any variation of it) is not in my vocabulary and I do not know what it means.

25.  The 2004 letter referred to by Mr. Wieseltier (annexed hereto as Exhibit

"K")  was a form letter that stated in full as follows:

Dear Stanley,

Like many publishing companies, The New Republic is working to expand
into the web and related technologies, and in so doing, afford you maximum
exposure. We've had a wonderful relationship with you over the years and see
this expansion as a great opportunity to further promote you and your talents
for our mutual benefit. Recent Supreme Court decisions have made it neces-
sary that we explicitly confirm the terms under which you write for The New
Republic.

Thus, in the interest of responsibly managing our business, we are making
efforts to memorialize in writing all of our agreements with our writers, in-
cluding freelance contributors. Our agreement with you bas always been an
oral understanding, and among other things we do want to ensure that we are
not violating your rights in any way. To that end, we'd like to confirm with you
our understanding of our past relationship with you, as well as our relationship
with you and your contributions to The New Republic going forward.

We have always understood that you have been writing articles for The New
Republic as a freelance contributor. We have also always undcrs1ood in doing
business with you that, in light of our regular monthly compensation arrange-
ment with you, all articles you have written for The New Republic have been
"works made for hire, as that term is defined under the US Copyright laws.
We'd like to confirm with you that the above understanding of our business
relationship with you is correct, but also that the above understanding will
remain in effect as to any future articles you write for The New Republic,
unless and until we and you both agree otherwise in writing.

Please acknowledge your agreement with us about this by so indicating with
your signature below.

Many thanks.

26.  In his Declaration, Mr. Marx has sworn: "I can confirm that Stanley always

understood -- and proceeded to act on that understanding -- that he owned and controlled all

his writings.  Specifically, over all those decades, he repeatedly authorized numerous re-

publications of much of his writings, including especially his writings for The New Repub-lic magazine, and to my knowledge he never doubted that he had the full legal right to do so and never hesitated (or sought permission of anyone else) to grant those authorizations."

27.  Beginning in 1966, eight years after he began submitting pieces to The New Republic and 38 years before the 2004 Form Letter, Mr. Kauffmann regularly authorized the republication in book form of such pieces.  Among those books were:

A WORLD ON FILM,  Harper & Row, 1966.

FIGURES OF LIGHT, Harper & Row, 1971.

LIVING IMAGES, Harper & Row, 1975.

PERSONS OF THE DRAMA, Harper & Row, 1976.

BEFORE MY EYES: FILM CRITICISM AND COMMENT, Harper & Row, 1980.

THEATRE CRITICISMS, Performing Arts Journal Publications, 1983.

FIELD OF VIEW, Performing Arts Journal Publications, 1986.

DISTINGUISHING FEATURES, Johns Hopkins University Press, 1994.

REGARDING FILM, Johns Hopkins University Press, 2001.

28.  Each of those books contains a notice that the copyright owner of the contents of the book is Stanley Kauffmann.  None of those books contains any suggestion that anyone else, including The New Republic, had any copyright ownership interest in any of those contents.

29.  During most if not all of Mr. Kauffmann's career as a writer, he was represented by the Brandt & Brandt (later Brandt & Hochman) literary agency.

10

30.  Henry Thayer, an agent at that agency, has submitted a Declaration on these motions.  In that Declaration, he stated:  "Based on my review of B&H's files, my work with Mr. Brandt, my own interactions with Mr. Kauffmann, and my service as his agent, I can state that B&H always understood that Mr. Kauffmann owned the copyrights in all his contributions to The New Republic magazine ('TNR') and that it consistently acted on that understanding.  For example, B&H handled for Mr. Kauffmann numerous book contracts and licenses for the publication (and other use) of his TNR pieces and in all those dealings Mr. Kauffmann was treated as the sole copyright owner of all that work.  Based on our files and my own direct involvement, I can state that B&H never received any indication from anyone else, including TNR,  inconsistent with that understanding or that we needed to clear any of those dealings with anyone else, including TNR."

31.  As stated in Mr. Marx's Declaration, at the time of the 2004 Form Letter Mr. Kauffmann trusted Mr. Wieseltier implicitly and he treated the letter as a routine paperwork request to confirm what it claimed was a pre-existing "understanding."

32.  The 2004 Form Letter does not contain even a hint that its real purpose was to enable The New Republic to usurp for itself all the copyrights to Mr. Kauffmann's (then) 46-year body of contributions to the magazine.

33.  With respect to the "work made for hire" sentence in the 2004 Form Letter, Mr. Wieseltier has stated under penalty of perjury: "with the apparent exception of that letter, I never used the phrase 'work made for hire' (or any variation of it) in any communication with Mr. Kauffmann; and in fact, the phrase 'work made for hire' (or any variation of it) is not in my vocabulary and I do not know what it means."

11

34.  With respect to the "work made for hire" sentence in the 2004 Form Letter,  Mr. Marx has stated under penalty of perjury: "In all that time [four-plus decades], I can't remember [Mr. Kauffmann] ever uttering the word 'copyright,' much less the phrase 'work made for hire.'  I seriously doubt that he had any comprehension of what those terms entailed."

35.  Mr. Marx has declared under penalty of perjury that in 2004 Mr. Kauffmann was 88 years old and "trusted Mr. Wieseltier implicitly and would have signed anything he asked him to sign, even without reading or understanding it."  Further, "I am even more certain of that conclusion because -- based on my personal knowledge and direct contact with them -- in 2004 Stanley's wife Laura was entering the early stages of dementia and Stanley had no time for or interest in such (to him) unimportant matters as a letter that Mr. Wieseltier asked him to sign as a matter of routine paperwork."

36.  As some copyright lawyers know, but probably few other lawyers and most non-lawyers don't, the "definition" of "work made for hire" was materially different as between the Copyright Act of 1909 (in effect though 1977) and the Copyright Act of 1976, effective January 1, 1978.  The 2004 Form Letter purports to span both statutes, but does not indicate which is referred to therein.  The 1909 Act contained no definition of "work made for hire."  The current Act's "definition" of that term is set forth at the very end of Section 101 of Title 17 of the United States Code.  That definition includes the phrase "specially ordered or commissioned for use as a contribution to a collective work . . ."  The term "collective work" has its own separate definition, and the phrase "specially ordered or commissioned" is not defined in the Act.  The definition of "work made for hire" in Section 101 of Title 17 does

not provide any indication of the significance – the consequences – of a work meeting that definition, and neither does the 2004 Form Letter.

37.  In addition to his regular column of film criticism in The New Republic, Mr. Kauffmann also frequently submitted to it miscellaneous other pieces -- essentially one-offs -- that he originated himself without the impetus or expectation of The New Republic.  He also at various times submitted to it theater and book criticism.

38.  Prior to the 2004 Form Letter, Mr. Kauffmann executed numerous agreements authorizing others to publish or otherwise use pieces he wrote for The New Republic.

39.  Fewer than three years after The New Republic's corporate epiphany reflected in the 2004 Form Letter, The New Republic completely abandoned its claimed 2004 "understanding" that "all articles . . . written for The New Republic [are] 'works made for hire,' as that term is defined under the US Copyright laws."  Instead, The New Republic acknowledged that its contributors in fact owned the copyrights in their contributions and that those writers were only granting to the magazine specific limited rights to those contributions.  (A copy of the relevant new document is annexed hereto as Exhibit "L.")

40.  RIT has proffered evidence that The New Republic regularly – almost entirely while the Copyright Act of 1909, which was in effect through December 31, 1977, was the applicable law – transferred to Mr. Kauffmann the copyrights to his contributions that it obtained when it copyrighted the entire relevant issue of the magazine.

41. The New Republic's regular and routine -- on its own initiative -- practice of transferring to Mr. Kauffmann the copyrights in his contributions flows from the "indivisibility" of copyright under the 1909 Copyright Act.  As explained by the Second Circuit in

2001, referring to its 1970 holding in <u>Goodis v. United Artists Television</u>, 425 F.2d 397, 400

(2d Cir. 1970): "In <u>Goodis</u>, we examined whether, under the prior Copyright Act of 1909,

notice of copyright by a magazine was sufficient to obtain a valid copyright on behalf of the

author of an individual work contained in the magazine, and concluded that it was. . . .  Un-

like the current Copyright Act, the prior Act mandated indivisibility of copyright which

meant that if the author did not obtain a copyright in his work, publication would put the

work into the public domain.  We said in <u>Goodis</u> that we were 'loath to bring about the un-

necessarily harsh result of thrusting the author's product into the public domain,' . . . when it

was clear from the magazine's copyright notice that the author did not intend such a result."

<u>Morris v. Business Concepts, Inc.</u>, 259 F.3d 65, 72-73 (2d Cir. 2001), amended in unrelated

ways, 283 F.2d 502 (2d Cir. 2002).  As approved by <u>Goodis</u>, and reiterated by <u>Morris</u>, The

New Republic's practice of obtaining in its own name and then routinely transferring to its

contributors the copyrights in their contributions served both to preserve for the contributors

and to then transfer to them those copyrights and obviously reflected and was motivated by

its recognition of and respect for the fact that those contributors were the rightful owners of

those copyrights .

42.  On April 2, 1993, an employee of The New Republic wrote a letter to Mr. Kauff-

mann that stated as follows: "This is to confirm our telephone call this morning. You may, of

course, reprint any or all the film reviews you have done for TNR in your forthcoming anth-

ology. We'd simply request that there be some indication that the essays first appeared in our

pages."  There is nothing in the record of these motions to suggest the nature and substance

of the request Mr. Kauffmann's had apparently made.  (A possible version of that request is set forth in the Memorandum of Law submitted herewith.)

43.  That letter was written almost three decades after Mr. Kauffmann first and then repeatedly thereafter authorized, in his own name and as the sole copyright owner, republication of his contributions to The New Republic, without any indication that he sought the permission of anyone else in so doing.  That letter makes no mention of "copyright" and contains no suggestion that Mr. Kauffmann did not own the copyrights in his contributions to the magazine or that he should reference anyone but himself as the true owner of those copyrights.

44.  When Mr. Kauffmann authorized the republication of pieces he submitted to The New York Times, the paper required that such republication acknowledge that The Times was the owner of the copyrights in those pieces.

45.  The New Republic never imposed any such requirement and never objected when Mr. Kauffmann authorized republication of his pieces for it in his own name and as the sole copyright owner thereof.

46.  The only input from The New Republic on these motions is a  Declaration of David Myer, an officer of the company. That Declaration conspicuously a) makes no mention of and certainly does not endorse or ratify the 2004 Form Letter; b) makes no mention of and certainly does not disown the 2007 effective repudiation of the 2004 Form Letter; c) does not contain the word "copyright"; d) does not contain the phrase "work made for hire"; and e) does not mention, much less claim, any "understanding" or "agreement" between The New Republic and Mr. Kauffmann on any issue, including the copyright ownership of his

55-year body of work in the magazine.  As a result, there is nothing in the record of these

motions whereby The New Republic claims to be the owner of the copyrights that are the

subject of this action.

Dated: January 12, 2018

                                                __s/  Kenneth P. Norwick_____

# EXHIBIT "A"



# THE MILLENNIAL CRITIC

*Stanley Kauffmann on Film*

*1999–2009*

*Edited by* **Bert Cardullo**

# THE MILLENNIAL CRITIC

## *Stanley Kauffmann on Film*
## *1999–2009*

*The Millennial Critic: Stanley Kauffmann on Film, 1999-2009* is the first posthumous collection of film criticism by the late Stanley Kauffmann (1916–2013). Kauffmann's professional life spanned seven decades as a film and drama critic for *The New Republic*, *The New York Times*, and *Saturday Review*. With precision, wit, and wisdom, Kauffmann's work joins that of influential critics such as Andrew Sarris, Pauline Kael, and John Simon within the New York school of twentieth-century American criticism.

## ABOUT THE EDITOR

Bert Cardullo, the editor of *The Millennial Critic*, was the regular film critic for *The Hudson Review*. A graduate of Yale University, where he studied with Stanley Kauffmann, Cardullo has authored or edited a number of books, including: *Bazin on the Global Cinema* (2014), *Soundings on Cinema: Speaking to Film and Film Artists* (2008), and *In Search of Cinema: Writings on International Film Art* (2004).

ISBN 978-939125-26-2



9 781939 125262 >

 RIT PRESS
ROCHESTER, NEW YORK

A-261

# EXHIBIT "B"

Case 18-2404, Document 45, 10/01/2018, 2400477, Page70 of 201

Farewell to our Film Critic of 55 Years, Stanley Kauffmann

IN COMBAT WITH RICHARD DAWKINS     WHEN A MURDERER WANTS A SEX CHANGE

NOVEMBER 11, 2013

# THE CRISIS WILL END IN

2014 2015 2016
2017 2018 2019
2020 202
2022 2023 202
2025 2026 2

WHY WE'RE STUCK
WITH DYSFUNCTION.
BY JOHN B. JUDIS

# THE NEW REPUBLIC ● NOVEMBER 11, 2013



**The only gratifying revenge we can have on the powerful, not only for their actions but for *being* powerful, is through satire.** 33

FROM THE STACKS
"Almost Thirty"
BY JOHN KULB

Yes, Terry McAuliffe is about to run a major state.
BY NOREEN MALONE

The Ted Cruz of Israel.

Who should decide which leaks are kosher?

PHENOMENOLOGY
Big Mother is watching you.
BY JUDITH SHULEVITZ



CYCLORAMA The Amazon guide to tax-dodging.
BY WILLY STALEY

## FEATURES



**THE DARK AGE**
Why we're stuck with dysfunction.
BY JOHN B. JUDIS

**THE ARCHBISHOP OF ATHEISM**
Richard Dawkins, the world's most famous unbeliever, keeps making enemies.
BY ISAAC CHOTINER

**SHOULD WE PAY FOR A MURDERER'S SEX CHANGE?**
That depends on what you think we owe society's worst.
BY NATHANIEL PENN

BOOKS PRESUMPTIONS
Where does moral authority come from?
BY THOMAS NAGEL

BOOKS THE PARADOX OF SECRECY
For and against transparency.
BY ERIC A. POSNER

MUSIC THE DANDY AND THE BOXER
Gay life at the opera.
BY PHILIP KENNICOTT

FILM THE ART OF SCANDAL
Bergman, Rossellini, and three small masterpieces.
BY DAVID THOMSON

POETRY
Anatomy and Making
BY JANE HIRSHFIELD
1 Corinthians 13:11
BY JERICHO BROWN
Aubade
BY RACHEL HADAS

FILM STANLEY KAUFFMANN ON FILMS: TO LIVE
Our beloved film critic's last review.

FILM HALF A CENTURY AT THE MOVIES
From the writings of Stanley Kauffmann.

BOOKS THE NOTHING THAT IS
The least known masterpiece of European literature.
BY ADAM KIRSCH



**"Roberto was a womanizer, Ingrid slept around as if it were a religious calling. It was inevitable that they would become an item."**

Stanley BY LEON WIESELTIER

Watching the Parade March By  BY GEOFF DYER

# Stanley Kauffmann
# On Films: To Live

**Our beloved film critic's last review.**

By Stanley Kauffmann

N

NICKY'S FAMILY IS A CZECH TRIBUTE (stirringly deserved) to Nicholas Winton, the Englishman who organized the rescue of mostly Jewish Czech children from Prague when the Nazis invaded. His organization has been active ever since in similar work. Welcome as this picture is, the tribute is only part of its achievement. It has created a cinematic marvel: a reproduction of Prague in 1939.

Most of us have seen plenty of film of Nazi devastation, but this film's director, Matej Mináč, apparently felt that the available footage is not good enough, and so he and his Czech editors proceeded to recreate that crisis. They used original material as they could and supplemented as they needed to. (For instance, the young Winton, played by an actor, visits Prague and gets involved. Eventually he rescued more than six hundred children.) By weaving originals and additions, the film creates the feeling of life in a territory where the Germans could pick up a section of the earth as if it were a blanket and toss it into disorder in the name of their order. Soldiers knock at apartment doors; children, accompanied or not, huddle on stairs and in groups; lines are formed, offices are visited, files and registers are paramount,

there is a hell of rubber stamps. And of camps and buses.

In addition to the force and the officialdom, dizzying and stark, there are particularly sharp stabs of feeling. A three-year-old tags after his family's cart. A mother at a Nazi-controlled train station puts her boy on a crowded train to escape, but as the train slowly moves out, she despairingly pulls him off the train, and then with different despair puts him back on the train again—in escape. Through all this, like huge convulsions, a series of faces appears, all white-haired people, all rescued children who survived in various countries and differently made their ways. This set of interviews, set against the harried city, is just overwhelming.

The central cinematic marvel completed, the film returns to its tribute to Nicholas Winton today at his English headquarters, together with rescued children and their children from various countries. Winton is now 104, and as active as can be while his staff continues work in harried places. Britain has knighted him, many call for a Nobel Peace Prize for him. Meanwhile here is this outstanding film, with a filmic jewel center, rightly to celebrate him.

NUDITY—THE NUDITY OF A MODEL IN AN artist's studio—has often been a film subject, and here it is again in a French-language work unblushingly called The Artist and the Model. The screenplay was co-written by the director Fernando Trueba, who has style and taste, and Jean-Claude Carrière, one of the most highly regarded of French screenwriters. The setting is southern France in 1943, near the Spanish border, with World War II still raging.

The specific place is the home and studio

and grounds of a famous (fictitious) old sculptor named Marc Cros. He is played by the invaluable Jean Rochefort, who has been enhancing French films for decades. Seeing Rochefort again reminds us that some film worlds treasure their veterans.

We first see Cros as he comes strolling in his grounds with a stick, picking up twisted twigs and things, not cleaning, just signaling that he is not presently engaged in much. Then we see his wife (played by the former luminary Claudia Cardinale) and maid in the nearby town. They discover a girl sleeping in a doorway, take her home and feed her, and learn that she is a fugitive from a refugee camp. The wife, who is a former model herself, sees at a glance that this girl, Mercè, has the sort of skin that her husband likes in models. One glance at Mercè by Cros confirms this.

In the studio, quickly convinced by Cros that she is not being inveigled, Mercè strips, and we enter this special world of nudity. It isn't sexual; but it isn't, of course, normal. It is a particular privileged area between them. He sets to work at once making charcoal sketches. Then, through the weeks, come figures, even an oil painting of Mercè bathing. Cros is searching for something that he is not yet sure of. We note that it is a sculptor's basic task to make hard materials look soft.

While he works, licensed perhaps by this privacy and attuned to his searching work, Cros delivers grand pronouncements about life, often including the word "God." We take these comments as part of his process. He is nearing completion of a kneeling figure of her.

One day, when she has been allowed to stroll about, she discovers a young man burying another young man. Both were

PAGE 38 | NOVEMBER 11, 2013 | THE NEW REPUBLIC | FILM



Harold Pinter with Stanley Kauffmann on his show "The Art of Film," New York, 1960s

escapes from that refugee camp, and the other man was killed. Mercè takes the surviving refugee back to Cros, who shelters him. Then a German army officer visits. When he and Cros meet, they embrace. The officer, in peacetime, was a professor of art history in a German university and is writing a book about Cros. He has come for more information. When he leaves, he tells Cros, who is of course an old friend, that he expects to be sent to the Russian front, a stroke of doom. He and Cros embrace and part.

Then comes the need to help the refugee escape. Mercè helps. Cros supplies money. Mercè, her modeling done, wants to go. She and Cros do come to one moment of intimacy, but it is in the nature of farewell. She will bicycle to Marseilles if Cros will give her his bicycle, and we last see her biking away. Cros is left alone in his studio. He gives a final touch to the kneeling figure of Mercè. Then he concludes the film—concludes everything. It is his closing statement.

This film has its own nature, almost its own reality. It is as if some gifted people got together to make it, then arranged some

themes in and around the gleaming box of that private nudity. The sudden finish almost seems meant to make it our responsibility to comprehend the whole.

IN 2005 AN AMERICAN FILM-MAKER named Joshua Oppenheimer, together with a crew, began to make a movie that may shrivel many souls. In northern Indonesia he began shooting film of Anwar Congo, a local leader who during the 1960s mass-murdered his enemies, communists. Congo and his friends may have killed millions.

Now, in *The Act of Killing*, Oppenheimer presents a film of his experience there, a country in which death has been substituted for life, in which Congo's chief regret is that his victims' eyes were not closed. He himself is a cordial gray-haired man, not a toughie; most of his pals are obese and gloating. They all live in brightly colored houses, surrounded by luxuries, including women, and are eager only to prolong their regime.

The country has one national game—imitating tough guys of Hollywood films,

wearing costumes, wigs, false teeth. All with a camera to record it. In the midst of this everyday horror, it is chilling to hear Pacino, Brando, and others being sanctified for all the wrong reasons.

The effect of the film is to turn the universe upside down and to come up perversely smiling. Of course we think of Cambodia with its killing fields in the 1970s, and the way most of the world could do little about it. Here, just because we are figuratively present, the soul is wrung. I certainly do not move that the film should be suppressed, only that one should know what it is. It is a bath in a smiling madness.

After the picture was well along, Oppenheimer got Errol Morris and Werner Herzog to come aboard as executive producers, men who have done some moderately comparable but vastly superior work. Oppenheimer's is not a horror film in the usual commercial sense. It makes those films look even sillier. ●

*Stanley Kauffmann reviewed films for* THE NEW REPUBLIC *for fifty-five years. He died on October 9.*

COURTESY OF THE ESTATE OF STANLEY KAUFFMANN

PAGE 39 | NOVEMBER 11, 2013 | THE NEW REPUBLIC 

# Half a Century at the Movies

**From the writings of Stanley Kauffmann.**



A FOREIGN DIRECTOR SAID TO ME AFTER seeing Ingmar Bergman's last film, *Winter Light*, "It's a rich director's picture." He explained that, in his view, its economy of cast and settings, its brevity, were less the result of artistic refinement than of laziness-cum-arrogance bred of success. I thought his remark more funny than true and still do; but Bergman's latest, *The Silence*, gives it another meaning. Bergman–in his current phase, at least–is exemplifying the saw about specialists: men who know more and more about less and less. He may not be a "rich" director, but, in spite of the passion in this film, he is a more aloof one than he was. He is anatomizing narrower and narrower circles of materials and the emphasis is on the dissection rather than on any revelation.

The film is patently a symbolic work about alienation. But its symbolism is its defect; it breaks down into a series of discernible metaphors, rather than aggregating them into an organic and effective work. We are constantly aware that there is a code to be read and we spend our time reading it. That the film is a rebus, with clues to be hunted in, it, indicates its limitations. It almost seems to have been contrived as an exercise for that school that looks on criticism as cryptography.

*The Silence, 1964*

I have had a chance to watch Brando's career from its beginning because he made his professional debut in a children's play of mine at the Adelphi Theater in New York in 1944. His role consisted of being hit on the head and falling down; but he managed to find a way of falling down that, without being obtrusive, was individual.

Brando has evolved a personal style which relies largely on understatement and the liberal use of pauses. Often the effect is

heart-breaking; remember the poignancy he gave the vapid monosyllable "Wow" in *On the Waterfront* when he learned that his brother was threatening his life. Occasionally the style lapses out of meaning into mannerism; some of *Sayonara* could have used compression. But in essence he reflects in his style–as actors often do–a prevalent artistic vein of his day. Kemble exemplified the classic, elegant eighteenth century. Kean the wild, torrential romantics of the early nineteenth century. Irving the elaborate majesty of the late Victorians. I compare Brando with these luminaries only to draw a parallel. He is a bellum realist: an epitome not of that joyous realistic revolution which swept away the humbug that obscured the contours of the world but of that generation born into realism which has seen its world with harsh clarity, whose work is to reconcile itself to that world's revealed boundaries and to find its triumphs inwardly.

*The Young Lions, 1958*

Meanwhile, however, what's most bothersome about *Pulp Fiction* is its success. This is not to be mean-spirited about Tarantino himself; may he harvest all the available millions. But the way that this picture has been so widely raveed up and drooled over verges on the disgusting. *Pulp Fiction* nourishes, abets, cultural slumming.

So much of what inundates us these days–in film, in various kinds of pop music–is calculated grunginess, of climate and temper. So much of what goes on in (what I hear of) rock music revels in the lower end of every kind of spectrum, grungy ideas and diction delivered by grungy people. So much of modern film seems to compete in grunginess. Very little of this stuff seems to have anything to do with the lives actually lived by its avid public. Most of it seems designed as guided tours of an underworld for people otherwise placid–career-oriented students, job-holding others. Escapism always has been one function of theater and film, and for ages it was cloyingly pretty-pretty. Boy, has the pendulum swung.

*Pulp Fiction, 1994*

I wish I could believe that Godard is a committed Maoist; it would at least give the picture an internal validity. But the impression grows and persists that Godard is congenitally a bootlicker of young boots. When he made *Breathless* almost ten years ago, postwar nihilism was "in" with youth, so it was "in" with him; *Breathless* was nihilistic. (It was his first film, and it seemed a personal statement.) Today the cognate youth-group is politically activist, so *La Chinoise* is Maoist.

I do not suggest that Godard is forbidden to change or that he should distort the current state of society or should abandon his interest in youth–which is really his only interest. But from the course of his work one may deduce a consistent belief: Young equals Good, Older equals God.

*La Chinoise, 1968*

The hippie life is the most credible I have seen in a fiction film. And visually, imaginatively, the picture captures a sense of journey, of the hunger for frontier in American space, the feeling that there ought to be a possible large-spirited life in a large land, that the very ability to move through this country is a refutation of the crabbed lives on every side. But, like so many films whose aim is to tell some truth, it gets a bit cross-eyed as it gets closer to its goal. There is some arrant triteness and falseness. The aide-de-camp of the drug-buyer, with his dark glasses and death's-head cane, is a comic-book figure. When the cyclists fix a flat in a rancher's barn, we look past them to the rancher shoeing a horse. (Get it?) The meal with the rancher and his family under the trees is third-rate Steinbeck. The scene where the two youths go swimming with two hippie girls is all cliché; swimming–particularly in the nude–is by now a very weary objective correlative for purity of heart.

*Easy Rider, 1969*

Bill Clinton influences the film world. The missile attacks that he recently ordered have revived interest in *Wag the Dog*. His

personal behavior has extended permissiveness in public discussion; so it has, in some degree, affected the atmosphere in which *Lolita* arrives. Candor passed a milestone in this country with a comment by a man interviewed on a news program last month: "I never thought I'd have to explain oral sex to my eleven-year-old daughter." And this is only one of the fractures of reticence that have lately been crackling all around us.

Clinton is not into pedophilia like Nabokov's Humbert Humbert. Still, his sexual activities and the publicity about them have made a difference, of this film. No one in his right mind, or even a fragment of it, would make light of pedophilia; but a work of art on that subject cannot now be as completely—or merely—shocking today as it once was. "Once" means a year ago.

*Lolita*, 1998

Love, still making the world go round, still makes the rounds of the cinema world. In France, for example, it seems that one can win the Grand Prize and the Cannes Festival by taking one of the oldest of French film love stories and pasting on a new technical gimmick–letting all the characters sing their dialogue instead of speaking it. The story of *The Umbrellas of Cherbourg* is the one about the boy and the girl who are too idyllic to be careful, and when he is forced to go away before they can marry (this time it's the Army), she discovers just exactly how careless she has been. Practical *Maman*, not wasting much time on shock, sets out to find a man who will be broadminded enough to marry her daughter anyway. Years later, the girl and the boy, now both married, meet briefly, to squeeze out about 12 c.c. of *tristesse* before they part again forever. It all proves that no nation can manufacture synthetic rational goods like the nation itself. The word "French-type" shoddy comes from France.

*The Umbrellas of Cherbourg*, 1965

For me, who was glued to a radio on that June 6th, ankle deep in newspapers, no honor, no tribute, no regard can possibly be too much for the men who went ashore that day. But the film wasn't made solely to recreate that invasion, which is where the bafflement sets in. The film acts as if, from that large beginning, it moves to a special point; but it doesn't. Spielberg has said,

"How do you find decency in the hell of warfare. That was what attracted me to the project." But every World War II film I can remember, and many other war films, have dealt with comradeship and sacrifice. *Saving Private Ryan* leaves us with the sense that a master director made a film while searching for its unique point and never quite found it.

*Saving Private Ryan*, 1998

Truffaut can be called a Hollywood director without a Hollywood.

In daily Hollywood practice, what it came down to was that directors under contract to a studio were supplied with scripts by the studio. The director was simply one step, though a major one, in the manufacturing process from studio executive to consumer. He didn't have to find his subjects himself–certainly *not in himself*–as artists, film or otherwise, have usually done.

This, I would guess, is the aspect of Hollywood that Truffaut misses most. He has seemingly run out of sources, novels or other materials that genuinely spark him, and even his latest autobiographical films have been thinned out into entertainments. Heaven, for Truffaut, would presumably be the chance to work in an old-time studio with no responsibility to originate material, with a front-office that bombarded him with scripts, some of which he was obligated to direct. What a happy misery. Nothing to do but direct, just as if directing–in that merely execr*ant* sense–were filmmaking.

*Bed and Board*, 1971

I had lunched with Kubrick in New York two years earlier. (One remark lingers. I praised Peter Sellers's three roles in *Dr. Strangelove*, and Kubrick said dryly, "Yes, three performances for the price of six.") We had lunched because I was inviting Kubrick to appear on a series about film that I was then doing on PBS in New York; he had seen some of the programs and was sufficiently interested to meet and talk about it, though eventually he declined. He was now living abroad and he was working on a film. "This obviously makes it impossible." (Despite which, he had wanted to think it over.) "In addition to this," he said, "I have steadfastly avoided talks, lectures, etc., because they tend to formalize my own thinking, which I think would not be a good thing." I never forgot his statement because, as it seemed to me, it was almost a prophecy.

Isolated–notoriously so–in his country home and in his studio, he became more concerned with filmmaking than with films. Yes, themes can be discerned in his work, and since his death the winkling out of Kubrick themes has bloomed into a small critical industry. Certainly violence and cynical bleakness are patent in his work, but they seem structural conveniences to him rather than burning concerns. From *2001* on, with longer and longer periods of time between pictures, he became centered on the solution of problems, technical and narrative, rather than on creating work aimed at the responses of the viewer. Solipsism became king in the Kubrick studio; formalism became supreme. This is a long way from design, which is a beauty and blessing in art, a means of affecting people. Formalism is a tyranny even when self-imposed, as it usually is.

*Eyes Wide Shut*, 1999

I am something of a traditionalist, I suppose, and when I saw *Last Year at Marienbad*, it warmed my conservative heart. "Here," I thought, "is respect for tradition. Here is a welcome return to the principles of the French film of the twenties–Delluc, Dulac, Jean Epstein, early René Clair, Cocteau. How pleasant to see a proper regard for the past in young folks." Imagine my surprise to find Alain Resnais, the director, being hailed everywhere as an innovator, a daring experimentalist, an *avant-gardist*. Were all these reviews and articles one huge typographical error? I felt relieved when I read that Resnais made no such claim to be an innovator and declared his debt to predecessors including D. W. Griffith.

The film is very interesting. It is not very moving. No characters are created; the actors, by and large, merely pose–as photographic and symbolic elements. The technique becomes the end instead of the means. We find ourselves saying, "Yes, that is remarkably like the way the conscious and subconscious gambol and struggle with each other," but of the effect of that gambol and struggle, we feel little. Still there is no reason why all motion pictures must be alike or achieve the same results. There is plenty of room for one like this, which provides a stimulating hour and a half. And it is good to see that someone (French, of course) has revived some of the film's oldest and most respectable techniques.

*Last Year at Marienbad*, 1962

# A-268

*Two or Three Things* is more interesting than many other Godard films because, for one reason, it seems to have sustained the director's own interest; there is no feeling, as in *Pierrot le Fou*, that this very bright man has embarked on something to which he is committed long after his darting mind has really left it and that he is forced to invent irreverences and interpolations to keep himself interested. For another reason, the film is devoid of the worst aspects of Youth Worship that sometimes taint his work; *it is about people,* some of whom are young.

But the impasted artistic and philosophical freight is once again tedious. The interviewing of characters by an unseen interviewer, which is supposed to break open conventional film form, is now a Godardian convention. The sound-track, with Godard quoting away, has an air of dormitory discovery, under the midnight lamp, what life and metaphor are All About. When we get a huge close-up of bubbles floating on the surface of coffee in a cup while Godard whispers about Being and Nothingness, it remains bubbles and quotations; there is no transformation into philosophical comment or Pongeist poem.

*Two or Three Things I Know about Her, 1970*

Political satire makes us feel good. Ever since it began in dramatized form—2,400 years ago with Aristophanes—it has been a means by which an audience of the powerless could enjoy criticism of the powerful. Curiously, however, in modern times the critical function has been at least matched by another function that had always lurked below and has now grown: vengeance.

The only gratifying revenge we can have on the powerful, not only for their actions but for *being* powerful, is through satire. It has not resulted in much change in America, and now it may result in even less, but, oh, does it make us feel better. Will *Wag the Dog* deter another Panama or Grenada adventure? We can doubt it. But at least the film demonstrates, with wit, that we are not unwitting. Our laughter at the film is our moment of absolute equality with our governors.

*Wag the Dog, 1998*

Lately, in the wave of sentimentality that always seems to follow success, much has been written to the effect that Miss Monroe is not merely attractive but also has gifts as a comedienne. She has few. She is not



Stanley Kauffmann, Laura Kauffmann, and Zero Mostel

nearly as good an actress, for instance, as her Continental counterpart, Miss Bardot; she lacks the French girl's voice, verve, moderate technical proficiency, and certainly lacks her range. But by now Miss Monroe and her advisers have learned where her strengths lie, and this role is superbly designed to conceal the weaknesses and display the strengths—physical and personal. One aspect of her superiority over such pneumatic dummies as Jayne Mansfield, Anita Ekberg, and Diana Dors is that she has learned not to take sex seriously. As a performer she kids sex; and as a character, in this film, she is so humble about her attractiveness that her effect is equal parts sexual and endearing. It is rumpled, unpretentious, good-hearted sex.

*Some Like It Hot, 1959*

The first time G. K. Chesterton walked down Broadway at night past the flashing electric advertisements, he said, "What a wonderful experience this must be for someone who can't read." In the case of *Lola*, one might add: or for those who want to pretend they can't—figuratively—read. For the script of *Lola* is just one more teary version of the Prostitute with the Heart of Gold.

To see this Lola as a mythopoeic figure of romance or a figure of the eternal Feminine, to posit that her story is related to our culture's concepts of romance, is to me a quasi-adolescent insistence on glorifying whores. And the acting of most of the principals is very bad.

Some of the *Lola* admirers might agree with all of this; all of them might agree with some of it. Together they reject its relevance. Why? Because they subscribe, with passionate and unquestionable conviction, to a theory of the hierarchy of film values. They believe in selecting and exalting sheerly cinematic values, like the matters I have praised earlier, and in subordinating or discounting such matters as those I've objected to. To them, this is exaltation in the true glory of cinema. To me, it is a derogation and patronization of cinema. To me, this hierarchy says, "This is what film can do and we mustn't really expect it to do any more, mustn't be disappointed if this is all it does."

The worst aspect of this approach is that it crimps the film out of its cultural heritage: the cinematic *and* literary and theatrical and psychological and social and political—and says to it, "Just go and be cinematic. If anything else is achieved, good. If not, no great matter." It is an aesthetic equivalent of the Victorian ethic of "knowing your place."

*Lola Montes, 1969*

COURTESY OF THE ESTATE OF STANLEY KAUFFMANN

| WASHINGTON DIARIST | Stanley | BY LEON WIESELTIER |

 **"MY EXPERIENCE WITH MARILYN MONROE BEGAN WITH** Edith Sitwell." This enchanting sentence was written by Stanley Kauffmann, who commanded precisely that range of cultural experience, and also that tone of tickled adventurousness. In the 1950s he worked in publishing–the greatest moviegoer who ever lived saved *The Moviegoer*–and one day he had the daunting task of persuading the movie star to sign off on a volume of photographs of her. Word had reached him that Monroe had met Sitwell (now there was the full spectrum of womanhood!) and that Sitwell might write a preface to Monroe's book. He phoned the Gorgon of over-civilization at the St. Regis and was rewarded with "an aristocratic English explosion. 'Yes? What is it?' 'Miss Sitwell?' I asked. More thunderously, 'My name is Dame Edith Sitwell, if you please.'" Ten days later there arrived a letter from "Dame Edith Sitwell, D.B.E. D.Litt. D. Litt. D. Litt." apologizing for her nastiness, but nothing doing with the preface. Undiscouraged, Stanley made his way to Monroe's apartment at the Waldorf Towers. From D.Litt. to delight: when "the globe's Aphrodite" came to the door, "she was wearing a white terry-cloth robe, tightly belted. The top billowed out just a bit. I wondered if this was to compensate me for my wait." Dream on, dear Stanley. But his first response to the proximity of the most famous flesh in the world was to call his wife. The phone was in the bedroom. He dialed home: "'I'm in Marilyn Monroe's bedroom, sitting on her bed.' 'Oh come on,' said Laura impatiently." She saw her twice more, once upon her return from the Actors Studio, looking "off duty," and again as she was being made up for a big appearance ("She saw me in the mirror and waved at me as someone did something to her dress.... The wave in the mirror [was] quick, almost apologetic..."). Like every intellectual male who ever encountered Monroe, he stilled his lust with her pathos. A paperback called *Marilyn Monroe as The Girl* was eventually published and sold poorly. But Stanley had another "album" for his winning memoirs.

There were noisier film critics in Stanley's time, and film critics who assisted in the creation of cults around their big ideas or their big persons. Stanley was different. His work was strong but it was egoless. He promulgated no theory and founded no school. He revered film but he did not worship in the church of "cinema." (I remember the self-importance with which one was taught to pronounce that word in the 1960s.) He believed undoctrinally in "the cinematic and the literary and theatrical and psychological and social and political," as befitted his diverse and welcoming temperament. His prose infused subtlety with vitality, and all the techniques of critical devastation were at his disposal, but he never raised his voice: in his millions of words you will not find a vulgar or hectoring one. In his withering reviews there was always a tincture of melancholy that a work had fallen short. He wanted so much to admire. A work of art was innocent before proven guilty, because he was on the side of art. His erudition was massive; all the traditions of all the theatrical arts were at his fingertips, and worn lightly and cunningly. His independence of mind through all the decades was an astonishment. He was sovereignly indifferent to the commercial promptings of the movie business, and was never content to serve as the last step in a movie's promotion. He stayed out of the system. Even when he adored a film, he contrived to express his adoration in a way that made it useless for advertisements. (The business side of this magazine was regularly displeased.) He reviewed the films that he thought were important, not the films that Hollywood thought were important. He was unmoved by money and celebrity; he was a true meritocrat. His movie writing is blissfully free of knowingness, or the Manhattan disease, and free also of the high-spirited relativizing irony into which certain critics descend when they do not much like a work but do not wish to be disinvited from the party. (In its arts pages *The New York Times* has made urbane ingratiation into a brand.) And long before globalization, he was a film globalist. He regarded the international nature of film as one of the medium's greatest excitements. He simply wanted to see, and if possible to support, every movie in existence. He championed obscure films from obscure places, and sometimes he was mocked for his esoteric interests; but esotericism is a provincial's pejorative, and he was perhaps the most cosmopolitan man who ever wrote about the movies.

There was a time when culture was not only studied, but also aspired to; and when you visited Stanley in his apartment in the clouds on West 18th Street you entered a small eden of culture. Film, theater, literature, music, ballet: it all *mattered*. Questions of taste were questions of worldview. Huge ideas were at stake on Off-Off-Off-Off-Broadway. The health of society was measured in part by the quality of the arts that it produced. The appearance of a good novel meant that we were doing alright, but a bungled *Agon* or *Figaro* made you wonder. Stanley presided over these conversations with the authority of his experience (six years ago he began a column this way: "On the morning of August 24, 1927, a few weeks before I started high school, I read the headlines in *The New York Times* announcing the executions of Sacco and Vanzetti...,"), and with the authority of his cultivation (how strenuously we debated, one afternoon, the relative merits of Giovanni Martinelli and Mario del Monaco in *Otello*), and with the authority of his graciousness, which was infinite. He was soulful, generous, refined, funny, heartening, exacting, and joyful; a man of many sympathies and many loves; a wholly exquisite man. For thirty years it was my custom at editorial meetings to begin my report on the next week's issue with the words: "We have Kauffmann." The last time I did so, I had a tear in my eye. But the tear is gone, because I have been reading him. There he still is. We have Kauffmann. ●

**A-270**

# EXHIBIT "C"

**The New York Times**      https://nyti.ms/19zZTw0

MOVIES

# Stanley Kauffmann, Critic, Dies at 97; Spent a Half-Century at the Movies

By WILLIAM GRIMES    OCT. 9, 2013

Stanley Kauffmann, whose literate, tightly constructed movie reviews appeared in The New Republic for more than a half-century and set a standard for critical ease and erudition, died on Wednesday in Manhattan. He was 97.

His death was announced by Leon Wieseltier, the literary editor of The New Republic, who said the cause was pneumonia. Mr. Kauffmann wrote for the magazine until his last months.

Mr. Kauffmann went from being an actor and a stage manager with a Manhattan repertory company to a book editor and a writer of vaguely philosophical novels before becoming a film critic at The New Republic in 1958. His reflective, highly wrought essays appeared weekly for the next 55 years, with a break in 1966, when he was, briefly, the chief theater critic for The New York Times.

He also doubled as the theater critic for The New Republic from 1969 to 1979, but it was as a film critic that his influence was felt, even if it was hard to define, since he belonged to no camp. His abiding interest in theatrical givens like theme, story, dramatic construction and character could make him seem old-fashioned, and set him in direct opposition to the auteur school, with its emphasis on the formal aspects of film. Readers came to him for reviews that read like mini-tutorials, the product of a deeply literary mind and a graceful pen.

Although resolutely high-minded, with a strong bias toward foreign art films, he was not elitist. He championed Jane Fonda early in her career and preferred Britain's lightly satirical Ealing comedies, like "Kind Hearts and Coronets," to the kitchen-sink realism of the British New Wave. He forgave many sins in otherwise negligible films if they had a progressive social message.

"He was a literate, quarterly sort of writer, and to the extent that he had disciples, they wrote in quarterlies," Phillip Lopate, the essayist and editor of "American Movie Critics: An Anthology From the Silents Until Now" (2006), said in an interview in 2011. "He had a good influence on film criticism by pushing it away from teenage gaga enthusiasm for the joy ride and toward adult responsibility."

Stanley Jules Kauffmann was born on April 24, 1916, in Manhattan. His father was a dentist, and the family was well off. After graduating from DeWitt Clinton High School in the Bronx, he enrolled at New York University, where he studied in the drama department, intending to become an actor. He received a bachelor's degree in 1935.

At the university he began writing and publishing dozens of one-act plays — potboilers with titles like "Father Spills the Beans" and "Right Under Her Nose." He also became an actor and stage manager with the Washington Square Players, a repertory company affiliated with the university (not to be confused with the group that later became the Theater Guild). The company performed Shakespeare and Shaw for the most part, and in summers took up residence at a theater in Cooperstown, N.Y.

Internal dissension and the outbreak of World War II led to the company's demise, and Mr. Kauffmann turned to novels, beginning with "The King of Proxy Street" in 1941. His abiding themes were free will and moral choice, explored in "The Hidden Hero" (1949), "A Change of Climate" (1954), "Man of the World" (1956) and several others, many of which he wrote while working as an editor at Knopf, where he discovered the Walker Percy novel "The Moviegoer."

2
ARTICLES REMAINING

In 1944 his children's play "Bobino," about a c⋯  ⋯derstand the

SEE MY OPTIONS        Subscriber login

notable chiefly for being Marlon Brando's first professional engagement, as a guard who gets hit on the head and falls down.

"He was wonderful," Mr. Kauffmann said on "The Dick Cavett Show" in 1979. "He had a way of falling that made you know that he'd thought about how to do it a different way from the way every other actor had ever done it, and yet his fall fit into what was going on. It wasn't merely freakish."

In 1943 Mr. Kauffmann married Laura Cohen, who died in 2012. He had no immediate survivors. He lived on West 15th Street in Manhattan "in a penthouse crowded with books and pictures," Mr. Wieseltier wrote in an e-mail.

An avid moviegoer, Mr. Kauffmann awoke to the possibility of film criticism in the early 1930s, when he read a review in The Nation by William Troy that compared scenes in two films stylistically. Suddenly, he wrote in an introduction to his anthology "American Film Criticism: From the Beginnings to Citizen Kane" (1972), he realized that film could be criticized as an art in the same way as literature or theater.

"I'm not sure that my jaw actually dropped, but that's the feeling I remember," he wrote.

In the late 1950s he began writing reviews and sent one to The New Republic, which soon offered him a permanent post. He found its smallish but earnest and well-educated readership ideally suited to his cool, intellectual style and literary grounding.

In a 1965 essay on Pauline Kael in Harper's Magazine, he declared allegiance to "a view of film as a descendant of the theater and literature, certainly *sui generis* but not without ancestors or cousin, to be judged by its own unique standards which are yet analogous to those of other arts: a view that is pluralistic, aesthetic but not anti-science, contemporary but not unhistorical, and humanistic."

His approach proved to be flexible and effective in tapping key qualities of a film.

Reviewing "L'Avventura," Michelangelo Antonioni's 1960 tale of two wealthy Romans drawn to each other as they search for the man's missing lover, he wrote: "The theme is upper-middle-class morality — not low enough to be corseted by suburban respectability, not high enough to be subject to *noblesse oblige*. These are Chekhov's people in Italy today; and, like Chekhov's people, we see them overripening before they drop. It is no accident that much of this film takes its indolent way across Sicily (Danilo Dolci's Sicily! — with disease and rooted poverty screaming just offstage)."

Mr. Lopate called him "the only film critic who did not take sides in aesthetic debates," adding: "He did not align with the auteurs or the anti-auteurs, and he was far too gentlemanly to side with a critic like John Simon. He didn't play favorites or fall in love the way Pauline Kael did, or to some extent Andrew Sarris."

He could, however, deliver a tart putdown. He called the director Robert Altman "a walking death sentence on the prospect of American film," dismissed "Casablanca" as "a slushy romance" and called Luis Buñuel "a highly resourceful technician and a highly neurotic adolescent."

In January 1966, The Times installed him as chief drama critic. That same month he examined the predicament of gay male playwrights in an essay in The Times under the headline "Homosexual Drama and Its Disguises." While concurring with the view that gay playwrights tended to present a distorted picture of women and marriage, he argued that social and legal pressures made it impossible for a gay writer to deal openly with same-sex relationships.

"If he is to write of his experience, he must invent a two-sex version of the one-sex experience that he really knows," he wrote. He added, "It is we who insist on it, not he," and pleaded for a change in social attitudes.

Many readers bristled at his analysis, taking it as an attack on homosexuals and saying it questioned the ability of gay playwrights to create authentic heterosexual characters. In the ensuing decades the article has been singled out as an illustration of the intolerance prevalent at the time. He was replaced nine months later by Walter Kerr, who became available when The New York Herald Tribune ceased publication. Mr. Kauffmann returned to The New Republic, where he remained.

His film criticism was collected in "A World on Film" (1966), "Figures of Light" (1971), "Living Images" (1975), "Before My Eyes" (1980) and "Regarding Film" (2001). He also wrote two volumes of memoirs, "Albums of Early Life" (1980) and "Albums of a Life" (2007).

His last article printed in The New Republic appeared on Dec. 31, reviewing the films "Amour," "Barbara" and "Beasts of the Southern Wild." His last review appeared on the magazine's Web site this August.

"Some titles embrace us," he wrote in that review. "They seem to have been waiting, affectionately quintessential — the heart of the matter. Such is 'Israel: A Home Movie.' It fits so snugly into a preconception we didn't know we had that we feel as if we have already seen the film, and want to see it again."

A version of this article appears in print on October 10, 2013, on Page A29 of the New York edition with the headline: Stanley Kauffmann, Critic, Dies at 97; Spent a Half-Century at the Movies .

© 2018 The New York Times Company

**A-276**

# (INCORPORATED) EXHIBIT "D"

THIS EXHIBIT IS THE PLAINTIFF'S COMPLAINT, WHICH IS INCORP-
ORATED BY REFERENCE AT PARAGRAPH 8 OF THIS DECLARATION

A-277

# EXHIBIT "E"

# A-278



**SCHIFFHARDIN**ᴸᴸᴾ

666 Fifth Avenue
Suite 1700
New York, New York 10103
telephone: 212.753.5000
fax: 212.753.5044

February 12, 2014

Dear Mr. Cardullo:

Thank you for your inquiry concerning the estate of Stanley Kauffmann.

We can confirm that Mr. Kauffmann's will does in fact assert that you, and only you, may anthologize any and all reviews by him, from *The New Republic* or any other journal, that are previously uncollected or un-anthologized in book form. You need only make clear the place of original publication and, of course, give proper attribution to Stanley Kauffmann.

There is no fee attached to this re-publication of Mr. Kauffmann's work, and any royalties from the publication of such a book edited by you should go to you, and you alone. You have the sole authority to choose the press that publishes this work.

Please let me know if you have any further questions.

Sincerely,



Christine A. McGuinness
Coordinating Partner
Schiff Hardin, New York

**SCHIFFHARDIN**ᴸᴸᴾ

NEW YORK   CHICAGO   WASHINGTON

SAN FRANCISCO

A-279

# EXHIBIT "F"

From: stanley kauffmann <stanleykauffmann@gmail.com>
To: robertcardullo@yahoo.com
Sent: Sunday, April 22, 2013 2:48 PM
Subject: permissions

Dear Bert,

I apologize for taking so long to get back to you, as I have been ill.

Yes, of course you have my permission to reprint, in book form, all of my reviews from 1999 to the present (or whenever I stop writing). The reviews are all copyrighted in my name, so you don't have to get permission from any of the original places of publication—namely, *The New Republic*. I don't have the energy to undertake such a project at this point—especially now that Laura is gone. But another, perhaps final collection of my film criticism would be welcome.

Thanks for taking all the trouble to publish this book. I hope you come up with a good title. If I'm still here, do send me a copy eventually! That is all I ask.

All best to you.

Stanley

Stanley Kauffmann
10 West 15th Street
New York, New York 10011
(212) 242-1659

A-281

# EXHIBIT "G"

NORWICK, SCHAD & GOERING
ATTORNEYS AT LAW

110 EAST 59TH STREET
NEW YORK, NEW YORK 10022

(212) 751-4440
FAX: (212) 604-0997

E-MAIL: KEN@NORWICKSCHAD.COM
WEBSITE: WWW.NORWICKSCHAD.COM

January 4, 2016

BY EMAIL AND FIRST-CLASS MAIL

Marilyn Schleyer
Office of Legal Affairs
Rochester Institute of Technology
154 Lomb Memorial Drive
Rochester, NY 14623-5608

Dear Ms. Schleyer:

I represent Robert Marx, the nominated Executor/Trustee of the Estate of Stanley Kauffmann ("the Estate"). When duly appointed by the Court, which we expect will happen imminently, Mr. Marx will be legally authorized to take any and all appropriate actions, including commencing litigation, to protect and vindicate the works of Mr. Kauffmann, including the copyrights therein. This letter is being sent to you at the direction of Bruce Austin, Director of RIT Press ("the Press").

This letter concerns the book the Press recently published entitled THE MILLENNIAL CRITIC ("the Book"). A review of the Book's Table of Contents reveals that it includes works that are the copyright property of the Estate ("the Copyrighted Works"). The Press's publication of those Works is utterly without the authority of anyone in a position to grant it and therefore constitutes egregious (and very possibly willful) infringement of the copyrights therein.

Accordingly, we demand that the Press immediately cease and desist from all publication and other exploitation of the Copyrighted Works. We also demand that the Press immediately deliver to us any and all documents, correspondence, and other materials which purport to give it (or support its) authority to publish those Works, including (quoting Mr. Austin) "a letter from ShiffHardin, LLP which confirmed that Stanley Kauffmann's will did in fact assert that Mr. Cardullo, and only Mr. Cardullo, may anthologize any and all reviews by Mr. Kauffmann . . . ." – which "letter" we believe to be a forgery. The Press's compliance, or lack thereof, with these demands may well be highly relevant in any copyright infringement litigation that may be

**A-283**

Marilyn Schleyer
January 4, 2016
Page Two

commenced against it and/or in any other proceedings involving possible fraud and forgery, etc. Further, if the Press would like to resolve all issues presented by its infringing publication of the Copyrighted Works -- including financial issues of damages, profits, and attorneys' fees, etc. -- without the need for litigation, you are invited to contact me for that purpose without delay.

The foregoing is expressly without prejudice to all rights and remedies in this connection.

Sincerely,

Kenneth P. Norwick

KPN:hs

cc: Robert Marx
     Henry Thayer

A-284

R·I·T

Rochester Institute of Technology

Office of Legal Affairs
Finance and Administration Division
154 Lomb Memorial Drive
Rochester, NY 14623-5608
585-475-2426 • Fax 585-475-5360

January 11, 2016

Kenneth Norwick, Esq.
Norwick, Schad & Goering
110 East 59th Street
New York, New York 10022

Re:   *The Millennial Critic-Stanley Kauffmann*

Dear Mr. Norwick:

I am General Counsel for the Rochester Institute of Technology ("RIT") and am in receipt of your letter to my paralegal Marilyn Schleyer wherein you allege copyright infringement of the works of Stanley Kauffmann by the RIT Press. In your letter you "demand that the Press immediately cease and desist from all publication ... of the Copyrighted Works." As Bruce Austin from the RIT Press indicated in email communication with Henry Thayer on December 2, 2015, the RIT Press had already ceased the production of the book on November 30, 2015 and has removed it from the RIT website.

Your letter also demands that the RIT Press deliver copies of documents which were provided to give authority to publish the Works. Again, as Mr. Austin indicated to Mr. Thayer in email correspondence on November 30, 2015, this is not information that the RIT Press would release to anyone absent a validly issued subpoena. Once a validly issued subpoena has been served, RIT will provide the documentation being sought.

Feel free to contact me if you have any questions.

Very truly yours,

ROBERT A. COLÓN
General Counsel

cc: Bruce Austin

Case 18-2404, Document 45, 10/01/2018, 2400477, Page93 of 201

**A-285**

Case 6:17-cv-06061-CJS-MWP   Document 60-7   Filed 01/12/18   Page 5 of 11
7/18/2017                              Network Solutions RE_ THE MILLENNIAL CRITIC: Printout

**Ken Norwick <ken@norwickschad.com>**                              1/15/2016 11:53 AM

## RE: THE MILLENNIAL CRITIC

To Marilyn E. Schleyer <mesela@rit.edu>  Copy Robert Marx <rmarx@samuels.org>  Blind copy
Joseph Mitchell <jmitchell@samuels.org> • Henry Theyer <hthayer@bromasite.com> •
Gail Hochman <ghochman@bromasite.com>

Dear Ms. Schleyer,

       Thank you for sending Mr. Colon's 1/11 letter.  Please forward to him my response, which follows:

Dear Mr. Colon,

I write in your response to your letter to me dated January 11, 2016.

Since you are a lawyer, I assume you are aware that I cannot issue a "subpoena" in the absence of a
pending legal action.  Also, I note that your letter ignores my invitation to RIT to discuss a possible pre-
litigation settlement of my client's copyright infringement claims.  Thus, although I find this
astonishing from a General Counsel of an institution like RIT, it appears that you are in fact daring and
forcing us to bring a formal action (in the Southern District of New York) for copyright infringement, in
which action of course RIT will automatically be compelled to produce the very documents you
currently refuse to produce.  If you do not promptly advise me that my conclusions about your position
are incorrect, we will proceed to commence that action without further notice.  Please be advised that
you may not destroy or dispose of any such documents pending the outcome of that action.  The
foregoing is without prejudice to all rights and remedies in this matter.

Sincerely,
Ken Norwick


       On January 14, 2016 at 4:47 PM Marilyn E. Schleyer wrote:

       Mr. Norwick - Per your request.

       Regards,

       *Marilyn E. Schleyer*
       Paralegal/Legal Assistant
       **ROCHESTER INSTITUTE OF TECHNOLOGY**
       Office of Legal Affairs
       154 Lomb Memorial Drive
       Rochester, New York 14623-5608
       Tel: (585) 475-2426
       Fax: (585) 475-5360
       Marilyn.Schleyer@rit.edu

Case 18-2404, Document 45, 10/01/2018, 2400477, Page94 of 201

**A-286**

Case 6:17-cv-06061-CJS-MWP   Document 60-7   Filed 01/12/18   Page 6 of 11
Network Solutions RE_ THE MILLENNIAL CRITIC Printout

7/18/2017



**From:** Ken Norwick [mailto:ken@norwickschad.com]
**Sent:** Thursday, January 14, 2016 4:16 PM
**To:** Marilyn E. Schleyer <mesola@rit.edu>
**Subject:** RE: THE MILLENNIAL CRITIC

Ms. Schleyer,

   Update: The letter you said was mailed on (or before) January 11 did not arrive in today's mail either. PLEASE extend to me the courtesy of sending a copy of it to me by email today. I can't imagine why you would refuse to do so.

Thank you,
Ken Norwick

   On January 13, 2016 at 3:50 PM Ken Norwick <ken@norwickschad.com> wrote:

   Dear Ms. Schleyer,

      The letter you said was mailed on (or before) January 11 has not yet arrived. Could you please send me a copy of it by email today?

      Thank you for your cooperation.

   Ken Norwick

      On January 11, 2016 at 4:04 PM "Marilyn E. Schleyer" <mesola@rit.edu> wrote:

      Good afternoon Mr. Norwick. A response to your letter has been mailed; you should receive it shortly.

      Regards,

      *Marilyn E. Schleyer*
      Paralegal
      **ROCHESTER INSTITUTE OF TECHNOLOGY**
      Office of Legal Affairs
      154 Lomb Memorial Drive
      Rochester, New York 14623-5608
      Tel: (585) 475-2426
      Fax: (585) 475-5360

7/18/2017                      Network Solutions RE_ THE MILLENNIAL CRITIC Printout

Marilyn.Schleyer@rit.edu



**From:** Ken Norwick [ken@norwickschad.com]
**Sent:** Monday, January 11, 2016 2:49 PM
**To:** Marilyn E. Schleyer <mesola@rit.edu>
**Cc:** Robert Marx <rmarx@samuels.org>; Henry Thayer <hthayer@bromasite.com>
**Subject:** Re: THE MILLENNIAL CRITIC

Dear Ms. Schleyer,

   I would very much appreciate your advising me whether, and if so, when, you will respond to my January 4, 2016 letter to you.  If you fail to so advise me withing the next few days, we will assume that RIT does not intend to respond and we proceed accordingly.

   The foregoing is without prejudice to all rights and remedies in this connection.

Sincerely,
Ken Norwick

      On January 4, 2016 at 4:17 PM Ken Norwick <ken@norwickschad.com> wrote:

   Dear Ms. Schleyer,

      Please see the attached letter.

   Sincerely,

   Ken Norwick


   Kenneth P. Norwick
   Norwick, Schad & Goering
   110 East 59th Street
   New York, NY 10022
   T: 212-751-4440
   C: 917-553-3340
   F: 212-604-9997
   website: norwickschad.com
   -----------------------------
   This e-mail and any attachments are intended
   solely for the use of the addressee and may contain

# R·I·T

Rochester Institute of Technology

Office of Legal Affairs
Finance and Administration Division
154 Lomb Memorial Drive
Rochester, NY 14623-5608
585-475-2426 • Fax 585-475-5360

January 18, 2016

Kenneth Norwick, Esq.
Norwick, Schad & Goering
110 East 59th Street
New York, New York 10022

Re:   *The Millennial Critic-Stanley Kauffmann*

Dear Mr. Norwick:

I have received your January 15, 2016 email to my paralegal Marilyn Schleyer. My letter to you dated January 11, 2016 speaks for itself. Should you be compelled to commence an action, I will accept service on behalf of the Rochester Institute of Technology at the address listed below:

Rochester Institute of Technology
Office of Legal Affairs
154 Lomb Memorial Drive
Rochester, New York 14623-5608

Very truly yours,

ROBERT A. COLÓN
General Counsel

7/18/2017

Network Solutions RE_ THE MILLENNIAL CRITIC Printout

**Ken Norwick <ken@norwickschad.com>**                              1/28/2016 10:35 AM

## RE: THE MILLENNIAL CRITIC

To Marilyn E. Schleyer <mesola@rit.edu>   Copy Robert Marx <rmarx@samuels.org>   Blind copy
Joseph Mitchell <jmitchell@samuels.org> • Gail Hochman <ghochman@bromasite.com> •
Henry Thayer <hthayer@bromasite.com>

Dear Ms. Schleyer,

   Please forward the email below to Mr. Colon.  Also, if you or Mr. Colon are so inclined, you can
provide me with his direct email address.  Thank you.

Dear Mr. Colon.

   I write to acknowledge receipt of your 1/18 letter and to advise you that we will commence the
litigation RIT apparently wants as soon as possible.  I will send copies of the relevant court documents
directly to you.  Of course, our Complaint will duly note -- and seek appropriate remedies for -- RIT's
utter refusal to even discuss a possible pre-litigation resolution of this matter, thus making the litigation
necessary.

Sincerely,
Ken Norwick

   On January 15, 2016 at 11:53 AM Ken Norwick <ken@norwickschad.com> wrote:

Dear Ms. Schleyer,

   Thank you for sending Mr. Colon's 1/11 letter.  Please forward to him my response, which
follows:

Dear Mr. Colon,

I write in your response to your letter to me dated January 11, 2016.

Since you are a lawyer, I assume you are aware that I cannot issue a "subpoena" in the absence of a
pending legal action.  Also, I note that your letter ignores my invitation to RIT to discuss a possible
pre litigation settlement of my client's copyright infringement claims.  Thus, although I find this
astonishing from a General Counsel of an institution like RIT, it appears that you are in fact daring
and forcing us to bring a formal action (in the Southern District of New York) for copyright
infringement, in which action of course RIT will automatically be compelled to produce the very
documents you currently refuse to produce.  If you do not promptly advise me that my conclusions
about your position are incorrect, we will proceed to commence that action without further notice.
 Please be advised that you may not destroy or dispose of any such documents pending the outcome
of that action.  The foregoing is without prejudice to all rights and remedies in this matter.

Sincerely,
Ken Norwick

Case 18-2404, Document 45, 10/01/2018, 2400477, Page98 of 201

**A-290**

Case 6:17-cv-06061-CJS-MWP   Document 60-7   Filed 01/12/18   Page 10 of 11
7/18/2017                          Network Solutions RE_ THE MILLENNIAL CRITIC Printout

On January 14, 2016 at 4:47 PM Marilyn E. Schleyer wrote:

Mr. Norwick - Per your request.

Regards,

*Marilyn E. Schleyer*
Paralegal/Legal Assistant
**ROCHESTER INSTITUTE OF TECHNOLOGY**
Office of Legal Affairs
154 Lomb Memorial Drive
Rochester, New York 14623-5608
Tel: (585) 475-2426
Fax: (585) 475-5360
Marilyn.Schleyer@rit.edu



**From:** Ken Norwick [mailto:ken@norwickschad.com]
**Sent:** Thursday, January 14, 2016 4:16 PM
**To:** Marilyn E. Schleyer <mescia@rit.edu>
**Subject:** RE: THE MILLENNIAL CRITIC

Ms. Schleyer,

   Update: The letter you said was mailed on (or before) January 11 did not arrive in today's mail either.  PLEASE extend to me the courtesy of sending a copy of it to me by email today.  I can't imagine why you would refuse to do so.

Thank you,
Ken Norwick

   On January 13, 2016 at 3:50 PM Ken Norwick <ken@norwickschad.com> wrote:

   Dear Ms. Schleyer,

      The letter you said was mailed on (or before) January 11 has not yet arrived.  Could you please send me a copy of it by email today?

      Thank you for your cooperation.

   Ken Norwick

Case 18-2404, Document 45, 10/01/2018, 2400477, Page99 of 201

# A-291

Case 6:17-cv-06061-CJS-MWP   Document 60-7   Filed 01/12/18   Page 11 of 11
7/18/2017
Network Solutions RE_ THE MILLENNIAL CRITIC Printout

On January 11, 2016 at 4:04 PM "Marilyn E. Schleyer" <mesola@rit.edu> wrote:

Good afternoon Mr. Norwick.  A response to your letter has been mailed; you should receive it shortly.

Regards,

*Marilyn E. Schleyer*
Paralegal
**ROCHESTER INSTITUTE OF TECHNOLOGY**
Office of Legal Affairs
154 Lomb Memorial Drive
Rochester, New York 14623-5608
Tel: (585) 475-2426
Fax: (585) 475-5360
Marilyn.Schleyer@rit.edu



**From:** Ken Norwick [ken@norwickschad.com]
**Sent:** Monday, January 11, 2016 2:49 PM
**To:** Marilyn E. Schleyer <mesola@rit.edu>
**Cc:** Robert Marx <rmarx@samuels.org>; Henry Thayer <hthayer@bromasite.com>
**Subject:** Re: THE MILLENNIAL CRITIC

Dear Ms. Schleyer,

I would very much appreciate your advising me whether, and if so, when, you will respond to my January 4, 2016 letter to you.  If you fail to so advise me withing the next few days, we will assume that RIT does not intend to respond and we proceed accordingly.

The foregoing is without prejudice to all rights and remedies in this connection.

Sincerely,
Ken Norwick

On January 4, 2016 at 4:17 PM Ken Norwick <ken@norwickschad.com> wrote:

Dear Ms. Schleyer,

Please see the attached letter.

Sincerely,

A-292

# EXHIBIT "H"

# A-293

Henry Thayer

| | |
|---|---|
| **From:** | Robert Cardullo <robertcardullo@yahoo.com> |
| **Sent:** | Thursday, December 03, 2015 1:45 AM |
| **To:** | Henry Thayer |
| **Cc:** | Bruce Austin |
| **Subject:** | follow-up |
| **Attachments:** | Kauffmann_Round 3 Interior Pages_8-27_with Index copy.pdf |
| | |
| **Follow Up Flag:** | Follow Up |
| **Flag Status:** | Completed |

Mr. Thayer,

Unless you desist and give RIT Press authority to continue publishing *The Millennial Critic*--and, by the way, let us see, in writing, *your* authority to act in Stanley Kauffmann's place--I shall upload the attached pdf of the book to the Internet for anyone to read at his or her leisure, free of charge.

You have until Friday, Dec. 4, 2015, by 5 PM EST to decide. If, at that point, the book is not once again advertised on the RIT Press website, I shall promptly upload it to multiple Internet sites. And there will be nothing you or anyone else can do about it. (Agents like you, I trust you realize, are fast becoming dinosaurs in the Age of the Internet.)

I am not in this for the money; RIT Press and I have performed a service for the late Mr. Kauffmann, in his memory. Please honor that memory by desisting. If you do not, I have spelled out the consequences.

Bert Cardullo
Editor, *Conversations with Stanley Kauffmann*
Editor, *Before His Eyes: Essays in Honor of Stanley Kauffmann*
Editor, *The Millennial Critical: Stanley Kauffmann on Film, 1999-2009*

1

**A-294**

# EXHIBIT "I"

**A-295**

### RIT Press case

**Robert Cardullo**                                   3/4/2017 5:44 AM
To ken@norwickschad.com  Copy charles.weiss@hklaw.com, jpoczek@bsk.com

Dear Mr. Norwick,

This is my response to the summons I received.

As I live in Finland and my resources are limited, I cannot appear in court in the state of New York. There is no real defense that I can make for my deception, except that I have not monetarily profited off my carefully edited editions of Stanley Kauffmann's work, and I believe that I have served his critical legacy well. RIT Press is also to blame, but they, or their university, have a lot more money than I do. So, if it's money you're after (and I suspect that this is the case), I'm not your man. If you simply want to defame and delimit me, you have succeeded.

I knew Kauffmann well and studied with him; if he were here, I think he would be proud of what I have done. My editions of his work speak for themselves, but, unfortunately, I don't think they will be allowed to speak at trial.

Please share this message with the court, as I could not find an email address on their website.

Sincerely,

R. J. Cardullo

# EXHIBIT "J"

# A-297

3/9/2017                                              Network Solutions FW_ RIT lawsuit Printout

Jeremy Oczek <oczekjp@bsk.com>                                       3/6/2017 9:51 AM

## FW: RIT lawsuit

To Ken Norwick <ken@norwicksched.com>

Ken, FYI.

**From:** Robert Cardullo [mailto:robertcardullo@yahoo.com]
**Sent:** Friday, March 03, 2017 3:43 AM
**To:** Oczek, Jeremy
**Subject:** RIT lawsuit

Dear Mr. Oczek,

As you know, I am living in retirement in Finland. I cannot afford to travel to the U.S. for any jury trial.

So let me declare that I am fully guilty of all the charges against me and that RIT Press was duped by me in this affair. That said, I have made no money, nor do I wish to make any money, off the Kauffmann book. I did what I did as a service to Stanley's legacy; it seems now that others are trying merely to profit from that legacy.

I am guessing that a judgment will be found against me, since I cannot respond in any other way than this one. If so, all that I can tell you is that my resources are extremely limited and I hope that the court takes this into account.

I make all of these statements not to exonerate myself but to absolve RIT Press of most its responsibility in this matter. Yes, the Press could have checked on me and determined that I was a bad "investment," but I initiated the deception and must take responsibility for that.

Sincerely,

R. J. Cardullo

**A-298**

# EXHIBIT "K"

**A-299**



# THE NEW REPUBLIC

*Leon Wieseltier*

March 22, 2004

Stanley Kauffmann
Penthouse C
10 West 15th Street
New York, NY 10011

Dear Stanley,

Like many publishing companies, *The New Republic* is working to expand into the web and related technologies, and in so doing, afford you maximum exposure. We've had a wonderful relationship with you over the years and see this expansion as a great opportunity to further promote you and your talents for our mutual benefit. Recent Supreme Court decisions have made it necessary that we explicitly confirm the terms under which you write for *The New Republic*.

Thus, in the interest of responsibly managing our business, we are making efforts to memorialize in writing all of our agreements with our writers, including freelance contributors. Our agreement with you has always been an oral understanding, and among other things we do want to ensure that we are not violating your rights in any way. To that end, we'd like to confirm with you our understanding of our past relationship with you, as well as our relationship with you and your contributions to *The New Republic* going forward.

We have always understood that you have been writing articles for *The New Republic* as a freelance contributor. We have also always understood in doing business with you that, in light of our regular monthly compensation arrangement with you, all articles you have written for *The New Republic* have been "works made for hire," as that term is defined under the US Copyright laws. We'd like to confirm with you that the above understanding of our business relationship with you is correct, but also that the above understanding will remain in effect as to any future articles you write for *The New Republic*, unless and until we and you both agree otherwise in writing.

Please acknowledge your agreement with us about this by so indicating with your signature below.

Many thanks.

Date: _March 24, 2004_

Agreed: _____

Sincerely,

Leon Wieseltier
Literary Editor

Author Signature _____

13138

1331 H STREET   SUITE 700   WASHINGTON, D.C. 20005   202-508-4444   F 202-508-4477   lwieseltier@tnr.com

**A-300**

# EXHIBIT "L"

**AUTHOR AGREEMENT (for Bank of the Nest)**

12059 

This Agreement is made between The New Republic, L.L.C., with a business address of 1331 H St., NW, Suite 700, Washington, D.C. 20005 ("Publisher") and Stanley Kauffmann, an individual residing at 19 West 10th St., Penthouse C, New York, NY 10014 ("Author") on this 9th day of _____ March _____, 2007.

Publisher is the publisher of The New Republic, a periodical magazine. Author is a regular contributor to the magazine who will write, every other week, an article of approximately 1500-2000 words on the subject of current films and/or related media. References herein to the "Article" will be deemed to mean all Articles written by Author pursuant to this Agreement. Articles submitted from this day forth will be indicated on Addendum #1 to this Agreement (which is incorporated herein by reference), as modified by the parties subsequently in connection with Author's submission of additional Articles. Author and Publisher wish to proceed with the submission and consideration of the Article pursuant to the terms of this Agreement, and accordingly agree as follows:

1.  **Submission.** Author shall deliver the article to Publisher, at its business address, on or before a regular submission date, in electronic format, either on disc or by e-mail. Additional Articles will be delivered on terms mutually agreed by the parties.

**Grant of Rights in the Article.**

Author hereby grants to Publisher the exclusive worldwide right to first publication of the Articles in The New Republic and in Publisher's Internet website TNR ONLINE, and the perpetual worldwide rights, which shall be exclusive during the first thirty (30) days following publication and nonexclusive thereafter, (a) to publication of the Articles on TNR ONLINE, (b) to reproduce and distribute the Articles at any time as part of the issue of The New Republic in which the Articles appear, (c) to publish, reproduce, distribute, perform, or display the Articles on microfilm, microfiche, CD-ROM, and any other archival system or medium now existing or hereafter developed, and electronic databases, online networks, including but not limited to TNR ONLINE, and any other system or medium now known or hereafter developed, (d) to reproduce and distribute the Articles on audiotape, webcast, streaming audio or similar medium now existing or hereafter developed, (e) to syndicate and sublicense the Articles, and to republish, reproduce, display and distribute the Articles and authorize others to do so, in English and in translation, alone, in compilations, in anthologies, in textbooks, or as a part of the publication in which the Articles first appeared, in print, digital, and electronic form (including on TNR ONLINE) and in any and all formats and media now known or hereafter developed, (f) to publish and distribute the Articles in any foreign language edition of The New Republic or any compilation or derivative work thereof, (g) to make or grant to others the permission to make copies or photocopies of the Articles in any or all media. In accordance with this grant of rights, Author shall not authorize or permit

03/09/2007   12:27    212-2421669                    S KAUFMANN                          PAGE   03

any reprint, republication, or distribution of any Article within thirty (30) days following its publication by Publisher.

In any publication of an Article, Publisher shall, or shall by contract require any licensee to, refer to Author as author of such Article. Author also hereby grants to Publisher the non-exclusive right to use Author's name, likeness, and biographical material in promoting, advertising, and publicizing the Articles and the publications in which they appear and to authorize others to exercise or perform any of these rights on its behalf.

2.    **Medium.** All rights granted by this Agreement are applicable in any form or medium in which the Articles, including any translated, abridged or condensed versions thereof, may be published, reproduced, distributed, performed, displayed or transmitted, including, but not limited to, electronic, digital and optical versions.

3.    **Editing.** Publisher may revise, edit, or otherwise modify the Articles, and Author agrees promptly to make such changes or revisions in the Articles as Publisher may request and to cooperate with Publisher's revision and editing process, including assisting in and providing all materials requested in connection with any checking Publisher may determine to undertake as to the accuracy of the Articles. Publisher may illustrate the Articles with photographs or illustrations or both, at its sole discretion. Publisher has and shall retain sole discretion to decide whether, when, and how to publish the Articles, or any of them.

4.    **Warranty.** With regard to any Article proposed by Author to be published pursuant to this Agreement, Author represents and warrants that the Article is the original work of Author, is factually correct and accurate, has not previously been published in any form, does not contain any libelous material, does not invade any right of privacy, and does not infringe or violate any copyright or any personal or proprietary rights of any third party. In the event any complaint or claim relating to the Article is made by any third party at any time, whether by a formal legal complaint or otherwise, Author shall fully indemnify Publisher and hold Publisher harmless with regard to all costs, expenses, damages, and losses (including reasonable attorneys' fees) arising from that complaint or claim, and will fully cooperate with Publisher in responding to and defending against such complaint or claim.

5.    **Compensation.** Publisher agrees to pay Author, upon publication, a fee for this article that is mutually agreed upon. This payment encompasses all rights granted herein and Author shall have no other rights to additional compensation, including royalties. Compensation for future Articles will be determined by agreement of Publisher and Author prior to publication of such Articles. Such agreement will be indicated by modification of Addendum #1 to this Agreement (which is incorporated herein by reference).

6.    **Decision Not to Publish.** Publisher has the right not to accept the Articles, or any of them, at its discretion. If Publisher decides for any reason not to publish an Article, Publisher shall provide Author with notice of said decision and

1

03/09/2007   12:27    212-2421659             S KAUFFMANN                                  PAGE   84

Publisher may, at its discretion, pay a kill fee.  Upon the giving of notice of a decision not to publish and, if applicable, payment of the kill fee to Author, all rights in such Article shall revert to Author, and unless this Agreement relates to multiple Articles (in which case the following clause is not applicable), this Agreement shall terminate, and neither party hereto shall have any liability or further obligation to the other.

7.    Author shall be free to advertise, to solicit business, and to contract to provide services to other persons and businesses.  The only restriction on these rights is that for the period beginning on the date on which this Agreement is executed and ending thirty (30) days after publication of an Article by Publisher, Author shall not, without Publisher's prior consent, write or publish, or cooperate in the writing or publishing of, any article on the same or a similar subject as such Article.

8.    Independent Contractor.  It is understood and agreed that Author is an independent contractor and will not be considered an employee or agent of Publisher for any purposes. Publisher shall not withhold any amounts for income tax, social security, unemployment insurance, disability insurance, worker's compensation insurance, or any other withholding pursuant to any law or regulation applicable to employers, and Author will not be eligible to participate in any employee benefit plan offered by or through Publisher.  Author shall be solely liable for the payment of any and all taxes or other charges on Author's compensation imposed by federal, state, or local governments and for any insurance, and Author agrees to hold Publisher harmless from any liability with respect thereto. All payments to Author hereunder shall be reported on Author's year-end 1099 tax form.

9.    General.  Except as specifically referred to in Paragraph 1 and Paragraph 5 of this Agreement regarding additional Articles, this Agreement sets forth the entire agreement of the parties, supersedes all prior agreements between the parties with respect to the subject matter hereof, will not be binding on either party until fully executed by both parties, and may not be altered except in a document signed by the party to be bound thereby.  This Agreement will be governed by the laws of the District of Columbia, applicable to contracts to be wholly performed therein and any action based on or alleging a breach of this Agreement must be brought in the local or federal courts in the District of Columbia, and the parties hereby consent to the exclusive jurisdiction of such courts.

## Addendum #1 to Author Agreement

Reference is made to the Author Agreement, dated 8/4/17 (the "Agreement"). This Addendum is the Addendum #1 referred to in the Agreement and will be deemed to be a part thereof. All defined terms not otherwise defined in this Addendum will have the meanings given them in the Agreement.

The purpose of this Addendum is a description, as applicable, of the subject matter, length, and compensation terms for Articles proposed by Author pursuant to the Agreement. This Addendum will be modified by the parties in connection with each Article proposed.

| Article | Subject | Article Length (# of words), if applicable | Compensation (fee per published word, single fee for the Article, or other) |
|---|---|---|---|
| Initial Article | | | |

**A-305**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
THE ESTATE OF STANLEY KAUFFMANN,

      Plaintiff,

   - against -          17 Civ. 6061 (CJS)(MWP)

ROCHESTER INSTITUTE OF TECHNOLOGY,

      Defendant and
      Third-Party Plaintiff,

   - against -

ROBERT J. CARDULLO,

      Third Party Defendant .
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## DECLARATION OF ROBERT MARX

ROBERT MARX declares under penalty of perjury as follows:

1.  I was a student of Stanley Kauffmann's at the Yale School of Drama in the 1970s.
Beginning in the fall of 1972 through their deaths a few years ago, I became a close confidant
and trusted friend of Stanley and his wife Laura. I am the Executor of Stanley's Estate. The
copyrights to Stanley's lifetime of work -- along with his reputation and legacy -- are the Estate's
only significant assets. I am one of a very few people in the world who are intimately familiar
with his entire oeuvre and career. My full-time "day job" is as President of a private foundation
based in New York City.

**A-306**

2.  Over those four-plus decades, Stanley and I had numerous conversations about his work and career.  In all that time, I can't remember him ever uttering the word "copyright," much less the phrase "work made for hire."  I seriously doubt that he had any comprehension of what those terms entailed.

3.  Over all those decades, I can confirm that Stanley always understood -- and proceeded to act on that understanding -- that he owned and controlled all his writings.  Specifically, over all those decades, he repeatedly authorized numerous re-publications of much of his writings, including especially his writings for The New Republic magazine, and to my knowledge he never doubted that he had the full legal right to do so and never hesitated (or sought permission of anyone else) to grant those authorizations.

4.  As the Executor of Stanley's Estate, which owns and controls all those writings, that was also always my understanding as well, and I have consistently acted on it, including by authorizing the commencement of this lawsuit against RIT based on its egregious infringements of the Estate's copyrights.

5.  At various stages throughout his entire writing career, Stanley submitted articles to and was published by numerous different publications, including (most prolifically) The New Republic but also to Saturday Review, Harper's, Horizon, The American Scholar, Yale Review, Commentary, Salmagundi, and Partisan Review, among others.  In fact, Stanley submitted pieces to those other publications at the same time he was submitting pieces to The New Republic.  In addition, at one point Stanley also had his own television program on the predecessor of what is now PBS, even while he was submitting work to The New Republic and other publications.

2

6.  Among the books that Stanley authorized that re-published (or adapted) works of his that were first published in The New Republic were these:

A WORLD ON FILM,  Harper & Row, 1966.

FIGURES OF LIGHT, Harper & Row, 1971.

LIVING IMAGES, Harper & Row, 1975.

PERSONS OF THE DRAMA, Harper & Row, 1976.

BEFORE MY EYES: FILM CRITICISM AND COMMENT, Harper & Row, 1980.

THEATRE CRITICISMS, Performing Arts Journal Publications, 1983.

FIELD OF VIEW, Performing Arts Journal Publications, 1986.

DISTINGUISHING FEATURES, Johns Hopkins University Press, 1994.

REGARDING FILM, Johns Hopkins University Press, 2001.

7.  With only one exception, each of those books contains a notice that the copyright owner of the contents of the book is Stanley Kauffmann.  The exception is that pieces that originally appeared in The New York Times carried notices that the copyright owner of the pieces was The Times.  Otherwise, none of those books contains any suggestion that anyone else, including The New Republic, had any copyright ownership interest in any of those contents.

8.  Stanley's memoir "Albums of a Life" contained pieces of his previously published in such publications as Yale Review, American Scholar, Cosmopolitan, Partisan Review, and that memoir contains only one copyright notice -- in the name of Stanley Kauffmann.

9.  With respect to Stanley's writing in The New Republic, it may also be relevant that in addition to his regular film columns -- which are the subject of this litigation -- he also frequently submitted to it miscellaneous other pieces -- essentially one-offs -- that he originated himself

without the impetus or expectation of The New Republic. He also provided at various times theater and book reviews for the magazine. I don't know whether RIT will claim that all those other non--film pieces are included within the asserted sweep of the 2004 Form Letter discussed in the next paragraph.

10. I understand that RIT has invoked a 2004 form letter sent to Stanley by Leon Wieseltier and countersigned by Stanley. At that time, Stanley was 88 years old and Mr. Wieseltier had been his editor at The New Republic for more than 20 years. Based on my close personal relationship with and knowledge of Stanley at that time, I know for a fact that Stanley trusted Mr. Wieseltier implicitly and would have signed anything he asked him to sign, even without reading or understanding it. And I am even more certain of that conclusion because -- based on my personal knowledge and direct contact with them -- in 2004 Stanley's wife Laura was entering the early stages of dementia and Stanley had no time for or interest in such (to him) unimportant matters as a letter that Mr. Wieseltier asked him to sign as a matter of routine paperwork ostensibly confirming a pre-existing arrangement. (I understand that Mr. Wieseltier has acknowledged that he did not write that 2004 letter, that he sent it at the direction of his superiors at the magazine, and that its essence is effectively gibberish to him.)

11. About Robert (Bert) Cardullo: I understand that Cardullo's reputation as a notorious plagiarist and liar will be set forth in other papers to be submitted to the Court. I will just add the following: Decades ago, Cardullo was a student and then a colleague of Stanley's. But in 2003, Stanley learned that Cardullo had forged a letter "from" Stanley to the University of Michigan vouching for Cardullo in an attempt to forestall it firing him for plagiarism. Stanley was appalled by this betrayal and directly advised the University of that forgery. Thereafter, Stanley – then 86

4

years old -- largely reduced any contact with Cardullo. (Copies of the relevant documents are attached hereto as Exhibit "A.")    And then, in 2007, Stanley learned that Hudson Review fired Cardullo as its film critic because he was caught plagiarizing Stanley (!), for which it issued a public retraction. At that point, Stanley severed all contact with Cardullo.

12. Attached to this Declaration as Exhibit "B" is a purported April 22, 2013 email from Stanley to Cardullo that purports to grant to Cardullo "permission to reprint in book form all of my reviews from 1999 to the present." I understand that RIT has asserted that it relied on this "email" when it decided to publish the book that is the subject of this case. Based on my personal extensive knowledge and experience with Stanley, especially in the last year of his life, and in particular on my personal knowledge of his utter disdain for Cardullo by that time, I can state with absolute certainty that that purported email is a complete forgery. (Among other things, the email address is fake, as is the date.) I can further state with absolute certainty that if RIT had made the slightest effort to confirm with me (the Estate) the legitimacy of that purported email I would have immediately and unequivocally advised it that it was a forgery. Alas, RIT made no such effort, and instead published the book. (I understand that other Cardullo forgeries, as well as his own confessions of his "deception," will be discussed in other documents submitted with this one.)

13. Although I am not aware that it has yet done so, I assume that at some point RIT will disown and repudiate the book it published that is the subject of this litigation. But for now, for whatever this is worth, I note that that book, published with RIT's enthusiastic imprimatur, proclaimed as follows: "Stanley Kauffmann . . . during his long career always copyrighted his articles, reviews, and essays in his own name rather than the name of the publication in which

5

they first appeared." And while I am loathe to endorse anything Cardullo may say, RIT's book happens to be correct in proclaiming that Stanley always (except for his pieces for the New York Times) owned the copyrights to his work.

Dated: January 2, 2018

_____
Robert Marx

# EXHIBIT "A"

DEC-14-02 WED 05 41 PM   THEATRE AND DRAMA   FAX 7545472297   PAGE 2



4 Dec 2002

Dear Stanley,

I have used you as a personal reference on an internal matter here at the University. Please, if you are contacted in any way, say nothing and call me first. I'll explain later. I appreciate your understanding and friendship in this situation. On a related note, I'm applying for the chair's job at Columbia - Barnard, and I've also used you as a reference there. Thanks again for your assistance (your book, Conversations with SK, proceeds apace)

All best,

Best
Cardeu?



THE UNIVERSITY OF MICHIGAN

OFFICE OF THE VICE PRESIDENT FOR RESEARCH

4080 FLEMING BUILDING, 503 THOMPSON STREET
ANN ARBOR, MICHIGAN 48109-1340
734 764-1185    FAX: 734 763-0085

January 31, 2003

Professor Emeritus Stanley Kauffmann
10 West 15th Street
New York, New York 10011

Dear Professor Kauffmann:

I am providing staff assistance to a faculty committee at the University of Michigan that is reviewing some concerns that have arisen related to Dr. Robert J. Cardullo's publication of <u>Vittorio De Sica: Director, Actor, Screenwriter</u>, McFarland & Company, Inc., 2002. Based on the letter you sent to J.W. Kline (copy attached), it appears that you are aware of this situation. We are writing to ask you to confirm that the letter is yours and if you have any additional information to provide. We thank you in advance for your time.

Sincerely yours,

Jane Ritter, PHR
Administrative Assistant

ATTACHMENT

NOV-15-02 FRI 06:09 PM   THEATRE AND DRAMA   FAX:7346472297   PAGE 5
11/08/2002 10:57   212-2421659   S KAUFFMANN   PAGE 01

# Yale University

Yale School of Drama/           Campus address:
Yale Repertory Theatre          222 York Street
P.O. Box 1903A Yale Station     Telephone:
New Haven, Connecticut 06520-7434   203 436-1589

*4 November 2002*

*J. W. Kline*
*Attorney at Law*
*32540 Schoolcraft Road*
*Suite 220*
*Livonia, Michigan 48150*


*Dear Mr. Kline,*

*This is to attest that I have first-hand knowledge that Bert Cardullo wrote the monograph that Stephen Harvey published under his own name in 1991. I also knew Harvey for many years, and can tell you—and ultimately the court hearing this liable case—that he was completely capable of such skulduggery. Cardullo was my graduate student and assistant at Yale from 1982-1986 (and, I might add, one of the best I ever had); we discussed the De Sica matter a number of times (he took the assignment against my advice, given what I knew about Harvey); I saw his manuscript at various stages; and I even wrote a question for Cardullo's comprehensive doctoral examination based on his De Sica research! Enough already.*

*I'm sorry for Bert that the truth was revealed in this way, but better this way than no other. Let me know about court dates, further deposition, etc. Thanks.*


*Sincerely yours,*

*Professor of Dramatic Literature Emeritus*

**Stanley Kauffmann**
**10 West 15 St.  PH-C**
**New York, N.Y. 10011**
**Tel. & Fax: 212-242-1659**

February 6, 2003

Jane Ritter
Office of the Vice President for Research
University of Michigan
4080 Fleming Building, 503 Thompson Street
Ann Arbor Mich., 48109-1340

Dear Ms. Ritter:

I have your letter of January 31, 2003, which arrived by Fedex two days ago.  You attached a Xerox copy of a letter purportedly written by me on Yale University stationery, dated 4 November 2002, addressed to J. W. Kline, a lawyer in Livonia, Michigan.

You ask me to confirm that the Kline letter is mine.  I cannot do so.  I did not write this letter.  I never saw it or heard of it until I received the Xerox you sent me.  The signature looks like mine, but I did not sign this letter.

Yours,



THE UNIVERSITY OF MICHIGAN
503 THOMPSON STREET
ANN ARBOR, MICHIGAN 48109-1340

March 28, 2003


Professor Emeritus Stanley Kauffmann
10 West 15th Street PH-C
New York, New York  10011

Dear Professor Kauffmann:

In a letter dated January 31, 2003, Jane Ritter, staff to an internal University of Michigan committee investigating academic misconduct, wrote to you regarding Stephen Harvey's authorship of a substantial essay on Vittorio De Sica.

You graciously responded in a letter dated February 6, 2003.

Allow us to provide you additional context for Ms. Ritter's inquiry.  The University investigated an allegation that Professor Cardullo inappropriately used text from "Vittorio D.: De Sica behind the camera and on the screen," by Stephen Harvey, pp. 13-86 in: *Vittorio De Sica*, preface by Gian Luigi Rondi, Ministero Del Turismo E Dello Spettacolo, published by Cinecittà International – Rome ® 1991 (*I Quaderni Di Cinecittà*, 6); in "Actor-become-auteur: The neorealist films of Vittorio De Sica," *The Massachusetts Review*, vol. 41, issue 2, pp. 173-192, Summer 2000, copyright Massachusetts Review, Inc.; and in *Vittorio De Sica: Director, Actor, Screenwriter*, 210 pages, McFarland & Company, Inc., copyright  2002.   The internal investigation found him guilty of plagiarism seriously at variance from scholarly standards and of falsification of documents submitted to the investigation committee.

Professor Cardullo has resigned his position at the University of Michigan effective May 1, 2003.

Sincerely,


Paul N. Courant
Provost and Executive Vice President for Academic Affairs


Fawwaz T. Ulaby
Vice President for Research


PNC:FTU/jcr



2 June 2003

Dear Stanley,

I hope this is still of interest to you; I will send you copies of the book upon publication. I'll be moving to the east coast soon as a result of my resignation here. Again, sorry to have violated our friendship in the way I did. There's no excuse and I don't expect anyone's understanding outside this university. All that I can tell you is: I'm glad to be leaving.

All best to you,

Bert

NOTE: The relevant page from the musical catalog was attached. SK

**A-318**

# EXHIBIT "B"

# A-319

**From:** stanley kauffmann <stanleykauffmann@gmail.com>
**To:** robertcardullo@yahoo.com
**Sent:** Sunday, April 22, 2013 2:48 PM
**Subject:** permissions

Dear Bert,

I apologize for taking so long to get back to you, as I have been ill.

Yes, of course you have my permission to reprint, in book form, all of my reviews from 1999 to the present (or whenever I stop writing). The reviews are all copyrighted in my name, so you don't have to get permission from any of the original places of publication—namely, *The New Republic*. I don't have the energy to undertake such a project at this point—especially now that Laura is gone. But another, perhaps final collection of my film criticism would be welcome.

Thanks for taking all the trouble to publish this book. I hope you come up with a good title. If I'm still here, do send me a copy eventually! That is all I ask.

All best to you,

Stanley

Stanley Kauffmann
10 West 15th Street
New York, New York 10011
(212) 242-1659

**A-320**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

THE ESTATE OF STANLEY KAUFFMANN,

              Plaintiff,

       - against -                        17 Civ. 6061 (CJS)(MWP)

ROCHESTER INSTITUTE OF TECHNOLOGY,

              Defendant and
              Third-Party Plaintiff,

       - against -

ROBERT J. CARDULLO,

              Third Party Defendant .
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

<u>DECLARATION OF HENRY THAYER</u>

HENRY THAYER declared under penalty of perjury as follows:

1. I am a literary agent at the New York City-based literary agency Brandt & Hochman

("B&H").   Under a different name, B&H was founded in 1913 – more than 100 years ago – and

it has continued since then as a prominent and well-respected "boutique" agency.  When I joined

B&H in 2009, I worked directly under Carl Brandt, the son of the founding Brandt.  (Carl Brandt

died in 2013.)

2. For over four decades, Carl Brandt served as literary agent for Stanley Kauffmann, and

when Mr. Brandt died I assumed direct responsibility for Mr. Kauffmann's works.  I knew Mr.

Kauffmann personally and I am fully familiar with B&H's files relating to his works.  In fact, I recently produced to R.I.T. voluminous documents from those files in response to a subpoena addressed to B&H in this case and in so doing I had to review them all.

3.  Based on my review of B&H's files, my work with Mr. Brandt, my own interactions with Mr. Kauffmann, and my service as his agent, I can state that B&H always understood that Mr. Kauffmann owned the copyrights in all his contributions to The New Republic magazine ("TNR") and that it consistently acted on that understanding.  For example,  B&H handled for Mr. Kauffmann numerous book contracts and licenses for the publication (and other use) of his TNR pieces and in all those dealings Mr. Kauffmann was treated as the sole copyright owner of  . all that work.  Based on our files and my own direct involvement, I can state that B&H never received any indication from anyone else, including TNR,  inconsistent with  that understanding or that we needed to clear any of those dealings with anyone else, including TNR.   (Under the Copyright Act of 1909, which remained in effect through 1977, the entire contents of every issue of TNR were "copyrighted" by TNR and TNR then regularly and routinely transferred back to Mr. Kauffmann the copyrights in his TNR pieces, confirming that he was the proper owner of those copyrights..  The Copyright Act of 1976, which took effect on January 1, 1978, rendered that practice obsolete because after that date Mr. Kauffmann became the owner of the copyrights in his work automatically on its creation, and that practice was discontinued in due course.)

Dated: December 20, 2017

Henry Thayer

**A-322**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
THE ESTATE OF STANLEY KAUFFMANN,

                Plaintiff,

     - against -                             17 Civ. 6061 (CJS)(MWP)

ROCHESTER INSTITUTE OF TECHNOLOGY,

                Defendant and
                Third-Party Plaintiff,

     - against -

ROBERT J. CARDULLO,

                Third Party Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

<u>DECLARATION OF LEON WIESELTIER</u>

NOTE: THE ABOVE CAPTION AND HEADING WERE ADDED TO THE DECLARATION THAT FOLLOWS  AFTER IT WAS SIGNED BY ITS DECLARANT TO ENSURE THAT IT <u>WILL BE DULY FILED  IN THE CORRECT COURT DOCKET</u>

## DECLARATION OF LEON WIESELTIER

I hereby declare under penalty of perjury:

1. From 1983 to 2014, I was Literary Editor of The New Republic, and during that period I was Stanley Kauffmann's editor and principal contact with the Magazine.

2. I have been shown a 2004 letter from me to Mr. Kauffmann. Although I have no specific memory of that letter or of drafting or signing or sending it, I do recall that I was asked by my superiors at the Magazine to send such letters and that I did so as requested as a matter of course. (A copy is attached.)

3. With respect to that letter, and more generally, a) I never discussed with Mr. Kauffmann (orally or in writing) the copyright ownership of his contributions to the Magazine; b) with the apparent exception of that letter, I never used the phrase "work made for hire" (or any variation of it) in any communication with Mr. Kauffmann; and c) in fact, the phrase "work made for hire" (or any variation of it) is not in my vocabulary and I do not know what it means.

Dated: December 15, 2017

_____
Leon Wieseltier



*Leon Wieseltier*

March 22, 2004

15081

Stanley Kauffmann
Penthouse C
10 West 15th Street
New York, NY 10011

Dear Stanley,

Like many publishing companies, *The New Republic* is working to expand into the web and related technologies, and in so doing, afford you maximum exposure. We've had a wonderful relationship with you over the years and see this expansion as a great opportunity to further promote you and your talents for our mutual benefit. Recent Supreme Court decisions have made it necessary that we explicitly confirm the terms under which you write for *The New Republic*.

Thus, in the interest of responsibly managing our business, we are making efforts to memorialize in writing all of our agreements with our writers, including freelance contributors. Our agreement with you has always been an oral understanding, and among other things we do want to ensure that we are not violating your rights in any way. To that end, we'd like to confirm with you our understanding of our past relationship with you, as well as our relationship with you and your contributions to *The New Republic* going forward.

We have always understood that you have been writing articles for *The New Republic* as a freelance contributor. We have also always understood in doing business with you that, in light of our regular monthly compensation arrangement with you, all articles you have written for *The New Republic* have been "works made for hire," as that term is defined under the US Copyright laws. We'd like to confirm with you that the above understanding of our business relationship with you is correct, but also that the above understanding will remain in effect as to any future articles you write for *The New Republic*, unless and until we and you both agree otherwise in writing.

Please acknowledge your agreement with us about this by so indicating with your signature below.

Many thanks.

Date: _Mouch 24, 2004_

Agreed: _____

Sincerely,

Leon Wieseltier
Literary Editor

Author Signature _____

13138

1331 H STREET   SUITE 700   WASHINGTON, D.C. 20005   202-508-4444   F 202-508-4477   lwieseltier@tnr.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
THE ESTATE OF STANLEY KAUFFMANN,

                           Plaintiff,


        - against -                                    17 Civ. 6061 (CJS)(MWP)


ROCHESTER INSTITUTE OF TECHNOLOGY,

                           Defendant and
                           Third-Party Plaintiff,


        - against -


ROBERT J. CARDULLO,

                           Third Party Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY


                                        Kenneth P. Norwick
                                        Norwick & Schad
                                        110 East 59th Street
                                        New York, NY 10022
                                        (212) 751-4440
                                        ken@norwickschad.com

**A-326**

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

THE RELEVANT PARTIES AND PLAYERS . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

THE RELEVANT FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

ALL APPLICABLE LAW AND EVIDENCE ESTABLISHES THAT THE
ESTATE OWNS ALL COPYRIGHTS TO MR. KAUFFMANN'S CON-
TRIBUTIONS TO THE NEW REPUBLIC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

    The Relevant Copyright Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

    Initial Ownership of Copyrights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

    'Work Made for Hire' Under the 1909 Act . . . . . . . . . . . . . . . . . . . . . . . . . .   13

    'Work Made for Hire' Under the 1976 Act . . . . . . . . . . . . . . . . . . . . . . . . . .   13

    The Law in the Second Circuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

    Applying the Law to this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

    Is There a Legally-Sufficient Writing Here? . . . . . . . . . . . . . . . . . . . . . . . . .   21

    What Did the Parties 'Understand'? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
ESTABLISHING RIT'S LIABILITY FOR COPYRIGHT INFRINGEMENT
SHOULD BE GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

i

TABLE OF AUTHORITIES

Cases

Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc., 716 F.3d 302
        (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17, 22, 26

Goodis v. United Artists Television, 425 F.2d 397, 400 (2d Cir. 1970) . . . . . . . . . .  10, 26, 30

Kid Stuff Marketing, Inc. v. Creative Consumer Concepts, Inc., 223
        F.Supp.3d 1168 (D.Kan. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..   17

Luis Hirsch y Cia. Sociedad Anonima v. Rosenblatt Casing Co.,
        418 F.2d 1300, 1302 (2d Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

Morris v. Business Concepts, Inc., 259 F.3d 65, 72-73 (2d Cir. 2001),
        amended, 283 F.2d 502 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . .   10, 26, 30.

Pimpinello v. Swift & Co., 253 N.Y. 159, 164  (NY 1930) . . . . . . . . . . . . . . . . . .   20

Playboy Enterprises, Inc. v. Dumas, 831 F.Supp. 295, 315 (S.D.N.Y. 1993) . . . . .   15

Playboy Enterprises, Inc. v. Dumas. 53 F.3d 549 (2d Cir. 1995) . . . . . . . . . . . . . .   passim

Playboy Enterprises, Inc. v. Dumas, 960 F. Supp. 710 (S.D.N.Y. 1997) . . . . ..   17 n

Playboy Enterprises, Inc. v. Dumas, (1998 U.S. App. LEXIS 15225 (2d Cir. 1998) . .   17n

Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410 (7th Cir. 1992) . . . . . . . .   14

Stanacard, LLC v. Rubard, LLC., 2016 U.S.Dist. LEXIS 15721
        (S.D.N.Y. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Urbont v. Sony Music Entertainment, 100 F.Supp.3d 342 (S.D.N.Y. 2015) . . . . . .   17, 20, 22

Urbont v. Sony Music Entertainment, 831 F.3d 80, 89 (2d Cir. 2016). . . . . . . . . . .   13


Statutes

Copyright Act of 1909 (17 U.S.C., repealed)  . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

Copyright Act of 1976 (17 U.S.C.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
<u>ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY</u>

Plaintiff Estate of Stanley Kauffmann ("Estate") respectfully submits this combined

Memorandum of Law a) in opposition to the motion of defendant Rochester Institute of Tech-

nology ("RIT") for summary judgment and b) in support of its cross-motion for partial summary

judgment establishing RIT's liability for copyright infringement as alleged in the Estate's Com-

plaint.

<u>PRELIMINARY STATEMENT</u>

RIT's motion for summary judgment is an utterly frivolous "Hail Mary" in an action that

RIT unnecessarily forced the Estate to bring against it.  There is not a scintilla of factual or legal

support for the ultimate legal conclusion RIT urges this Court to reach.  Indeed, exactly to the

contrary, <u>all</u> of the applicable evidence and law compels the rejection of RIT's proffered conclu-

sion and the adoption of the opposite, which is the Estate's position on its cross-motion.

RIT's motion urges this Court to judicially define the legal relationship between two

other parties in a way that neither of those parties endorses.  RIT's entire ostensible excuse for its

motion is a one-page form letter a) which purportedly defines -- solely by direct quotation from

an arcane federal statute which quotation is left completely unexplained -- the legal nature of a

46-year working relationship that never before considered any such definition; b) which the

sender of the letter has acknowledged under penalty of perjury he didn't write and doesn't under-

stand; and c) which was sent to an 88-year-old non-lawyer who trusted that sender implicitly and

who had far more serious matters to deal with.

Tellingly, the corporation responsible for that letter has apparently declined to stand

behind it even while it submitted to this Court an otherwise entirely innocuous declaration at

RIT's request.   As a result, RIT stands alone in urging this Court to give legal effect to a pur-

ported "agreement" that neither of the actual (ostensible) "parties" to it supports, that neither

signatory to it understood, and that could not have been more cynical -- but which, alas, RIT

nevertheless wholeheartedly embraces and urges on this Court.

<u>THE RELEVANT PARTIES AND PLAYERS</u>[1]

<u>Stanley Kauffmann</u> (1916-2013) was a distinguished and highly respected (by many

revered) critic, author, teacher, and what is now called a "public intellectual."  During his seven-

decade career he authored numerous books, hosted a public television program, and contributed

countless articles and columns to many publications, including Harper's, Saturday Review, Com-

mentary, Partisan Review, Yale Review, Horizon, and (most prolifically) The New Republic.

<u>The Estate</u> was created by Mr. Kauffmann's Will.  Its only significant assets are the copy-

rights in his works and his reputation and legacy.

<u>Robert Marx</u> was for the last five decades of Mr. Kauffmann's life his close friend and

confidant.  As such, he was intimately familiar with Mr. Kauffmann's oeuvre and career.  Mr.

Kauffmann's Will named Mr. Marx the Executor of his Estate.  In that capacity, Mr. Marx

authorized the commencement of this action.

<u>Robert J. (Bert) Cardullo</u> was at one time a student and colleague of Mr. Kauffmann.  In

2003, Mr. Kauffmann discovered that Cardullo had forged a letter ostensibly from him ad-

dressed to the University of Michigan vouching for Cardullo in an attempt to forestall the Uni-

versity firing Cardullo for plagiarism.  Mr. Kauffmann advised the University that the letter was a

---

[1] The factual assertions below are derived from the Estate's Rule 56 Statement, which
contains specific references to the parts of the record on these motions that support those
assertions.

2

forgery and Cardullo's employment there was then terminated.  Then, in 2007, Mr. Kauffmann learned that Hudson Review had fired Cardullo as its film critic because he was caught plagiarizing Mr. Kauffmann, for which it issued a public retraction and apology.  At that point, Mr. Kauffmann severed all contact with Cardullo.

Cardullo is now and has been for many years a notorious (and now self-confessed) plagiarist and liar (and worse, someone who has almost certainly committed federal felonies in perpetrating the fraud that underlies this action).  A brief review of Cardullo's notorious public reputation as a loathsome and widely shunned reprobate is set forth in the Complaint in this case, which is a part of the record on these motions, and in the Declarations of Kenneth P. Norwick and Robert Marx submitted herewith.  Cardullo's written confessions concerning the book that is the subject of this case -- "I am fully guilty of all the charges against me" -- are also part of the record on these motions.

The New Republic was, during the period relevant to this case, a respected magazine of comment and criticism on such subjects as politics and the arts.  From 1958 until his death at 97 in 2013 -- a period of 55 years -- Mr. Kauffmann contributed a wide variety of pieces to it, including but not limited to a regular column of film criticism.

Leon Wieseltier was from 1983 to 2014 the Literary Editor of The New Republic.  As such, he was Mr. Kauffmann's editor for work submitted by him to the magazine during that period.  He has executed a Declaration under penalty of perjury that is part of the record on these motions.

RIT is an institution of higher learning based in Rochester, New York.  It maintains and operates what it calls an "enterprise" called RIT Press that engages in the business of publishing

books.  In November 2015 it proudly published the book submitted to it by Cardullo that is the

subject of this case.  Cardullo, but not yet RIT, has publicly admitted that the book was a

complete fraud – and egregious copyright infringement.

The Millennial Critic: Stanley Kauffmann on Film: 1999-2009 ("the Infringing Book") is

the book that Cardullo submitted to RIT and that RIT proudly published.

Robert (Bobby) Colon was at relevant times the General Counsel of RIT.  In response to

the Estate's early request for the documents RIT claimed it relied on in publishing the Infringing

Book, he declared that he would only provide those documents in response to a "validly issued

subpoena" for them, thus forcing the Estate to bring this action.

## THE RELEVANT FACTUAL BACKGROUND

Mr. Kauffmann submitted pieces, including but not limited to a regular column of film

criticism, to The New Republic from 1958 until he died in 2013.   During that entire 55-year

period, at least as the record on these motions reveals, The New Republic and Mr. Kauffmann

never discussed much less reached agreement concerning the copyright ownership of those

pieces.  As a result, under both the Copyright Act of 1909 (in effect through December 31, 1977)

and the Copyright Act of 1976 (effective January 1, 1978) Mr. Kauffmann was -- and the Estate

now is -- the undisputed owner of all those copyrights.

3.  As Mr. Wieseltier has sworn: "I never discussed with Mr. Kauffmann (orally or in

writing) the copyright ownership of his contributions to the Magazine."

4.  As Mr. Marx has sworn: "I can confirm that Stanley always understood -- and pro-

ceeded to act on that understanding -- that he owned and controlled all his writings.  Specifically,

over all those decades, he repeatedly authorized numerous re-publications of much of his wri-

tings, including especially his writings in The New Republic magazine, and to my knowledge he never doubted that he had the full legal right to do so and never hesitated (or sought permission of anyone else) to grant those authorizations."

5.  Beginning in 1966, eight years after he began submitting pieces to The New Republic, Mr. Kauffmann regularly authorized the republication in book form of pieces that previously appeared in The New Republic.  Among those books were:

A WORLD ON FILM,  Harper & Row, 1966.

FIGURES OF LIGHT, Harper & Row, 1971.

LIVING IMAGES, Harper & Row, 1975.

PERSONS OF THE DRAMA, Harper & Row, 1976.

BEFORE MY EYES: FILM CRITICISM AND COMMENT, Harper & Row, 1980.

THEATRE CRITICISMS, Performing Arts Journal Publications, 1983.

FIELD OF VIEW, Performing Arts Journal Publications, 1986.

DISTINGUISHING FEATURES, Johns Hopkins University Press, 1994.

REGARDING FILM, Johns Hopkins University Press, 2001.

6.  Each of those books contains a notice that the copyright owner of the contents of the book is Stanley Kauffmann.  With one exception, none of those books contains any suggestion that anyone else, including The New Republic, had any copyright ownership interest in any of those contents.  The exception is that The New York Times required that the republication of pieces that originally appeared in The Times contain notices that the copyright owner of the pieces was The Times.   Otherwise, none of those books contains any suggestion that anyone else, including The New Republic, had any copyright ownership interest in any of those contents.

5

The New Republic never imposed any such requirement or request.

7.  During most if not all of Mr. Kauffmann's career as a writer, he was represented by the Brandt & Brandt (later Brandt & Hochman) literary agency.

8.  Henry Thayer, an agent at that agency, has sworn: "Based on my review of B&H's files, my work with Mr. Brandt, my own interactions with Mr. Kauffmann, and my service as his agent, I can state that B&H always understood that Mr. Kauffmann owned the copyrights in all his contributions to The New Republic magazine ('TNR') and that it consistently acted on that understanding.  For example, B&H handled for Mr. Kauffmann numerous book contracts and licenses for the publication (and other use) of his TNR pieces and in all those dealings Mr. Kauffmann was treated as the sole copyright owner of all that work.  Based on our files and my own direct involvement, I can state that B&H never received any indication from anyone else, including TNR,  inconsistent with that understanding or that we needed to clear any of those dealings with anyone else, including TNR."

9.  RIT has proffered a 2004 form letter on the letterhead of The New Republic that was sent and signed by Mr. Wieseltier to Mr. Kauffmann and countersigned by him ("the 2004 Form Letter").

10.  The second paragraph of the 2004 Form Letter states as follows (emphasis added): "Thus, in the interest of responsibly managing our business, we are making efforts to memorial-ize in writing all of our agreements with our writers, including freelance contributors. Our agree-ment with you has always been an oral understanding, and among other things we do want to ensure that we are not violating your rights in any way. To that end, we'd like to confirm with you our understanding of our past relationship with you, as well as our relationship with you and

your contributions to The New Republic going forward."

11.   That paragraph uses the phrase "our agreement" twice and "our understanding" once. The context of those uses makes clear that those phrases purport to speak only for The New Republic and not for "our writers, including freelance contributors" who are the Form Letter's intended recipients.  That paragraph contains not the slightest suggestion that those recipients in any way shared or even understood whatever those phrases purport to refer to.

12.   The third paragraph of the 2004 Form Letter states as follows (emphasis added): "We have always understood that you have been writing articles for The New Republic as a freelance contributor.  We have also always understood in doing business with you that, in light of our regular monthly compensation arrangement with you, all articles you have written for The New Republic have been 'works made for hire,' as that term is defined under the US Copyright laws. We'd like to confirm with you that the above understanding of our business relationship with you is correct, but also that the above understanding will remain in effect as to any future articles you write for The New Republic, unless and until we and you both agree otherwise in writing."

13.   The sender of the 2004 Form Letter, Leon Wieseltier, has stated under penalty of perjury: "with the apparent exception of that letter, I never used the phrase 'work made for hire' (or any variation of it) in any communication with Mr. Kauffmann; and in fact, the phrase 'work made for hire' (or any variation of it) is not in my vocabulary and I do not know what it means."

14.   Similarly, Mr. Marx -- Mr. Kauffmann's close confidant and friend – has stated under penalty of perjury: "In all that time [four-plus decades], I can't remember [Mr. Kauffmann] ever uttering the word 'copyright,' much less the phrase 'work made for hire.'  I seriously doubt that he had any comprehension of what those terms entailed."

7

15.  Mr. Marx has declared under penalty of perjury that in 2004 Mr. Kauffmann was 88 years old and "trusted Mr. Wieseltier implicitly and would have signed anything he asked him to sign, even without reading or understanding it."  Further, "I am even more certain of that conclusion because -- based on my personal knowledge and direct contact with them -- in 2004 Stanley's wife Laura was entering the early stages of dementia and Stanley had no time for or interest in such (to him) unimportant matters as a letter that Mr. Wieseltier asked him to sign as a matter of routine paperwork."

16.  The 2004 Form Letter, sent to an 88-year-old contributor who trusted its sender implicitly, treated the letter as a routine paperwork request to confirm what it claimed was a pre-existing "understanding."  To say the least, the letter does not contain even a hint that its real purpose was to usurp for The New Republic all of the copyrights to that contributor's (then) 46-year body of contributions to the magazine.

17.  For the 2004 Form Letter to have – to be given by a Court – legal effect, there must be a "meeting of the minds" as to the meaning and import of its provision that "<u>all articles you have written for The New Republic have been 'works made for hire,' as that term is defined under the US Copyright laws.</u>"  Without such a "meeting of the minds," the 2004 Form Letter is a legal nullity.

18.  As some copyright lawyers know, but probably few other lawyers and most non-lawyers don't, the "definition" of "work made for hire" was materially different as between the Copyright Act of 1909 (in effect though 1977) and the Copyright Act of 1976, effective January 1, 1978.  The 2004 Form Letter purports to span both statutes, but does not indicate which Act is referred to therein.  The 1909 Act contained no definition of "work made for hire."  The current

Act's "definition" of that term is set forth at the very end of Section 101 of Title 17 of the United States Code.  That definition includes the phrase "specially ordered or commissioned for use as a contribution to a collective work . . ."  The term "collective work" has its own separate defintion, and the phrase "specially ordered or commissioned" is not defined in the Act.  The definition of "work made for hire" in Section 101 of Title 17 does not provide any indication of the significance – the consequences – of a work meeting that definition, and neither does the 2004 Form Letter.

19.  Mr. Kauffmann began submitting pieces to The New Republic in 1958, at which time the effective U.S. Copyright Act contained no definition of "work made for hire."  The 2004 Form Letter does not state whether it applies to works contributed while that Act governed, virtually all of the copyrights to which were transferred by The New Republic to Mr. Kauffmann.

20.  In addition to his regular column of film criticism in The New Republic, Mr. Kauffmann also frequently submitted to it miscellaneous other pieces -- essentially one-offs -- that he originated himself without the impetus or expectation of The New Republic.  .He also at various times submitted to it theater and book criticism.  The 2004 Form Letter does not state whether it applies to one-off and other non-film-related works contributed by Mr. Kauffmann.

21.  Prior to the 2004 Form Letter, Mr. Kauffmann executed numerous agreements authorizing others to publish or otherwise use pieces he wrote for The New Republic.  The 2004 Form Letter does not state whether all those authorizations were retroactively rendered invalid and infringing of copyrights retroactively ostensibly claimed by The New Republic.

22.  Fewer than three years after The New Republic's claimed corporate epiphany reflected in the 2004 Form Letter, The New Republic completely abandoned its claimed 2004

9

"understanding" that "all articles . . . written for The New Republic [are] 'works made for hire,' as that term is defined under the US Copyright laws."  Instead, in early 2007 The New Republic acknowledged that its contributors in fact owned the copyrights in their contributions and that those writers were only granting to the magazine specific limited rights to those contributions.

23.  RIT has proffered evidence that The New Republic regularly – almost entirely while the Copyright Act of 1909 was the applicable law – transferred to Mr. Kauffmann the copyrights to his contributions that it obtained when it copyrighted the entire relevant issue of the magazine.

24.  The New Republic's regular and routine -- on its own initiative -- practice of transferring to Mr. Kauffmann the copyrights in his contributions flows from the "indivisibility" of copyright under the 1909 Copyright Act.  As explained by the Second Circuit in 2001, referring to its 1970 holding in Goodis v. United Artists Television, 425 F.2d 397, 400 (2d Cir. 1970): "In Goodis, we examined whether, under the prior Copyright Act of 1909, notice of copyright by a magazine was sufficient to obtain a valid copyright on behalf of the author of an individual work contained in the magazine, and concluded that it was. . . .  Unlike the current Copyright Act, the prior Act mandated indivisibility of copyright which meant that if the author did not obtain a copyright in his work, publication would put the work into the public domain.  We said in Goodis that we were 'loath to bring about the unnecessarily harsh result of thrusting the author's product into the public domain,' . . . when it was clear from the magazine's copyright notice that the author did not intend such a result."  Morris v. Business Concepts, Inc., 259 F.3d 65, 72-73 (2d Cir. 2001), amended in unrelated ways, 283 F.2d 502 (2d Cir. 2002).  As approved by Goodis and as reiterated by Morris, The New Republic's practice of obtaining in its own name and then routinely transferring to its contributors the copyrights in their contributions served both to

preserve for the contributors and to then transfer to them those copyrights.  That practice reflected and was motivated by the magazine's recognition of and respect for the fact that those contributors were the rightful owners of those copyrights.

25.  On April 2, 1993, an employee of The New Republic wrote a letter to Mr. Kauffmann that stated as follows: "This is to confirm our telephone call this morning. You may, of course, reprint any or all the film reviews you have done for TNR in your forthcoming anthology. We'd simply request that there be some indication that the essays first appeared in our pages."

26.  That letter was written almost three decades after Mr. Kauffmann first and repeatedly thereafter authorized, in his own name and as the sole copyright owner, republication of his contributions to The New Republic, without any indication in the record that he sought the permission of anyone else in so doing.  That letter makes no mention of "copyright" and contains no suggestion that Mr. Kauffmann did not own the copyrights in his contributions to the magazine or that he should reference anyone but himself as the true owner of those copyrights.

27.  That 1993 letter contains no indication of the underlying request apparently made by Mr. Kauffmann.  Here's an entirely plausible and factually accurate possibility: "As you know, I own and control all of my pieces for The New Republic and have since 1966 authorized the republication by others of those pieces in my own name as the sole owner of them.  I am currently working on another anthology containing such pieces and the publisher has asked me to ask you for confirmation that I own those pieces.  Please send me that confirmation.  Many thanks."

28.  The only input from The New Republic on these motions is a Declaration by David Myer, an officer of the company. That Declaration conspicuously a) makes no mention of and certainly does not endorse or ratify the 2004 Form Letter; b) makes no mention of and certainly

11

does not disown the 2007 effective repudiation of the 2004 Form Letter; c) does not contain the word "copyright"; d) does not contain the phrase "work made for hire"; and e) does not mention, much less claim, any "understanding" or "agreement" between The New Republic and Mr. Kauffmann on any issue, including the copyright ownership of his (then) 46-year body of work in the magazine.   In any event, the undisputed fact is that, notwithstanding the obvious opportunity to do so, The New Republic in late 2017 does not stand behind or urge on this Court the 2004 Form Letter.  Thus, on these motions, neither party to that ostensible "agreement" endorses or claims it should be given any legal respect or viability.

ALL APPLICABLE LAW AND EVIDENCE ESTABLISHES
THAT THE ESTATE OWNS ALL COPYRIGHTS TO
<u>MR. KAUFFMANN'S CONTRIBUTIONS TO THE NEW REPUBLIC</u>

<u>The Relevant Copyright Acts</u>

  Two separate U.S. Copyright Acts are relevant to this case and these motions.  The first, the Copyright of 1909, was in effect through December 31, 1977.  The second, the Copyright Act of 1976, took effect on January 1, 1978 and is the Act in effect today.  The 44 specific infringements at issue in this case were originally created and published in 1999, which means that only the current Copyright Act is applicable to them.  However, because RIT invokes on its motion works created and published beginning in 1958, when the 1909 Act was in effect, that Act must also be understood as relevant here.

<u>Initial Ownership of Copyrights</u>

  Under both Acts, quoting the current one, "Copyright in a work protected under this title vests initially in the author or authors of the work."  17 U.S.C. §201(a).

12

<u>'Work Made for Hire' Under the 1909 Act</u>

As reported by the Second Circuit, "The 1909 Copyright Act mentions works for hire only in the definition section of the statute, where it states that '[i]n the interpretation and construction of this title . . . the word 'author' shall include an employer in the case of works made for hire. . . . 'Under this definition, an 'employer' who hires another to create a copyrightable work is the 'author' of the work for purposes of the statute, absent an agreement to the contrary." <u>Urbont v. Sony Music Entertainment</u>, 831 F.3d 80, 89 (2d Cir. 2016). Giving meaning to the phrase "work made for hire" under the 1909 Act became the responsibility of the Courts. But because this action does not require any such determination, we will not here address whether Mr. Kauffmann's extensive contributions to The New Republic during the 20-year period from 1958 through 1977 qualify as "work made for hire" under the 1909 Act.

<u>'Work Made for Hire' Under the 1976 Act</u>

To protect freelance authors and other creators – artists, illustrators, photographers, etc. – from predatory publishers, Congress in enacting the 1976 Act severely restricted the situations where works could be considered "work made for hire" and imposed a strict requirement of a "written instrument" confirming that the work in question should be treated as "work made for hire." No longer would there be no limit on the kinds of work that could be so treated and no longer could a publisher simply declare, <u>ipse dixit</u> -- including many years after creation -- that it "owned" all the freelance creators' work as "work made for hire."

Instead, Congress a) limited the categories of work that could qualify – including, as here relevant, "contributions" to magazines, and b) imposed this immutable condition: "<u>if the parties expressly agree in a written instrument signed by them that the work shall be considered a work</u>

13

made for hire" (emphasis added).  For the purposes of the pending motions, it is this explicit "written instrument" condition – and not any other possible issues[2] – that will determine the outcome of the motions.

<u>The Law in the Second Circuit</u>

As with many legislated provisions, the "written instrument" condition presented inevitable – and crucial – issues of interpretation that had to be resolved by the courts.  Probably the most vexing such issue was <u>when</u> the writing had to be executed – before or simultaneously with the creation of the work?  Immediately after the creation of the work?  Many decades (as here) after the creation of the work?  Also, if after creation, does the use of the singular ("the work") in the statute allow for retroactive "blanket" "work made for hire" treatment – <u>e.g.</u>, (as here) covering <u>all</u> prior works of the creator for the publisher?

In 1992, the Seventh Circuit, in <u>Schiller & Schmidt, Inc. v. Nordisco Corp</u>., 969 F.2d 410 (7th Cir. 1992), became the first -- and until the SDNY and the Second Circuit weighed-in a few years later -- the only court to address the "when" issue.  That court declared a black-letter unambiguous answer: the writing required by the Act "must precede the creation of the property in order to serve its purpose of identifying the (noncreator) owner unequivocally." <u>Id.</u> at 413.  But then came the seminal (in this Circuit) case of <u>Playboy Enterprises, Inc. v. Dumas</u>, which generated two district court and two Second Circuit decisions, citations to which will be provided with the references to those decisions below.  (Possibly gratuitous disclosure: the Estate's undersigned counsel in this case represented plaintiff Playboy in that litigation, which began in 1991 --

---

[2] The 1976 Act also requires for eligibility that the work be "specially ordered or commissioned" by the publisher.  Without conceding that this requirement has been met here, the Estate sees no need to get into the weeds on that issue for the purposes of the pending motions.

14

twenty-seven years ago -- and which (finally) concluded in 1998.)

In that case, Playboy paid a freelance artist by check following his delivery and the acceptance of each assigned work and the artist (or others for him) endorsed those checks, each of which (as here relevant) contained a "legend" confirming the "work made for hire" status of the work. (Thus, each subject "writing" in that case applied to a specific identified work – as distinct from a blanket "all works" document, as here.) Playboy argued that the check-endorsements constituted the "work made for hire" "writing" required by the 1976 Act. A major issue in the case was whether those work-specific check-endorsements -- issued essentially immediately after the work was created and delivered -- met the "written instrument" requirement of the Act.

Following an extensive bench trial before the late District Judge Charles H. Tenney, Playboy's position was resoundingly rejected – Playboy was (temporarily) trounced. On the "when" issue – whether the writing can be signed after the work is created – Judge Tenney set forth the Seventh Circuit's rationale in Schiller and then held:

> This logic strikes the court as sound. This court therefore holds on the basis of the statutory scheme, the legislative history, and the reasoning of Judge Posner, that a writing is required prior to the creation of a work in order for the work to be considered a work made for hire within the meaning of *17 U.S.C. § 101(2)*. Accordingly, this court finds that none of the check legends in this case were a sufficient writing within the meaning of the 1976 Act to make the Nagel pieces work made for hire for Playboy, because all of the writings came after the creation of the works.

831 F.Supp. 295, 315 (S.D.N.Y. 1993).

Playboy appealed to the Second Circuit, and on the "when" issue that Court largely agreed with Judge Tenney but then added a limited and carefully nuanced exception. Because the Circuit's explicit holding could not be more crucial to the adjudication of the pending

15

motions, we will quote extensively from the opinion here – with selected passages emphasized

(sometimes doubly):

> We agree with the Seventh Circuit that the writing requirement was created, in part, to make the ownership of intellectual property rights clear and definite. The Supreme Court, in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 750, . . . . (1989) ("CCNV"), stated that one of Congress's goals in creating the work-for-hire provisions of the 1976 Act was to "ensure predictability through advance planning." In *CCNV,* the Court rejected the petitioner's argument that independent contractors should be considered "employees" under *§101(1)* if their works were "actually controlled" by the hiring party. That interpretation, the Court reasoned, would "thwart" the purpose of *§ 101* because it "leaves the door open for hiring parties, who have failed to get a full assignment of copyright rights from independent contractors falling outside the subdivision (2) guidelines, to unilaterally obtain work-made-for-hire rights years after the work has been completed." Id. (quoting Hamilton, *Commissioned Works as Works Made for Hire Under the 1976 Copyright Act: Misinterpretation and Injustice*, 135 U. Pa. L. Rev.1281, 1304 (1987))..

 The Circuit then continued:

> Likewise, Congress's goal of "predictability" would be thwarted if a hiring party and an independent contractor could enter into a work-for-hire agreement years after a work was created.  Prior to execution of such an agreement, the parties, as well as third parties, would act with the understanding that the independent contractor was the "author" of the work.  Only after the parties agreed retroactively that the work was made for hire would the hiring party somehow become the "author."  We also question whether Congress intended that a work could have two separate "authors"-- one during the first phase of its existence, and another after a work-for-hire agreement were executed.  We therefore find that the 1976 Act requires that the parties agree before the creation of the work that it will be a work made for hire.

And then the Circuit continued:

> We are not convinced, however, that the actual writing memorializing the agreement must be executed before the creation of the work.  The Nimmers make a convincing argument in their treatise on copyrights that such a requirement could itself create uncertainty. They argue:

>> One can [] imagine claims involving parties each of whom knew of the unanimous intent among all concerned that the work for hire doctrine

16

would apply, notwithstanding that some of the paperwork remained not
fully executed until after creation of the subject work. In that [] circum-
stance, the bright line rule could frustrate the intent of the parties, and
cloud rather than serve the goal of certainty.

1 *Nimmer § 5.03[B][2][b]* (1994). They conclude that "perhaps this rule needs
further testing in the crucible of fact patterns by future cases." *Id.* We agree. **In
the fact pattern of this case**, we will assume that the writing requirement of *§
101(2)* can be met by a writing executed after the work is created, **if the writing
confirms a prior agreement, either explicit or implicit, made before the cre-
ation of the work**. That leaves us with three questions: 1) whether the language
of the legends was sufficient to meet the writing requirement of *§ 101(2)*; 2) <u>if so,
whether Playboy and Nagel **understood** at the time the works were created that
the works were made for hire</u>. . . .

53 F.3d 549, 559 (2d Cir. 1995) (emphasis added).

The Second Circuit's decision in <u>Playboy</u>[3] was only the first in this Circuit to flatly reject

the kind of blanket, four-decades later, form letter "writing" urged on this Court by RIT.  Thus,

in 2013, the Second Circuit reiterated in <u>Gary Friedrich Enterprises, LLC v. Marvel Characters,

Inc.</u>, 716 F.3d 302, 315 (2d Cir. 2013): "[T]he Agreement appears to create an 'employee for

hire' relationship, but the Agreement could not render Ghost Rider a 'work made for hire' *ex post

facto*, even if the extrinsic evidence shows the parties had the intent to do so."  And in <u>Urbont v.

Sony Music Entertainment</u>, 100 F.Supp.3d 342, 353 (S.D.N.Y. 2015), Judge Buchwald quoted

extensively from <u>Friedrich</u>, <u>supra</u>, to make the exact same point.  (That decision was reversed in

part on other grounds, 831 F.3d 80 (2d Cir. 2016.)  See also to the same effect, <u>Stanacard, LLC v.

Rubard, LLC.</u>, 2016 U.S.Dist. LEXIS 15721 (S.D.N.Y. 2016) and [cited by RIT in its brief] <u>Kid

Stuff Marketing, Inc. v. Creative Consumer Concepts, Inc.</u>, 223 F.Supp.3d 1168, 1179 (D.Kan.

_____

[3] As a result of that opinion and the district court's decision on remand (960 F. Supp. 710
(S.D.N.Y. 1997) and then the Circuit's affirmance of that decision (1998 U.S. App. LEXIS 15225
(2d Cir. 1998), Playboy was found to have met the stringent new "work made for hire" require-
ments for most of the works at issue in the case.

2016) ("The Second Circuit, in *Playboy Enterprises, Inc. v. Dumas*, agreed with the Seventh Circuit to the extent that parties may not enter into work-for-hire agreements years after a work is created. 53 F.3d 549, 559 (2nd Cir. 1995)."

<u>Applying the Law to this Case</u>

To recap the applicable law: The Second Circuit in <u>Playboy</u> limited its ultimate holding to "the fact pattern of this case" -- <u>i.e.</u>, work-specific writings that immediately followed the creation of the work.  Also, the Court stated unequivocally: "We agree with the Seventh Circuit that the writing requirement was created, in part, to make the ownership of intellectual property rights clear and definite."  Further, the Court declared that the law must prevent a publisher from being able "to unilaterally obtain work-made-for-hire rights years after the work has been completed." Further, the Court made clear: "We also question whether Congress intended that a work could have two separate 'authors'-- one during the first phase of its existence, and another after a work-for-hire agreement were executed."

Also: No case – certainly no case cited by RIT – has come close to upholding a purported retroactive "blanket" ("all works") "work made for hire" writing, as here; and no case – and certainly no case cited by RIT – has come close to upholding a purported retroactive "work made for hire" writing that was set forth in a form letter that neither the sender nor the recipient understood, as here; and no case – and certainly no case cited by RIT – has come close to upholding a purported retroactive "work made for hire" writing that looked back more than four decades, as here.

The 1976 Copyright Act, and the law as summarized above, and indeed RIT itself, all agree that the requisite "writing" must constitute a legally-enforceable "agreement," which of

course requires "a meeting of the minds" on the essential element -- here, the crucial provision that "<u>all articles you have written for The New Republic have been 'works made for hire,' as that term is defined under the US Copyright laws.</u>"   Here are the undisputed facts:

1.   The sender of the letter, Mr. Wieseltier, has sworn that the phrase 'work made for hire' (or any variation of it) is not in my vocabulary and I do not know what it means."

2.   The recipient of the letter, Mr. Kauffmann, almost certainly also had no idea what that phrase meant.  As Mr. Marx has sworn, "In all that time [four-plus decades], I can't remember [Mr. Kauffmann] ever uttering the word 'copyright,' much less the phrase 'work made for hire.' I seriously doubt that he had any comprehension of what those terms entailed."

3.   The phrase is exquisitely legalistic in nature – consisting of a direct quotation from (and wholly dependent on) an understanding of an arcane federal statute, with no attempt what-ever to explain its meaning or consequences.

4.   The recipient of the letter, Mr. Kauffmann, was 88-years-old at the time.

5.   At the time the 2004 Form Letter was sent, Mr. Kauffmann "trusted Mr. Wieseltier implicitly and would have signed anything he asked him to sign, even without reading or under-standing it."

6.   At that time, as sworn by Mr. Marx, Mr. Kauffmann's wife Laura was entering the early stages of dementia and he had no time for or interest in such (to him) unimportant matters as a letter that Mr. Wieseltier asked him to sign as a matter of routine paperwork.

To find for RIT on this issue, this Court must find, on these facts, that Mr. Wieseltier and Mr. Kauffmann had the requisite "meeting of the minds"on both a) the Letter's crucial, entirely unexplained, and quintessentially legalistic reference to "work made for hire," and b) the result

thereof -- i.e., that the copyright in every article Mr. Kauffmann ever contributed to The New Republic over the previous 46 years would suddenly and retroactively be transferred from him to the magazine.

Two seminal non-copyright high appellate decisions further reinforce the conclusion that the 2004 Form Letter simply cannot be found to be a legally-sufficient, legally-enforceable, agreement for the purposes of the 1976 Act.  In Pimpinello v. Swift & Co., 253 N.Y. 159, 164 (NY 1930), the New York Court of Appeals declared that an instrument signed by the plaintiff should not be enforced because a) he (mistakenly) relied on his "trusted lawyer" in signing it, and b) "[i]t was not to have been expected by the plaintiff that, as a natural consequence of his reliance upon the word of his attorney, relating to the contents of the instrument, a writing which in no wise expressed his will would be executed by him."

And in Luis Hirsch y Cia. Sociedad Anonima v. Rosenblatt Casing Co., 418 F.2d 1300, 1302 (2d Cir. 1969), the Second Circuit similarly refused to give effect to a document concededli signed by the party in question.  As the Circuit explained: "Certainly, it is the rule that in the absence of fraud or deceit, a party is bound by his acceptance of a term even if his acquiescence is naive and uninformed.  But considering all the circumstances of this case -- the unusual nature of the letter proposed by Hirsch y Cia., the role played by Julius Hirsch as a good faith but misleading adviser, the virtual certainty that Rosenblatt would have discovered the irregularity of Hirsch's proposals -- it cannot be said that there was a meeting of the minds on this term when Rosenblatt had no understanding of what he was accepting. [Citation omitted]."

<u>Is There a Legally-Sufficient Writing Here?</u>

RIT here asks this Court to find that the 2004 Form Letter -- the only writing proffered by it -- qualifies as a legally-sufficient "written instrument" as required by the 1976 Act and by the law as developed by the Second Circuit.

RIT's position on these motions makes a mockery of the Second Circuit's confirmed need for "predictability" in the ownership of copyrights, as well as the need that copyright ownership be "clear and definite."  RIT's position also flagrantly ignores the Circuit's express rejection of the notion that a predatory publisher could "retroactively . . . somehow become the 'author' [of the real author's body of work]."  RIT's position also flouts the Circuit's doubt that "Congress intended that a work could have two separate 'authors' -- one during the first phase of its existence, and another after a work-for-hire agreement were executed."

And RIT's position is wholly dependent on this Court giving effect to 88-year-old Mr. Kauffmann's reliance on his trusted editor in signing a document that was presented to him as routine paperwork and that did not begin to explain its radical intent and effect, especially where, to quote the above-discussed cases,  he "had no understanding of what he was accepting" and never would have signed if he did.

Although we will not speculate here as to how this happened, we respectfully submit that RIT's attempt to benefit from that 2004 Form Letter could not be more cynical -- and frivolous -- and reflects horribly on that institution.  That position should resoundingly be rejected.

<u>What Did the Parties 'Understand'?</u>

If, and only if, this Court determines that the 2004 Form Letter constitutes a legally suf-ficient "written instrument" as required by the 1976 Act and the applicable caselaw, it must then

21

turn to an even more crucial question.  As the Second Circuit put it in Playboy, that question is whether The New Republic and Mr. Kauffmann "understood at the time the works were created that the works were made for hire" (emphasis added).   Or, as the Second Circuit put it in Friedrich, "regardless of the parties' intent in 1978, the evidence must prove Ghost Rider was actually a 'work made for hire' at the time of its creation."  716 F.3d at 316.  Or, as Judge Buchwald put it in Urbont, "It follows, then, that only an agreement dating back to the work's creation would be able to accurately shed light on in whom the copyright vested at that time; by contrast, a settlement some thirty years after the work's creation can provide only limited insight into what the parties originally intended, no less in whom the copyright initially vested as a result of their actions." 100 F.Supp. 3d at 354.

So, let's review the actual evidence in the record on these motions relevant to each party's "understanding" over the 46 years between 1958 and 2004 as to who owned the copyrights to all of Mr. Kauffmann's contributions to The New Republic during that period.

1.  From 1958 until his death at 97 in 2013 -- a period of 55 years -- Mr. Kauffmann contributed a wide variety of pieces to The New Republic, including but not limited to a regular column of film criticism.[4]

2.  During that entire 55-year period, at least as the record on these motions reveals, The New Republic and Mr. Kauffmann never discussed, either orally or in writing, much less reached agreement concerning, the copyright ownership of those pieces.

---

[4] Because RIT seems to rely on the fact that Mr. Kauffmann contributed film reviews on a regular basis, for regular established fees, it would appear that all his other contributions -- including one-offs created on his own initiative -- are excluded from its "work made for hire" argument on these motions.  Presumably RIT will clarify that issue in its Reply papers.

3.  Further, during that entire 55-year period The New Republic never once communicated to Mr. Kauffmann -- not orally, or in writing, or otherwise -- that it owned any copyrights in the pieces he submitted to it.

4.  Further, during that entire 55-year period, The New Republic never once objected to the countless times Mr. Kauffmann authorized the republication by others of any of those pieces in his own name and as the sole copyright owner thereof.

5.  Mr. Wieseltier has executed a Declaration that states in full as follows:

1. From 1983 to 2014, I was Literary Editor of The New Republic, and during that period I was Stanley Kauffmann's editor and principal contact with the Magazine.

2. I have been shown a 2004 letter from me to Mr. Kauffmann. Although I have no specific memory of that letter or of drafting or signing or sending it, I do recall that I was asked by my superiors at the Magazine to send such letters and that I did so as requested as a matter of course.

3. With respect to that letter, and more generally, a) I never discussed with Mr. Kauffmann (orally or in writing) the copyright ownership of his contributions to the Magazine; b) with the apparent exception of that letter, I never used the phrase "work made for hire" (or any variation of it) in any communication with Mr. Kauffmann; and c) in fact, the phrase "work made for hire" (or any variation of it) is not in my vocabulary and I do not know what it means.

6.  In his Declaration, Mr. Marx has sworn: "I can confirm that Stanley always understood -- and proceeded to act on that understanding -- that he owned and controlled all his writings.  Specifically, over all those decades, he repeatedly authorized numerous re-publications of much of his writings, including especially his writings for The New Republic magazine, and to my knowledge he never doubted that he had the full legal right to do so and never hesitated (or sought permission of anyone else) to grant those authorizations."

23

7.  Beginning in 1966, eight years after he began submitting pieces to The New Republic and 38 years before the 2004 Form Letter, Mr. Kauffmann regularly authorized the republication in book form of such pieces.  Among those books were:

A WORLD ON FILM,  Harper & Row, 1966.

FIGURES OF LIGHT, Harper & Row, 1971.

LIVING IMAGES, Harper & Row, 1975.

PERSONS OF THE DRAMA, Harper & Row, 1976.

BEFORE MY EYES: FILM CRITICISM AND COMMENT, Harper & Row, 1980.

THEATRE CRITICISMS, Performing Arts Journal Publications, 1983.

FIELD OF VIEW, Performing Arts Journal Publications, 1986.

DISTINGUISHING FEATURES, Johns Hopkins University Press, 1994.

REGARDING FILM, Johns Hopkins University Press, 2001.

8.  Each of those books contains a notice that the copyright owner of the contents of the book is Stanley Kauffmann.  None of those books contains any suggestion that anyone else, including The New Republic, had any copyright ownership interest in any of those contents.

9.  During most if not all of Mr. Kauffmann's career as a writer, he was represented by the Brandt & Brandt (later Brandt & Hochman) literary agency.

10.  Henry Thayer, an agent at that agency, has submitted a Declaration on these motions. In that Declaration, he stated: "Based on my review of B&H's files, my work with Mr. Brandt, my own interactions with Mr. Kauffmann, and my service as his agent, I can state that B&H always understood that Mr. Kauffmann owned the copyrights in all his contributions to The New Republic magazine ('TNR') and that it consistently acted on that understanding.  For example,

24

B&H handled for Mr. Kauffmann numerous book contracts and licenses for the publication (and other use) of his TNR pieces and in all those dealings Mr. Kauffmann was treated as the sole copyright owner of all that work.  Based on our files and my own direct involvement, I can state that B&H never received any indication from anyone else, including TNR,  inconsistent with that understanding or that we needed to clear any of those dealings with anyone else, including TNR."

11.   Mr. Marx has stated under penalty of perjury: "In all that time [four-plus decades], I can't remember [Mr. Kauffmann] ever uttering the word 'copyright,' much less the phrase 'work made for hire.'  I seriously doubt that he had any comprehension of what those terms entailed."

12.   In addition to his regular column of film criticism in The New Republic, Mr. Kauffmann also frequently submitted to it miscellaneous other pieces -- essentially one-offs -- that he originated himself without the impetus or expectation of The New Republic.  He also at various times submitted to it theater and book criticism.

13.   Prior to the 2004 Form Letter, Mr. Kauffmann executed numerous agreements authorizing others to publish or otherwise use pieces he wrote for The New Republic.

14.   RIT has proffered evidence that The New Republic regularly – almost entirely while the Copyright Act of 1909, which was in effect through December 31, 1977, was the applicable law – transferred to Mr. Kauffmann the copyrights to his contributions that it obtained when it copyrighted the entire relevant issue of the magazine.

15.   The New Republic's regular and routine -- on its own initiative -- practice of  transferring to Mr. Kauffmann the copyrights in his contributions flows from the "indivisibility" of copyright under the 1909 Copyright Act.  As explained by the Second Circuit in 2001, referring to its 1970 holding in Goodis v. United Artists Television, 425 F.2d 397, 400 (2d Cir. 1970): "In

Goodis, we examined whether, under the prior Copyright Act of 1909, notice of copyright by a

magazine was sufficient to obtain a valid copyright on behalf of the author of an individual work

contained in the magazine, and concluded that it was. . . .  Unlike the current Copyright Act, the

prior Act mandated indivisibility of copyright which meant that if the author did not obtain a

copyright in his work, publication would put the work into the public domain.  We said in

Goodis that we were 'loath to bring about the unnecessarily harsh result of thrusting the author's

product into the public domain,' . . . when it was clear from the magazine's copyright notice that

the author did not intend such a result."  Morris v. Business Concepts, Inc., 259 F.3d 65, 72-73

(2d Cir. 2001), amended in unrelated ways, 283 F.2d 502 (2d Cir. 2002).  As approved by Goodis

and reiterated by Morris, The New Republic's practice of obtaining in its own name and then

routinely transferring to its contributors the copyrights in their contributions served both to

preserve for the contributors and to then transfer to them those copyrights, which practice

obviously reflected and was motivated by its recognition of and respect for the fact that those

contributors were the rightful owners of those copyrights.

16.  When Mr. Kauffmann authorized the republication of pieces he submitted to The

New York Times, the paper required that such republication acknowledge that The Times was

the owner of the copyrights in those pieces.

17.  The New Republic never imposed any such requirement and never objected when

Mr. Kauffmann authorized republication of his pieces for it in his own name and as the sole

copyright owner thereof.

Now, let's take a look at the evidence with respect to The New Republic's "under-

standing" during the 46-years leading up to the 2004 Form Letter.  (Some of this evidence also

appears in our review above of the evidence establishing Mr. Kauffmann's understanding.)

1.  From 1958 until his death at 97 in 2013 -- a period of 55 years -- Mr. Kauffmann contributed a wide variety of pieces to The New Republic,  including but not limited to a regular column of film criticism.

2.  During that entire 55-year period, at least as the record on these motions reveals, The New Republic and Mr. Kauffmann never discussed, either orally or in writing, much less reached agreement concerning, the copyright ownership of those pieces

3.  Further, during that entire 55-year period The New Republic never once communicated to Mr. Kauffmann -- not orally, or in writing, or otherwise -- that it owned any copyrights in the pieces he submitted to it.

4.  Further, during that entire 55-year period, The New Republic never once objected to the countless times Mr. Kauffmann authorized the republication by others of any of those pieces in his own name and as the sole copyright owner thereof.

5.  In his Declaration, Mr. Marx has sworn: "I can confirm that Stanley always understood -- and proceeded to act on that understanding -- that he owned and controlled all his writings.  Specifically, over all those decades, he repeatedly authorized numerous re-publications of much of his writings, including especially his writings for The New Republic magazine, and to my knowledge he never doubted that he had the full legal right to do so and never hesitated (or sought permission of anyone else) to grant those authorizations."

6.  Beginning in 1966, eight years after he began submitting pieces to The New Republic and 38 years before the 2004 Form Letter, Mr. Kauffmann regularly authorized the republication

27

in book form of such pieces.  Among those books were:

A WORLD ON FILM,  Harper & Row, 1966.

FIGURES OF LIGHT, Harper & Row, 1971.

LIVING IMAGES, Harper & Row, 1975.

PERSONS OF THE DRAMA, Harper & Row, 1976.

BEFORE MY EYES: FILM CRITICISM AND COMMENT, Harper & Row, 1980.

THEATRE CRITICISMS, Performing Arts Journal Publications, 1983.

FIELD OF VIEW, Performing Arts Journal Publications, 1986.

DISTINGUISHING FEATURES, Johns Hopkins University Press, 1994.

REGARDING FILM, Johns Hopkins University Press, 2001.

7.  Each of those books contains a notice that the copyright owner of the contents of the book is Stanley Kauffmann.  None of those books contains any suggestion that anyone else, including The New Republic, had any copyright ownership interest in any of those contents.

8.  During most if not all of Mr. Kauffmann's career as a writer, he was represented by the Brandt & Brandt (later Brandt & Hochman) literary agency.

9.  Henry Thayer, an agent at that agency, has submitted a Declaration on these motions. In that Declaration, he stated:  "Based on my review of B&H's files, my work with Mr. Brandt, my own interactions with Mr. Kauffmann, and my service as his agent, I can state that B&H always understood that Mr. Kauffmann owned the copyrights in all his contributions to The New Republic magazine ('TNR') and that it consistently acted on that understanding.  For example, B&H handled for Mr. Kauffmann numerous book contracts and licenses for the publication (and other use) of his TNR pieces and in all those dealings Mr. Kauffmann was treated as the sole

28

copyright owner of all that work.  Based on our files and my own direct involvement, I can state that B&H never received any indication from anyone else, including TNR, inconsistent with that understanding or that we needed to clear any of those dealings with anyone else, including TNR."

10.  In addition to his regular column of film criticism in The New Republic, Mr. Kauff-mann also frequently submitted to it miscellaneous other pieces -- essentially one-offs -- that he originated himself without the impetus or expectation of The New Republic.  He also at various times submitted to it theater and book criticism.

11.  Prior to the 2004 Form Letter, Mr. Kauffmann executed numerous agreements authorizing others to publish or otherwise use pieces he wrote for The New Republic.

12.  Fewer than three years after The New Republic's claimed corporate epiphany re-flected in the 2004 Form Letter, The New Republic completely abandoned its claimed 2004 "understanding" that "all articles . . . written for The New Republic [are] 'works made for hire,' as that term is defined under the US Copyright laws."  Instead, The New Republic acknowledged that its contributors in fact owned the copyrights in their contributions and that those writers were only granting to the magazine specific limited rights to those contributions.

13.  RIT has proffered evidence that The New Republic regularly – almost entirely while the Copyright Act of 1909, was the applicable law – transferred to Mr. Kauffmann the copyrights to his contributions that it obtained when it copyrighted the entire relevant issue of the magazine.

14.  The New Republic's regular and routine -- on its own initiative -- practice of trans-ferring to Mr. Kauffmann the copyrights in his contributions flows from the "indivisibility" of copyright under the 1909 Copyright Act.  As explained by the Second Circuit in 2001, referring to its 1970 holding in <u>Goodis v. United Artists Television</u>, 425 F.2d 397, 400 (2d Cir. 1970): "In

Goodis, we examined whether, under the prior Copyright Act of 1909, notice of copyright by a

magazine was sufficient to obtain a valid copyright on behalf of the author of an individual work

contained in the magazine, and concluded that it was. . . .  Unlike the current Copyright Act, the

prior Act mandated indivisibility of copyright which meant that if the author did not obtain a

copyright in his work, publication would put the work into the public domain.  We said in

Goodis that we were 'loath to bring about the unnecessarily harsh result of thrusting the author's

product into the public domain,' . . . when it was clear from the magazine's copyright notice that

the author did not intend such a result."  Morris v. Business Concepts, Inc., 259 F.3d 65, 72-73

(2d Cir. 2001), amended in unrelated ways, 283 F.2d 502 (2d Cir. 2002).  As approved by Goodis

and reiterated by Morris, The New Republic's practice of obtaining in its own name and then

routinely transferring to its contributors the copyrights in their contributions served both to pre-

serve for the contributors and to then transfer to them those copyrights, which practice obviously

reflected and was motivated by its recognition of and respect for the fact that those contributors

were the rightful owners of those copyrights.

15.  When Mr. Kauffmann authorized the republication of pieces he submitted to The

New York Times, the paper required that such republication acknowledge that The Times was

the owner of the copyrights in those pieces.

16.  The New Republic never imposed any such requirement and never objected when

Mr. Kauffmann authorized republication of his pieces for it in his own name and as the sole

copyright owner thereof.

17.  On April 2, 1993, an employee of The New Republic wrote a letter to Mr. Kauff-

mann that stated as follows: "This is to confirm our telephone call this morning. You may, of

30

course, reprint any or all the film reviews you have done for TNR in your forthcoming anthology. We'd simply request that there be some indication that the essays first appeared in our pages."

18.  That letter was written almost three decades after Mr. Kauffmann first and repeatedly thereafter authorized, in his own name and as the sole copyright owner, republication of his contributions to The New Republic, without any indication in the record that he sought the permission of anyone else in so doing.  That letter makes no mention of "copyright" and contains no suggestion that Mr. Kauffmann did not own the copyrights in his contributions to the magazine or that he should reference anyone but himself as the true owner of those copyrights.

19.  That 1993 letter contains no indication of the underlying request apparently made by Mr. Kauffmann.  Here's an entirely plausible and factually accurate possibility: "As you know, I own and control all of my pieces for The New Republic and have since 1966 authorized the republication by others of those pieces in my own name as the sole owner of them.  I am currently working on another anthology containing such pieces and the publisher has asked me to ask you for confirmation that I own those pieces.  Please send me that confirmation.  Many thanks."

All of the above evidence compels only one conclusion: both Mr. Kauffmann and The New Republic understood (the Second Circuit's requirement) that Mr. Kauffmann – and only Mr. Kauffmann – was the rightful owner of the copyright in every piece he contributed to the magazine over (at least) the 46 years leading up to the 2004 Form Letter.

We will now review the evidence supporting RIT's contention that both Mr. Kauffmann and The New Republic understood that the magazine was the rightful owner of the copyright in every piece Mr. Kauffmann contributed to the magazine over (at least) the 46 year period leading up to the 2004 Form Letter:

31

**A-359**

:

:

Actually, there is no such evidence in the record – not a scintilla, not a shred.  It is beyond dispute that both parties to their decades-long relationship – Mr. Kauffmann and The New Republic – clearly understood that Mr. Kauffmann was the rightful owner of every copyright in and to his thousands of contributions to the magazine and that there was no understanding – "work made for hire" or otherwise – to the contrary.

PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
ESTABLISHING RIT'S LIABILITY FOR COPYRIGHT INFRINGEMENT
<u>SHOULD BE GRANTED</u>

This case concerns the publication and dissemination by RIT – actually, by its "enterprise" RIT Press -- of a book entitled <u>The Millennial Critic: Stanley Kauffmann on Film 1999-2009</u> ("the Infringing Book").  The Infringing Book consists of 141 separate articles written by Mr. Kauffmann, but this action only concerns the infringement of 44 of those articles.   It is undisputed RIT published the Infringing Book (see Paragraph 6 of its Answer) and that the Infringing Book was in no way authorized by Mr. Kauffmann or the Estate or by anyone else with authority to do so, and thus constitutes infringements of the underlying copyrights therein.  (Sections 106(1) and (3) of Title 17 of the U.S. Code.)

As established in full above, the infringed copyrights are owned by the Estate, which therefore can and has sued for their infringements.  And because RIT has not asserted any other defenses or other reason why plaintiff's cross-motion should not be granted, we respectfully

submit that this Court should now enter an appropriate order granting partial summary judgment establishing that RIT is liable for its infringement of the 44 separate articles that are identified in the Complaint.

<u>CONCLUSION</u>

For all of the foregoing reasons, RIT's motion for summary judgment should be denied and the Estate's Cross-Motion for partial summary judgment establishing RIT's liability for copyright infringement as alleged in the Complaint should be granted, together with an appropriate award of sanctions and such other relief as the Court deems just.

Dated: January 12, 2018

Respectfully submitted,

By: <u>s/ Kenneth P. Norwick</u>
       Kenneth P. Norwick
NORWICK & SCHAD
110 East 59th Street
New York, NY  10022
Telephone: (212) 751-4440
Facsimile: (212) 604-9997
E-Mail: ken@norwickschad.com

*Attorney for Plaintiff Estate of Stanley Kauffmann*

33

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE ESTATE OF STANLEY KAUFFMANN,

                Plaintiff,

   v.

ROCHESTER INSTITUTE OF TECHNOLOGY,

                Defendant and
                Third-Party Plaintiff,

   v.

ROBERT J. CARDULLO,

                Third-Party Defendant.

Case No. 6:17-cv-06061-CJS-MWP

**DEFENDANT'S MEMORANDUM OF LAW IN FURTHER SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT & IN OPPOSITION TO PLAINTIFF'S
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

BOND, SCHOENECK & KING, PLLC
Mary P. Moore, Esq.
Jeremy P. Oczek, Esq.
350 Linden Oaks, Third Floor
Rochester, New York 14625
Telephone:  (585) 362-4700
Email:  mmoore@bsk.com
Email:  jpoczek@bsk.com

*Attorneys for Defendant/Third-Party
Plaintiff Rochester Institute of Technology*

<u>**TABLE OF CONTENTS**</u>

**Page**

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ...........................................................................................................3

I.      The Undisputed Material Facts Demonstrate That The Copyrights
        For The 1999 Film Reviews Were Works Made For Hire
        Belonging To The New Republic. ...........................................................3

        A.      Plaintiff Concedes That The 1999 Film Reviews Were "Specially Ordered
                Or Commissioned" By The New Republic. ................................3

        B.      The 2004 Letter Satisfies The Statutory Writing Requirement
                Because It Expressly Confirms The Parties' Prior Oral
                Understanding That The 1999 Film Reviews Were "Works Made
                For Hire." .......................................................................................4

        C.      The Plain Language Of The 2004 Letter Provides Sufficient
                Evidence Of The Parties' Precreation Intent. ...............................9

        D.      Plaintiff's Argument That There Was No Meeting Of The Minds With
                Respect To The 2004 Letter Is Speculative And Based Upon Assertions
                That Lack A Basis In Personal Knowledge Or Are Immaterial. ..............11

        E.      Plaintiff's Contention That The New Republic Is Not "Standing Behind"
                The 2004 Letter Is Baseless. ...................................................16

        F.      Plaintiff Has Not Demonstrated Disputed Issues Of Material Fact As To
                The Parties' Precreation Intent That The 1999 Film Reviews Were
                Contributed As Works Made For Hire. ...................................16

II.     Plaintiff's Cross-Motion for Summary Judgment Should Be Denied. .................25

CONCLUSION ....................................................................................................28

3102597.5 2/26/2018

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*,
   485 F.3d 85 (2d Cir. 2007) ....................................................................4

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...........................................................................13

*Argus Inc. v. Eastman Kodak Co.*,
   801 F.2d 38 (2d Cir. 1986) .............................................................11, 20

*Beatie v. City of N.Y.*,
   123 F.3d 707 (2d Cir. 1997) ................................................................28

*Brattleboro Publishing Co. v. Winmill Publishing Corp.*,
   369 F.2d 565 (2d Cir. 1966) ................................................................18

*Byrnie v. Town of Cromwell, Bd. of Educ.*,
   243 F.3d 93 (2d Cir. 2001) ..................................................................22

*Ceglia v. Zuckerberg*,
   2013 U.S. Dist. LEXIS 45500 (W.D.N.Y. Mar. 26, 2013)........................4

*Compaq Computer Corp. v. Ergonome Inc.*,
   210 F. Supp. 2d 839 (S.D. Tex. 2001) ........................................9, 10, 17

*Cope v. Wal-Mart Stores East, LP*,
   2017 U.S. Dist. Lexis 99931 (June 28, 2017) ........................................14

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   449 U.S. 340 (1991) ...........................................................................26

*FTC v. Vantage Point Servs., LLC*,
   266 F. Supp. 3d 648 (W.D.N.Y. 2017)..................................................24

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*,
   716 F.3d 302 (2d Cir. 2013) ..............................................................8, 9

*Goodis v. United Artists Television*,
   425 F.2d 397 (2d Cir. 1970) ...........................................................18, 19

*Haas v. Del. & Hudson Ry. Co.*,
   282 Fed. Appx. 84 (2d Cir. 2008).........................................................15

3102597.5 2/26/2018

*Homeowner Options for Mass. Elders, Inc. v. Brookline Bancorp, Inc.*,
754 F. Supp. 2d 201 (D. Mass. 2010), *aff'd*, 789 F. Supp. 2d 242 (D. Mass.
2011)........................................................................................................................7

*Kid Stuff Marketing v. Creative Consumer Concepts, Inc.*,
223 F. Supp. 3d 1168 (D. Kan. 2016)......................................................7, 8, 9, 17

*Logicom Inclusive, Inc. v. W.P. Stewart & Co.*,
2004 U.S. Dist. LEXIS 15668, at *32 (S.D.N.Y. Aug. 9, 2004) ................................8

*Looney Ricks Kiss Architects, Inc. v. Bryan*,
2010 U.S. Dist. Lexis 110100 (W.D. La. Oct. 14, 2010)....................................10, 17

*Luis Hirsch y Cia. Sociedad Anonima v. Rosenblatt Casing Co.*,
418 F.2d 1300 (2d Cir. 1969) ................................................................................15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ..............................................................................................11

*Mills v. Luplow*,
2008 U.S. Dist. LEXIS 79028 (W.D.N.Y. July 1, 2008)........................................24

*Paul T. Freund Corp. v. Commonwealth Packing Co.*,
288 F. Supp. 2d 357 (W.D.N.Y. 2003)...................................................................12

*Pimpinello v. Swift & Co.*,
253 N.Y. 159 (1930).............................................................................................15

*Plahutnik v. Daikin Am., Inc.*,
912 F. Supp. 2d 96 (S.D.N.Y. 2012) .......................................................................4

*Playboy Enterprises v. Dumas*,
53 F.3d 549 (2d Cir. 1995), *cert denied*, 516 U.S. 1010 (1995)....................*passim*

*Primmer v. CBS Studios, Inc.*,
667 F. Supp. 2d 248 (S.D.N.Y. 2009) ...................................................................12

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
969 F.2d 410 (7th Cir. 1992) ...................................................................................5

*Scotto v. Almenas*,
143 F.3d 105 (2d Cir. 1998) ...........................................................................11, 19

*Stanacard, LLC . Rubard, LLC*,
2016 U.S. Dist. Lexis 15721 (S.D.N.Y. Feb. 3, 2016), ..................................10, 17

*TMTV, Corp, v. Mass. Prods., Inc.*,
345 F. Supp. 2d 196 (D. P.R. 2004) .......................................................................7

**A-365**

*Urbont v. Sony Music Entm't,*
   100 F. Supp. 3d 342 (S.D.N.Y. 2015) ...................................................................9

*Urbont v. Sony Music Entm't,*
   831 F.3d 80 (2d Cir. 2016) ...................................................................9, 16

*In re Various Grand Jury Subpoenas,*
   235 F. Supp. 3d 472 (S.D.N.Y. 2017) ...................................................................4

*Villar v. City of N.Y.,*
   135 F. Supp. 3d 105 (S.D.N.Y. 2015) ...................................................................4

**Statutes**

17 U.S.C. § 26 (1976) ...................................................................18

17 U.S.C. § 101(2) ...................................................................*passim*

17 U.S.C. § 201(c) ...................................................................21

**Other Authorities**

Fed. R. Civ. P. 26(a) ...................................................................14

Fed. R. Civ. P. 26(a)(1)(A) ...................................................................2, 14

Fed. R. Civ. P. 37(c)(1) ...................................................................14

Fed. R. Civ. P. 56 ...................................................................*passim*

Fed. R. Civ. P. 56(c)(4) ...................................................................12, 24, 25

3102597.5 2/26/2018

## PRELIMINARY STATEMENT

The record before the Court demonstrates that the copyrights for the allegedly infringed works—the 1999 Film Reviews—were actually "works made for hire" belonging to The New Republic, **not** the Estate of Stanley Kauffmann.  Accordingly, because the Kauffmann Estate does not own the copyrights to the 1999 Film Reviews, RIT is entitled to summary judgment as a matter of law, and the parties should proceed to briefing the issue of whether RIT is entitled to costs and attorneys' fees as a result of the Kauffmann Estate's failure to properly investigate copyright ownership for the 1999 Film Reviews prior to bringing suit against RIT.

The record before the Court shows the following:

- Plaintiff does not dispute any of the facts set forth in RIT's Rule 56 Statement of Material Undisputed Facts.

- Plaintiff does not dispute the authenticity of the 2004 Letter.

- Plaintiff does not dispute that Leon Wieseltier signed the 2004 Letter on behalf of The New Republic, or that Mr. Kauffmann signed it on March 22, 2004.

- Plaintiff does not dispute that the 2004 Letter states that its purpose was to "confirm" the parties' prior "oral understanding" that all articles Mr. Kauffmann had written for The New Republic were "works made for hire," as that term is defined under the US Copyright laws.

Despite the plain language of the 2004 letter, and the prior course of conduct whereby The New Republic transferred copyrights to Mr. Kauffmann and/or provided him with permission to reprint contributions, Plaintiff asserts in its Opposition that Mr. Kauffmann owned (and thereby the Estate now owns) valid copyrights for the 1999 Film Reviews.  In doing so, Plaintiff concedes the authenticity of the 2004 Letter, but throws up a "fistful of dust" in an attempt to obfuscate the plain and simple fact that the Estate does not own copyrights for the 1999 Film Reviews.  Plaintiff's submissions in this regard are either based upon speculation and conjecture, lack a basis in personal knowledge, or are immaterial.

As this Court focuses on Plaintiff's submissions, it should keep in mind the following:

- The declaration of Plaintiff's counsel, Kenneth P. Norwick, is replete with legal arguments and gratuitous characterizations, as well as unsupported hearsay and conclusory statements for which he lacks personal knowledge, all of which should be disregarded by this Court.

- The statements in the declaration of Robert Marx—including that Mr. Kauffmann supposedly could not have understood the 2004 Letter and that Mr. Kauffmann must have believed that he owned the copyrights for the 1999 Film Reviews— lack a basis in personal knowledge and constitute self-serving speculation and conjecture.  Mr. Marx does not recount a single, specific interaction with Mr. Kauffmann from which these conclusions could reasonably be drawn.

- The declaration of Henry Thayer is immaterial because it sets forth Brandt & Hochman's purported present-day understanding of copyright ownership for The New Republic contributions—not Stanley Kauffmann's understanding prior to creating the 1999 Film Reviews.  Moreover, the affiant lacks personal knowledge as to the relationship between Mr. Kauffmann and The New Republic prior to creation of the 1999 Film Reviews because Mr. Thayer did not work with Mr. Kauffmann until 2013, when he died.

- The declaration of Leon Wieseltier, which may be disregarded by the Court on the basis that Plaintiff did not disclose him as required by Fed. R. Civ. P. 26(a)(1)(A), does not dispute the authenticity of the 2004 Letter.  In fact, it states that Mr. Wieseltier was asked to send such letters—memorializing work for hire agreements—by his superiors at The New Republic, and that he did so as a matter of course.  Wieseltier Decl. ¶ 2.

RIT addresses each of these submissions below, showing that none contain sufficient admissible evidence to defeat the undisputed evidence that there was an agreement between Stanley Kauffmann and The New Republic, memorialized in plain language in the 2004 Letter, that Mr. Kauffmann contributed the 1999 Film Reviews as works made for hire.  Given that Plaintiff has not properly raised any issues of fact concerning copyright ownership, RIT's motion for summary judgment should be granted and Plaintiff's cross-motion should be denied.

## ARGUMENT

**I.   The Undisputed Material Facts Demonstrate That The Copyrights For The 1999 Film Reviews Were Works Made For Hire Belonging To The New Republic.**

### A. Plaintiff Concedes That The 1999 Film Reviews Were "Specially Ordered Or Commissioned" By The New Republic.

In addition to the writing requirement (addressed below), to constitute a "work made for hire," the work must have been "specially ordered or commissioned for use as a contribution to a collective work," which includes a periodical.  17 U.S.C. § 101(2).  As under the Copyright Act of 1909, a contribution to a collective work is "specially ordered or commissioned" if it is written at the hiring party's "instance and expense."  *See Playboy Enterprises v. Dumas*, 53 F.3d 549, 554, 561 (2d Cir. 1995), *cert denied*, 516 U.S. 1010 (1995) (noting that Congress intended to incorporate the "instance and expense" test from the 1909 Act when it enacted the Copyright Act of 1978 through the phrase "specially ordered or commissioned").  RIT briefed this issue in its opening brief, showing that the undisputed facts support the conclusion that Mr. Kauffmann's 1999 film reviews[1] were written at The New Republic's "instance and expense," and therefore satisfied the "specially ordered or commissioned" requirement.  *See* Def.'s Mem. at 9-12.

Plaintiff did not dispute any of the material facts submitted by RIT in support of its motion, nor did Plaintiff even submit any legal argument in opposition to RIT's assertion that the "specially ordered or commissioned" requirement was met.  While acknowledging the "specially ordered or commissioned" requirement, Plaintiff simply saw "no need to get into the weeds on that issue for the purposes of the pending motions."  *See* Pl.'s Mem. at 14.

---

[1]  Plaintiff's opposition expresses confusion as to whether RIT is asserting that all articles Mr. Kauffmann contributed to The New Republic throughout their 55-year relationship were "works made for hire."  *See* Pl.'s Mem. at 22 n. 4.  The articles at issue in this litigation are limited to film reviews contributed in 1999.  The facts concerning Mr. Kauffmann's relationship with The New Republic, pursuant to which he contributed film reviews to the magazine each month in exchange for a sum certain, are offered to demonstrate that the 1999 film reviews were "specially ordered or commissioned" by The New Republic as a matter of law.  *See* Def.'s Mem. at 9-12.

3102597.5 2/26/2018

**A-369**

By failing to oppose RIT's argument that The New Republic "specially ordered or commissioned" the 1999 film reviews within the meaning of 17 U.S.C. § 101(2), Plaintiff has abandoned any argument that The New Republic **did not** specially order or commission the 1999 film reviews.  *See Villar v. City of N.Y.*, 135 F. Supp. 3d 105, 134 n. 11 (S.D.N.Y. 2015) ("'arguments not made in opposition to a motion for summary judgment are deemed abandoned'") (quoting *Plahutnik v. Daikin Am., Inc.*, 912 F. Supp. 2d 96, 104 (S.D.N.Y. 2012)); *Ceglia v. Zuckerberg*, 2013 U.S. Dist. LEXIS 45500, at *65 (W.D.N.Y. Mar. 26, 2013) (finding that Plaintiff acquiesced to an assertion made by Defendant by failing to rebut it).

Although Plaintiff posits that it is not "conceding that this requirement has been met here," *see* Pl.'s Mem. at 14 n. 2, its failure to put forth any disputed issues of material fact or to make any legal arguments on the "specially ordered or commissioned" requirement shows that Plaintiff **cannot** point to any disputed issues of fact or countervailing arguments on this issue. Moreover, if Plaintiff was going to oppose the 1999 film reviews having been contributed at The New Republic's "instance and expense," the time to do so was in opposition to RIT's motion for summary judgment.  The Court should therefore disregard any arguments made on this issue by Plaintiff on reply to its cross-motion.  *See In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017) ("The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered.") (citing *ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 100 n. 16 (2d Cir. 2007)).

**B.  The 2004 Letter Satisfies The Statutory Writing Requirement Because It Expressly Confirms The Parties' Prior Oral Understanding That The 1999 Film Reviews Were "Works Made For Hire."**

Plaintiff does not dispute the authenticity of the 2004 Letter.  Plaintiff does not dispute that Leon Wieseltier signed the letter on behalf of The New Republic, or that Mr. Kauffmann

3102597.5 2/26/2018

signed it on March 22, 2004.  Plaintiff does not dispute that the 2004 Letter states that it was intended to "confirm" the parties' prior "oral understanding" that all articles Mr. Kauffmann had contributed The New Republic were "'works made for hire,' as that term is defined under the US Copyright laws."[2]  *See* Def.'s Local Rule 56 Statement of Undisputed Material Facts ¶ 7-8 ("Def.'s SOF").  As set forth in RIT's opening brief, the plain language of the 2004 Letter meets the requirement that "the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."  17 U.S.C. § 101(2); *see* Def.'s Mem. at 6-8.

Plaintiff argues that the 2004 Letter does not meet the statutory writing requirement as a matter of law because of **when** the letter was executed.  *See* Pl.'s Mem. at 14-18.  Although Plaintiff's discussion of the "when" issue begins with an explanation of *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992) (holding that the writing "must precede the creation of the" work), that bright line rule was unequivocally rejected by the Second Circuit in *Playboy Enterprises v. Dumas*, 53 F.3d 549, 559 (2d Cir. 1995), *cert denied*, 516 U.S. 1010 (1995).  Although the Second Circuit agreed that parties could not decide to enter into a work-for-hire agreement only after the work was created, it concluded that the writing memorializing the parties' agreement need not have been made prior to creation of the work, as such a requirement could thwart the parties' otherwise "'unanimous intent . . . that the work for hire doctrine would apply.'"  *Id.* at 559 (quoting Nimmers on Copyright § 5.03(B)(2)(b)).  Thus in *Playboy*, the Second Circuit held that "the writing requirement of § 101(2) can be met by a

---

[2] Plaintiff is not disputing the facts set forth in Defendant's Rule 56 Statement, *see* Pl.'s Rule 56 Statement at 1, which states that the 2004 Letter "was signed by Leon Wieseltier on behalf of The New Republic."  *See* Def.'s Rule 56 Statement ¶ 8.  Although Mr. Wieseltier has "no specific memory" of the 2004 Letter, he does not dispute that his signature is on the 2004 Letter or that he signed it on behalf of The New Republic.  Wieseltier Decl. ¶ 2-3 [ECF # 63].  In fact, Mr. Wieseltier recalls having been "asked by [his] superiors at the Magazine to send such letters and that [he] did so as requested as a matter of course."  *Id.* ¶ 2.

3102597.5 2/26/2018

writing executed after the work is created, *if the writing confirms a prior agreement, either explicit or implicit, made before creation of the work*." *Id.* at 559 (emphasis added).

Plaintiff's assertion that *Playboy*'s holding is limited to "work-specific writings that immediately followed the creation of the work" is incorrect. *See* Pl.'s Mem. at 18. The writings at issue in *Playboy* were made on checks given to an artist by the magazine after he had delivered artwork to it, each of which contained a legend stating that by endorsing the check, the payee "acknowledges payment in full for services rendered on a work-for-hire basis in connection with the Work names on the face of this check." *Playboy Enters.*, 53 F.3d at 552. Contrary to Plaintiff's characterization of the holding in *Playboy*, the Second Circuit did not hold that the writing needed to be either: (1) specific to a particular work or (2) that it needed to immediately follow creation of the work.

Rather, these factors were cited by the Second Circuit in support of the trial court's finding of **precreation intent**, *i.e.* that it was Playboy's and the artist's implicit understanding at the time the works were created that they were works made for hire. *Id.* at 559-60. In *Playboy*, neither party had "proffered any direct evidence of the intent of the parties *before* creation of the works," and—unlike here—the writing was silent on the issue of precreation intent. *Id.* at 560 (emphasis added). But the continued use of the work-for-hire legends, and the artist's continued acceptance of the checks bearing such legends, created an implicit understanding that the artist was contributing works to the magazine as works made for hire. *Id.*

Several cases applying *Playboy* have considered writings memorializing the work-for-hire agreement years after the work was created. For example, in *Kid Stuff Marketing v. Creative Consumer Concepts, Inc.*, 223 F. Supp. 3d 1168 (D. Kan. 2016), cited approvingly by Plaintiff, the district court held that a work-for-hire agreement was signed **eight years** after the

works at issue were created (illustrations commissioned from an artist by a marketing company) met the writing requirement under 17 U.S.C. § 101(2). The writing expressly stated that the artist's "prior and future 'illustration services' commissioned by [the marketing company] constitute 'works made for hire'" belonging to the marketing company. *Kid Stuff Marketing*, 223 F. Supp. 3d at 1181. The Court concluded, as a matter of law, that this writing provided sufficient evidence of precreation intent because its "plain language . . . memorialize[d] the parties' understanding at the time the illustrations were created" that the artists' "prior and future 'illustration services' commissioned by KSM" were work made for hire. *Id.*

Thus, it is clear that a later-in-time writing, even years later (such as the 2004 Letter executed five years after the 1999 film reviews were created), is sufficient.[3] *See also TMTV, Corp, v. Mass. Prods., Inc.*, 345 F. Supp. 2d 196, 206 (D. P.R. 2004) ("A valid contract recognizing and reaffirming work for hire status may be signed after the work is produced."); *cf. Homeowner Options for Mass. Elders, Inc. v. Brookline Bancorp, Inc.*, 754 F. Supp. 2d 201, 208 (D. Mass. 2010) (that an agreement was signed three years after creation of the work would not preclude its consideration, but the agreement was not signed by both parties and it did not mention a work-for-hire relationship), *aff'd*, 789 F. Supp. 2d 242 (D. Mass. 2011).

*Kid Stuff Marketing* also contradicts Plaintiff's unsupported assertion that a so-called "blanket" work for hire agreement is *per se* invalid given that *Kid Stuff Marketing* involved a writing that purported to cover all "prior and future 'illustration services'" commissioned by the marketing company. *Kid Stuff Marketing*, 223 F. Supp. 3d at 1181. *Playboy* happened to involve writings that were made on a work-specific basis, but that decision does not even intimate (nor does any other case cited by Plaintiff) that there must be a separate writing for each

---

[3] Plaintiff repeatedly characterizes the writing as having been made "decades" after creation of the work. Given that the only works at issue in this litigation are contributions to The New Republic from 1999, the writing memorializing the work for hire agreement was made five years after the creation of the works.

3102597.5 2/26/2018

work that is created.  Indeed, such a requirement would not even make sense from a practical perspective, where (like here) there is an ongoing relationship between the parties that involves regular and continuous contributions.

Moreover, Plaintiff's contention that the use of the phrase "works made for hire" in the 2004 Letter is "exquisitely legalistic in nature," *see* Pl.'s Mem. at 19, is preposterous.  The statute requires that "the parties expressly agree in a written instrument signed by them that the work shall be considered *a work made for hire*."  17 U.S.C. § 101(2).  While the writing does not necessarily need to reference these "talismanic words," *Logicom Inclusive, Inc. v. W.P. Stewart & Co.*, 2004 U.S. Dist. LEXIS 15668, at *32 (S.D.N.Y. Aug. 9, 2004), the 2004 Letter does just that and even references that the term has significance under the U.S. Copyright Law.  Plaintiff has not cited any case law demonstrating the 2004 Letter is insufficient.

Plaintiff's reference to *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302 (2d Cir. 2013) as purportedly prohibiting a later-in-time writing is incorrect.  That case involved a work-for-hire agreement that was signed six years after the work at issue was first published.  *Id.* at 314.  But unlike here, the plain language of the written agreement "suggest[ed] that [it] was a forward-looking contract only intended to cover work submitted after the Agreement was signed."  *Id.*  There was not even any acknowledgement that the artist had ever provided works to the hiring party previously.  *Id.*

Plaintiff's citation to a portion of the decision stating that "the Agreement could not render [the work] a 'work made for hire' *ex post facto*" is misleading.  *See* Pl.'s Mem. at 17.  As the context shows, the Court was clarifying that the copyright claimant needed to prove that the parties intended that the work was a work made for hire "at the time of its creation," which the text of the agreement was silent on and suggested that it only covered future works.  *Id.* at 316.

In other words, just because the parties agree **after** a work is created that it be treated as a work made for hire, an *ex post facto* agreement is insufficient where there is no evidence that the parties intended prior to the works' creation that the works be treated as works made for hire.

Plaintiff's reference to *Urbont v. Sony Music Entm't*, 100 F. Supp. 3d 342 (S.D.N.Y. 2015) is similarly misleading. The portion of that decision cited in Plaintiff's opposition was vacated by the Second Circuit. *See Urbont v. Sony Music Entm't*, 831 F.3d 80, 83 (2d Cir. 2016) ("vacat[ing] the district court's summary judgment ruling with respect to plaintiff's Copyright Act claim"). The Second Circuit noted that the district court's reliance on the *Gary Friedrich* decision, as is referenced in Plaintiff's opposition, was "not on point" because *Gary Frederich* involved an "attempt[] . . . to render a work for hire '*ex post facto*,'" whereas *Urbont* involved a later-in-time written agreement (a settlement agreement) being "offered as evidence to corroborate the existence of an earlier ownership agreement between the parties." *Id.* at 93 n. 10. So a later in time agreement may indeed serve as evidence of a prior work for hire agreement.

### C. The Plain Language Of The 2004 Letter Provides Sufficient Evidence Of The Parties' Precreation Intent.

Under *Playboy*, the writing must "confirm[] a prior agreement, either explicit or implicit, *made before creation of the work*." *Playboy Enters.*, 53 F.3d at 559 (emphasis added). It bears repeating that the writing at issue in *Playboy* was entirely **silent** on the parties' precreation intent. The check legends in *Playboy* stand in stark contrast to the text of the 2004 Letter, which expressly speaks to the parties' prior "oral understanding": "We have also always understood that in doing business with you that, in light of our regular compensation relationship with you, all articles you have written for *The New Republic* have been 'works made for hire,' as that term is defined under the US Copyright laws." Declaration of David Myer, Ex A, Nov. 30, 2017

3102597.5 2/26/2018

[ECF Doc. #52-15].  By signing the letter, Mr. Kauffmann expressly "confirm[ed] . . . that the above understanding of [The New Republic's] business relationship with [him was] correct."  *Id.*

Similar to *Kid Stuff Marketing* and *Compaq Computer Corp. v. Ergonome Inc.*, 210 F. Supp. 2d 839 (S.D. Tex. 2001), cited in RIT's opening brief, "the agreement's language . . . [demonstrates] that both parties understood that the work was in fact made for hire."  *Compaq Computer*, 210 F. Supp. 2d at 844; *see also Looney Ricks Kiss Architects, Inc. v. Bryan*, 2010 U.S. Dist. Lexis 110100, at *23 (W.D. La. Oct. 14, 2010) ("From reading the document, it appears to conform with all the requisite formalities . . . it communicates that at the time the drawing was created Hamilton understood that it was a work for hire").  Thus, the plain language of the 2004 Letter provides clear and straightforward evidence of the parties' precreation intent.

*Stanacard, LLC . Rubard, LLC*, 2016 U.S. Dist. Lexis 15721 (S.D.N.Y. Feb. 3, 2016), cited in RIT's opening brief and also in Plaintiff's opposition, is not inapposite.  In *Stanacard*, the Court concluded that a written work-for-hire agreement, entered into three years after an independent contractor had begun creating the work at issue, was insufficient, but not because the agreement was later in time or because the agreement was "blanket" in nature.  *Id.* at *18-24. The written agreement contained an "Invention and Work-for-Hire" clause, which stated: "Individual agrees that prior to and during the Relationship, any and all inventions . . . which may be created . . . shall be the sole and exclusive property of Company as against Individual." While the Court deemed this language sufficient to indicate the parties' intent that the works described be considered works for hire, the agreement "tells us very little about what the parties understood before the creation of the work began—way back in 2006."  *Id.* *22-23.  So unlike the 2004 Letter, the written agreement in *Stanacard* was silent on the parties' precreation intent.

3102597.5 2/26/2018

**D. Plaintiff's Argument That There Was No Meeting Of The Minds With Respect To The 2004 Letter Is Speculative And Based Upon Assertions That Lack A Basis In Personal Knowledge Or Are Immaterial.**

Plaintiff posits that "neither the sender nor the recipient understood" the 2004 Letter.  *See*

Pl.'s Mem. at 18.  This assertion is based upon the following:

1) that Mr. Marx does not recall Mr. Kauffmann "ever uttering the word 'copyright, much less the phrase 'work made for hire'" and he believes that Mr. Kauffmann "would have signed anything" that Mr. Wieseltier asked him to sign, "even without reading or understanding it";

2) that Mr. Kauffmann was 88 years old and his wife was entering the early stages of dementia when he signed the 2004 Letter;

3) that Mr. Wieseltier does not know what the phrase "work made for hire" means.

*See* Pl's Mem. at 19.  The foregoing assertions are insufficient to demonstrate a "'genuine issue

as to any material fact'" concerning the parties' intent that the 1999 film reviews were

contributed to The New Republic as works made for hire.  When opposing summary judgment:

The non-moving party may not rely on conclusory allegations or unsubstantiated speculation.  Instead, the non-movant must produce specific facts indicating that a genuine factual issue exists.  If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted.  To defeat a motion, there must be evidence on which the jury could reasonably find for the [non-movant].

*Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal citations and quotation marks

omitted); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 42 (2d Cir. 1986) ("mere conjecture or

speculation by the party resisting summary judgment does not provide a basis upon which to

deny" the motion) (internal quotation marks omitted); *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 586 (1986) (a summary judgment "opponent must do more than

simply show that there is some metaphysical doubt as to the material facts").

Moreover, a "declaration used to support or oppose a motion must be made on personal

knowledge, set out facts that would be admissible in evidence, and show that the affiant or

3102597.5 2/26/2018

declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  "[C]onclusory allegations, examination of thoughts, *id.*, opinions, argument, and legal conclusions are all prohibited from affidavits submitted in support of, or in opposition to, a motion under Federal Rule of Civil Procedure 56."  *Paul T. Freund Corp. v. Commonwealth Packing Co.*, 288 F. Supp. 2d 357, 369 (W.D.N.Y. 2003).  In considering a motion for summary judgment, the Court may disregard any "portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements."  *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 254-55 (S.D.N.Y. 2009).

Plaintiff has put forward only speculation and conjecture that Mr. Kauffmann—who is deceased—did not understand the contents of the 2004 Letter.  Plaintiff's reliance on Mr. Marx's declaration to support this conclusion is improper.  Mr. Marx's entire basis for purportedly knowing what Mr. Kauffmann understood, or rather did not understand, about the 2004 Agreement is that he was a "close confidant and trusted friend" of Mr. Kauffmann since 1972 and that he had "numerous conversations" with Mr. Kaufmann "about his work and career."  Marx Decl. ¶ 1-2.  But the declaration does not state that Mr. Marx ever discussed the 2004 Letter with Mr. Kauffmann, or that he ever discussed copyright ownership of any contributions to The New Republic with Mr. Kauffmann.  In fact, Mr. Marx's statement that he "*seriously doubt[s]*" that Mr. Kauffmann understood what the terms "copyright" or "work made for hire" entailed, Marx Decl. ¶ 2 (emphasis added), demonstrates that he is only speculating as to whether Mr. Kauffmann understood the 2004 Letter.

That statement that Mr. Kauffmann "implicitly" trusted Mr. Wieseltier and "would have signed anything he asked him to sign, even without reading or understanding it," Marx Decl. ¶ 10, similarly lacks a basis in personal knowledge and is self-serving speculation.  Mr. Marx did

12

**A-378**

not set forth specific facts showing that Mr. Kauffmann indeed signed the 2004 Letter without reading or understanding it.  He is really just speculating as to Mr. Kauffmann's understanding.

Plaintiff's assertions that Mr. Marx could not possibly have understood the 2004 Agreement due to the fact that he was 88 years old, that his wife was entering the early stages of dementia at the time he signed it, *see*  Marx Decl. ¶ 10, is entirely self-serving, speculative, and immaterial.  These assertions do not present specific facts demonstrating a genuine issue of material fact as to: "(1) whether the language of the [2004 Letter] was sufficient to meet the writing requirement of [17 U.S.C.] § 101(2); (2) if so, whether [The New Republic and Kauffmann] understood at the time the works were created that the works were made for hire; and (3) whether [the 2004 Agreement was] signed by both parties or by their authorized agents." *See Playboy Enters.,* 53 F.3d at 559; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("the substantive law will identify which facts are material" and only disputes over material facts "under the governing law will properly preclude the entry of summary judgment").

Mr. Kauffmann's age or his wife's health condition at the time he signed the 2004 Letter does not present a dispute of fact as to any of the issues relevant here.  Even if they did, it would be speculative and pure conjecture to assume that Mr. Kauffmann could not have understood the 2004 Letter because of his age (particularly considering that he continued to regularly contribute film criticism to The New Republic for another eight years, *see* Def.'s Rule 56 Statement ¶ 1) or due to his wife's health condition.

Plaintiff's reliance on Mr. Wieselter's statement that he does not know what the phrase "work made for hire" means, *see* Wieseltier Decl. ¶ 3, also does not demonstrate a disputed issue of material fact as to "whether [The New Republic and Kauffmann] understood at the time the works were created that the works were made for hire."  *See Playboy Enters.*, 53 F.3d at 559.

13

Plaintiff does not dispute that Mr. Wieseltier signed the 2004 Letter or that he had authority to do so on behalf of The New Republic.  *See* Def.'s SOF ¶ 8; Wieseltier Decl. ¶ 2.  Mr. Wieseltier also states that he was asked by his superiors at The New Republic to send such letters and that he did so as a matter of course.  Wieseltier Decl. ¶ 2.

As such, the 2004 Letter sets forth The New Republic's understanding that Mr. Kauffmann contributed articles to The New Republic as "works made for hire."  The New Republic (not Mr. Wieseltier) was the party to be bound by the 2004 Letter, and it was The New Republic's understanding at the time the works were created that is at issue.  The 2004 Letter sets forth in plain language that The New Republic "always understood" that, in light of its regular monthly compensation relationship with Mr. Kauffmann, "all articles [Mr. Kauffmann] ha[d] written for *The New Republic* ha[d] been 'works made for hire,' as that term is defined under the US Copyright laws."  *See* Myer Decl., Ex. A.  That Mr. Wieseltier's superiors at The New Republic asked him to send such letters, indicates that The New Republic in fact understood what the 2004 Letter meant.  That Mr. Wieseltier—a former employee of The New Republic—did not understand the meaning of the phrase "work made for hire" does not show that The New Republic did not have the understanding set forth in the letter.

Moreover, the Court could disregard Mr. Wieseltier's declaration because Plaintiff never disclosed him as an individual likely to have discoverable information, as required by Fed. R. Civ. P. 26(a)(1)(A).  *See* Declaration of Mary P. Moore Decl. ¶ 3-5, Feb. 26, 2018 ("Second Moore Decl.").  Under Fed. R. Civ. P. 37(c)(1), a party that fails to identify a witness as required by Fed. R. Civ. P. 26(a) may not "use that . . . . witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  "The dilatory party has the burden to prove substantial justification or harmlessness."  *Cope v. Wal-Mart*

14

**A-380**

*Stores East, LP*, 2017 U.S. Dist. Lexis 99931, at *22 (June 28, 2017) (excluding affidavit where party failed to justify its failure to disclose); *Haas v. Del. & Hudson Ry. Co.*, 282 Fed. Appx. 84, 85 (2d Cir. 2008) (affirming exclusion of affidavit submitted in opposition to motion for summary judgment because the party did not explain why it failed to identify the affiant as a witness).

RIT was not on notice that Plaintiff intended to use Mr. Wieseltier as a witness.  He was not disclosed by Plaintiff in its preliminary disclosures, nor did Plaintiff amend its disclosures to identify Mr. Wieseltier as a witness after RIT specifically brought the 2004 Letter to Plaintiff's attention after it was produced by The New Republic in discovery.  *Id.*  Moreover, given that Mr. Wieseltier does not dispute the 2004 Letter's authenticity, the declaration is not probative.

The two cases cited by Plaintiff in support of its argument that there was no meeting of the minds as to the 2004 Letter are inapposite.  *See* Pl.'s Mem. at 20.  *Pimpinello v. Swift & Co.*, 253 N.Y. 159 (1930) involved a plaintiff who could neither read nor write, and who was fraudulently induced to sign a general release of claims against the defendant as a result of misrepresentations made **by his attorney**.  *Id.*  Mr. Wieseltier was not Mr. Kauffmann's attorney (or other fiduciary relationship), and there is no evidence that Mr. Kauffmann was either incompetent or fraudulently induced to sign the 2004 Letter.

*Luis Hirsch y Cia. Sociedad Anonima v. Rosenblatt Casing Co.*, 418 F.2d 1300 (2d Cir. 1969) is also not on point.  In this breach of contract action, the Second Circuit affirmed the district court's finding that a crucial term of the contract had never been settled between the parties.  There are no such facts presented here.

3102597.5 2/26/2018

**E. Plaintiff's Contention That The New Republic Is Not "Standing Behind" The 2004 Letter Is Baseless.**

Plaintiff's contention that The New Republic "has apparently declined to stand behind" the 2004 Letter, *see* Pl.'s Mem. at 1, is not supported by any facts.  The New Republic's Controller signed a declaration authenticating 2004 Letter and further stated that it is "a letter agreement between Stanley Kauffmann and The New Republic," and a business record of The New Republic.  *See generally* Myer Decl.  He further stated that Mr. Kauffmann was paid a flat monthly fee for his regular contributions to The New Republic.  *Id.*  In doing so, The New Republic has actually affirmed the authenticity of the 2004 Letter, not repudiated it.  And Plaintiff has not sought any testimony from The New Republic.

Moreover, the 2004 Letter says what it says and The New Republic's position on what the letter means is irrelevant—the letter is clear on its face.  It is also irrelevant that The New Republic is not challenging Plaintiff's claim to ownership of the copyrights at issue here. *See Urbont*, 831 F.3d at 86-88 (refusing to draw conclusions based upon purported copyright owner's absence from litigation involving—like here—a third party's assertion of a work for hire relationship).  There could be any number of reasons that The New Republic has not joined in this action to assert its ownership of the copyrights for the 1999 film reviews, including but not limited to the lack of damages at issue in this case.

**F. Plaintiff Has Not Demonstrated Disputed Issues Of Material Fact As To The Parties' Precreation Intent That The 1999 Film Reviews Were Contributed As Works Made For Hire.**

By signing the 2004 Letter, Mr. Kauffmann expressly "confirm[ed]" that, in light of The New Republic's "regular compensation relationship" with him, that "all articles [he] ha[d] written for *The New Republic* ha[d] been 'works made for hire,' as that term is defined under the US Copyright laws."  *See* Myer Decl., Ex. A.  As previously stated, the plain language of the

2004 Letter provides clear evidence that The New Republic and Mr. Kauffmann understood, prior to creation of the 1999 film reviews, that these articles were contributed to The New Republic as works made for hire.   *See* Section I(B)-(C), *supra*; *see also Kid Stuff Marketing*, 223 f. Supp. 3d at 1181; *Compaq Computer*, 210 F. Supp. 2d at 844; *Looney Ricks*, 2010 U.S. Dist. Lexis 110100, at *23.

Plaintiff does not dispute that Mr. Kauffmann "contributed . . . a regular column of film criticism" to The New Republic for 55 years, or that he was paid a monthly flat fee for his contributions.   *See* Pl.'s Mem. at 22; Def.'s SOF ¶ 1, 12-16.   Nor does Plaintiff dispute that Mr. Kauffmann's film reviews were specifically ordered or commissioned by The New Republic, within the meaning of 17 U.S.C. § 101(2).   *See* Section I(A),, *supra*.   The undisputed facts that Mr. Kauffmann signed the 2004 Letter, expressly confirming his understanding that he had always contributed articles to The New Republic as works made for hire, and that he was paid a monthly flat fee in exchange for doing so, demonstrates that the parties understood at the time the film reviews were created that they were works made for hire. *See Stanacard*, 2016 U.S. dist. Lexis at *23 (the mere signing of a later-in-time work made for hire agreement—even one silent on precreation intent—provides "evidence of what the parties understood all along").

### 1.   The Prior Copyright Transfers Do Not Demonstrate Disputed Issues Of Fact.

While no further evidence beyond the 2004 Letter is necessary, the parties' longstanding work for hire agreement is supported by the undisputed fact that The New Republic transferred to Mr. Kauffmann ownership if copyrights for contributions to The New Republic in various entire years and as published in particular issues.   *See* Declaration of Mary P. Moore Decl. ¶ 22, Exhibits 8 and 9, Dec. 4, 2017 [ECF Doc. #52-3] ("First Moore Decl.")

Plaintiff points out that many of these transfers occurred while the Copyright Act of 1909 was in effect, but there is no basis for Plaintiff's contention that these transfers supposedly "flow[ed] from the 'indivisibility' of copyright under the 1909 Act." *See* Pl.'s Mem. at 25.  The 1909 Act provided "the word 'author' shall include an employer in the case of works made for hire,'" without defining the terms "employer" or "works made for hire." *Playboy Enters.*, 53 F.3d at 554 (quoting 17 U.S.C. § 26 (1976) (repealed)).  In *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565, 567-68 (2d Cir. 1966), the Second Circuit held that an independent contractor is an "employee" and a hiring party was an "employer" for purposes of the 1909 Act if the work is made at the hiring party's "instance and expense." *See Playboy Enters.*, 53 F.3d at 554 (citing *Brattleboro*, 369 F.2d at 567-68).  Once it was established that a work was made for hire, the hiring party was presumed to be the author (and thus copyright owner) unless there was "evidence of a contrary agreement, either written or oral." *Id.* at 554.

The fact that Mr. Kauffmann contributed articles to The New Republic at its "instance and expense," which Plaintiff is not disputing, *see* Section I(A), *supra*, indicates that (while not at issue in this case) the copyrights for film reviews contributed while the 1909 Act was in effect belonged to The New Republic as the hiring party, even in the absence of a written agreement, because Plaintiff has not presented evidence of a contrary oral or written agreement.  The transfers were effected so that Mr. Kauffmann could obtain ownership of the copyrights to these particular articles, which were initially owned as works made for hire by The New Republic.

There is no evidence for Plaintiff's suggestion that these transfers were effected due to the doctrine of indivisibility of copyright. *Goodis v. United Artists Television*, 425 F.2d 397 (2d Cir. 1970) stands for the proposition that:

> where a magazine has purchased the right of first publication under circumstances
> which show that the author has no intention to donate his work to the public,

**A-384**

> copyright notice in the magazine's name is sufficient to obtain a valid copyright
> on behalf of the beneficial owner, the author or proprietor.

*Id.* at 399.  *Goodis* dealt with an argument that by licensing a periodical to serialize a book, which then published excerpts of the book without providing copyright notice in the author's own name, that the book had fallen into the public domain.  The Court rejected that argument because the periodical copyrighted the issue and the book author had not intention to donate his work to the public.  *Goodis* has no application here.

### 2.   The License Agreements Do Not Demonstrate Disputed Issues Of Fact.

Plaintiff asserts that "Mr. Kauffmann executed numerous agreements authorizing others to publish or otherwise use pieces he wrote for The New Republic."  *See* Pl.'s Mem. at 25. While Plaintiff has not submitted these purported authorizations to the Court, Plaintiff indeed produced a number of license agreements in discovery, showing that Brandt & Hochman, as Mr. Kauffmann's literary agent, granted re-publication rights for various articles contributed to The New Republic.  *See* Second Moore Decl., Ex. 2-3.  The vast majority of these license agreements are for articles where The New Republic had previously assigned and/or transferred copyright ownership to Mr. Kauffmann.  Second Moore Decl. ¶ 6-7.

While there are a handful of articles from the 1980s that Brandt & Hochman licensed where no assignments and/or transfers were produced, it is pure speculation to conclude that these isolated licenses signed by Brandt &Hochman (not Mr. Kauffman) in the 1980s indicate that Mr. Kauffmann did not in fact intend that the 1999 film reviews were contributed as works made for hire, despite his express recognition in the 2004 Letter that they were contributed as such.  *See Scotto*, 143 F.3d at 114 (summary judgment should be granted "[i]f the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative).

### 3.   Mr. Kauffmann's Anthologies Do Not Demonstrate Disputed Issues Of Fact.

Plaintiff also argues that Mr. Kauffmann did not intend for the 1999 film reviews to be contributed as works made for hire based on the fact that he authorized the republication of articles originally contributed to The New Republic in nine anthologies that were published between 1966 and 2001.  *See* Pl.'s Mem. at 24.  Mr. Kauffmann owned the copyrights to all of the articles contained in the first five anthologies listed by Plaintiff (*i.e.* A World On Film, Figures of Light, Living Images, Persons of the Drama, and Before My Eyes) because The New Republic had previously assigned and/or transferred copyright ownership for those articles to Mr. Kauffmann.  *See* Second Moore Decl. ¶ 9-10.

Mr. Kauffmann also caused four other anthologies to be published (Theatre Criticisms, Field of View, Distinguishing Features, and Regarding Film).  But Plaintiff also has not submitted any documents or testimony demonstrating that Mr. Kauffmann represented himself as the sole copyright owner of all of the works contained in these particular anthologies.  The publication agreements for these anthologies state that Mr. Kauffmann would obtain any permissions necessary for reproducing material under copyright.  *See* Second Moore Decl., Ex. 4-5.  Indeed, Plaintiff obtained permission from The New Republic in April 1993 to "reprint any or all the film reviews [he] ha[d] done for TNR in [his] forthcoming anthology."  *See* Myer Decl., Ex. B.  It is reasonable to conclude that Distinguishing Features, which was published in 1994, was covered indeed covered by this permission.[4]

Furthermore, there is no basis in fact for Plaintiff's assertion that these anthologies contain notices that the copyright owner of all of the "contents" of these books was Stanley Kauffmann.  *See* Pl.'s Mem. at 24.  Plaintiff did not present the Court with copies of the

---

[4] Plaintiff speculates that perhaps a publisher had requested this permission even despite Mr. Kauffmann's purported belief (also based upon speculation) that he owned copyrights to all of the articles that he had contributed to The New Republic.  *See* Pl.'s Mem. at 31.  This is pure speculation and conjecture, which "does not provide a basis upon which to deny" a motion for summary judgment.  *Argus*, 801 F.2d at 42.  Plaintiff has not deposed The New Republic, the publisher, or anyone else with knowledge about this permission.

3102597.5 2/26/2018

**A-386**

copyright notices contained in these anthologies.  Each of these anthologies (<u>Theatre Criticisms</u>, <u>Field of View</u>, <u>Distinguishing Features</u>, and <u>Regarding Film</u>) contain a copyright notice for the anthology as a collective work, in the year in which the anthology was published.  *See* Second Moore Decl., Ex. 7.  Under 17 U.S.C. § 201(c):

> Copyright in each separate contribution to a collective work [which is defined to include an "anthology" under 17 U.S.C. § 101] is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution.  In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

In other words, the copyright notice in each of these anthologies shows that Mr. Kauffmann held the copyright for the collective work as a whole, not for the individual contributions.  Mr. Kauffmann even represented in each of these books that the film reviews first appeared in The New Republic.  *See* Second Moore Decl., Ex. 7.

In contrast, the other five anthologies (<u>A World On Film</u>, <u>Figures of Light</u>, <u>Living Images</u>, <u>Persons of the Drama</u>, and <u>Before My Eyes</u>) contain copyright notices for multiple years, covering the years in which the individual contributions were made.  *See* Second Moore Decl., Ex. 6.  So in these anthologies, Mr. Kauffmann did in fact represent that he owned the copyrights for the individual contributions, as ownership of the particular contributions had previously been transferred to him by The New Republic.  *See* Second Moore Decl. ¶ 10.

Thus, a reasonable jury could not conclude, based on the representations as to copyright ownership made in these anthologies, that Mr. Kauffmann and The New Republic had not agreed prior to creation of the 1999 film reviews that they would be contributed as works made for hire, contrary to the plain language of the 2004 Letter.  *See Byrnie v. Town of Cromwell, Bd. of Educ.*,

3102597.5 2/26/2018

243 F.3d 93, 101 (2d Cir. 2001) ("[I]n order to defeat summary judgment, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor.").

> **4.  Other Unsupported Conjecture and Speculation in the Marx and Thayer Declarations Does Not Demonstrate Disputed Issues Of Fact.**

Plaintiff has not provided anything more than pure speculation and conjecture that Mr. Kauffmann believed that he owned the copyrights for the film reviews that he contributed to The New Republic in 1999.  Mr. Marx's declaration broadly states:

> Over all those decades, I can confirm that Stanley always understood—and proceeded to act on that understanding—that he owned and controlled all of his writings . . . and to my knowledge he never doubted that he had the full legal right to do so and never hesitated (or sought permission of anyone else) to grant those authorizations.

Marx Decl. ¶ 3.  But Mr. Marx does not set forth any particular conversations with Mr. Kauffmann, or other reason to believe, that Mr. Marx would have personal knowledge as to whether Mr. Kauffmann believed that the 1999 film reviews were contributed to The New Republic as works made for hire.  He appears to be drawing this conclusion based upon the aforementioned licenses authorizing re-publication of articles from the 1960s, 1970s, and 1980s, which were authorized by Brandt & Hochman on behalf of Mr. Kauffmann.  But a review of these prior license agreements does not make Mr. Marx competent to testify as to Mr. Kauffmann's understanding with respect to the 1999 film reviews at issue here.

Mr. Thayer's declaration states that "B&H always understood that Mr. Kauffmann owned the copyrights in all his contributions to The New Republic magazine ("TNR') and that it consistently acted on that understanding."  Thayer Decl. ¶ 3.  But Brandt & Hochman's understanding is not at issue.  Mr. Thayer's declaration does not show that he has personal knowledge about whether Mr. Kauffmann understood that the 1999 film reviews were contributed to The New Republic as works made for hire, as Mr. Kauffmann expressly

3102597.5 2/26/2018

**A-388**

confirmed in the 2004 Letter.  Mr. Thayer was not even Mr. Kauffmann's agent when the 1999

film reviews were created or when the 2004 Letter was signed.  *Id.* ¶ 2.  Carl Brandt was

Mr. Kauffmann's agent for four decades, until both of their deaths in 2013.  *Id.*

Mr. Thayer further states that in the "numerous book contracts and licenses for

publication (and other use) of his TNR pieces," that Mr. Kauffmann "was treated as the sole

copyright owner of all that work."  *Id.* ¶ 10.  But Brandt & Hochman's treatment of

Mr. Kauffmann as the sole owner of his contributions to the New Republic is not evidence of

what Mr. Kauffmann believed about the 1999 contributions.

Plaintiff also sets forth conclusory and unsupported assertions that "The New Republic

and Mr. Kauffmann never discussed, either orally or in writing, much less reached agreement

concerning, the copyright ownership of those pieces," and that "The New Republic never once

communicated to Mr. Kauffmann—not orally, or in writing, or otherwise—that it owned any

copyrights in the pieces he submitted to it."  *See* Pl.'s Mem. at 22.  There is no support for these

statements in the record.  The 2004 Letter, the authenticity of which has not been challenged by

Plaintiff, reflects that there was in fact an agreement in writing between The New Republic and

Mr. Kauffmann that The New Republic owned the copyrights to Mr. Kauffmann's contributions.

Although Mr. Wieseltier states that he never personally discussed copyright ownership with

Mr. Kauffmann, *see* Wieseltier Decl. ¶ 3, that does not mean that no one at The New Republic

ever discussed copyright ownership with Mr. Kauffmann, as is reflected in the 2004 Letter.

Plaintiff also argues that The New Republic "never objected when Mr. Kauffmann

authorized republication of his pieces for it in his own name and as the sole copyright owner

thereof."  *See* Pl.'s Mem. at 17.  There is no factual support for this statement in the declarations

put forth by Plaintiff, nor did Plaintiff seek any testimony from The New Republic.  Even if this

23

statement was supported, it is pure speculation to suggest that Mr. Kauffmann's 1999 contributions were not works made for hire on the basis that The New Republic did not object to Mr. Kauffmann licensing and anthologizing works that he owned the copyrights for and others of which he was granted permission to publish.

### 5. Unsupported Hearsay, Conclusory Statements, and Argument in the Norwick Declaration Should Be Disregarded.

Mr. Norwick's declaration is riddled with unsupported hearsay and conclusory statements upon which he lacks personal knowledge, as well as legal argument and characterization, all of which should be disregarded by this Court in considering RIT's motion for summary judgment. While "an attorney's affidavit can be used to introduce documents and is a common device in summary judgment motions performing that function," an affidavit "that is based on hearsay from counsel, unsupported by other competent proof, does not comply with" Fed. R. Civ. P 56(c)(4).  *Mills v. Luplow*, 2008 U.S. Dist. LEXIS 79028, at *5-6 (W.D.N.Y. July 1, 2008) (internal citations and quotation marks omitted); *see also FTC v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017) (disregarding those portions of an attorney affidavit that went "beyond the introduction of documents and veer[ed] into legal argument and factual allegations for which [the attorney] ha[d] no personal knowledge").

For example, Mr. Norwick states that "[f]ewer than three years after The New Republic's claimed corporate epiphany reflected in the 2004 Form Letter . . . The New Republic acknowledged that its contributors in fact owned the copyrights in their contributions."  *See* Pl.'s Mem. at 29.  He attaches a document (Exhibit L), which is not identified or authenticated.  The document shows an unexecuted agreement purporting to treat Mr. Kauffmann as the copyright owner of his contributions to The New Republic going forward, granting The New Republic certain publication rights.  Mr. Norwick does not have personal knowledge of what this

document is or its significant with respect to the parties' understanding of the 1999 articles. Plaintiff has not deposed The New Republic on this document, or any other topic. The Court should disregard it as inadmissible, and disregard Mr. Kauffmann's characterization of it.

Mr. Norwick's declaration is rife with other legal arguments and characterizations, as well as factual statements for which he lacks personal knowledge, which should be disregarded. These include the statements made in paragraphs 3-12, 14, and 19-46.[5] Mr. Norwick's declaration states at the outset that the "factual assertions that follow are derived from plaintiff's Rule 56 Statement, which contains references to the relevant parts of the record on these motions." Norwick Decl. ¶ 2. But the majority of Plaintiff's Rule 56 Statement (*i.e.* paragraphs 1-13, 20-24, 28-30, and 34-41) are based on Mr. Norwick's declaration. This circuitous logic— that the Norwick declaration is based on the Rule 56 Statement, which is based on the Norwick declaration—does not provide a factual basis for the statements in Mr. Norwick's declaration.

To the extent Mr. Norwick's declaration purports to parrot statements made in the declarations of Marx, Thayer, or Wieseltier, the Court should disregard Mr. Norwick's characterizations, summarizations, or recitations of them. *See*, *e.g.*, Norwick Decl. ¶ 20-31, 33-35. Moreover, Mr. Norwick's introduction of the allegations in the complaint, or any documents attached to the Complaint, purportedly "as factual assertions" does not render those allegations or exhibits admissible under Fed. R. Civ. P. 56(c)(4). *See* Norwick Decl. ¶ 8, 12.

## II.   Plaintiff's Cross-Motion for Summary Judgment Should Be Denied.

Plaintiff spends exactly five sentences arguing in support of its cross-motion for partial summary judgment on copyright infringement, and did not point to (nor did it submit) a single shred of evidence in support of its cross-motion. *See* Pl.'s Mem. at 32. In doing so, Plaintiff

---

[5] RIT has no objection to the use of the Norwick declaration to introduce the documents attached thereto as Exhibits A-C and G-K.

3102597.5 2/26/2018

establishes neither (1) "copying of constituent elements of the work that are original," or (2) ownership of a valid copyright," as it must in order to prevail on the single claim for copyright infringement. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 449 U.S. 340, 361 (1991).

As an initial—and most basic—matter, Plaintiff has not set forth exactly what the original copyrighted works are that were supposedly copied in The Millennial Critic. None of Plaintiff's declarations provided in support of its cross-motion append, or even identify, a single original work that was purportedly infringed. Plaintiff simply argues that The Millennial Critic contains 141 articles by Mr. Kauffmann and that this action involves 44 of them. *See* Pl.'s Mem. at 32. Indeed, Plaintiff alleged in the Complaint that 44 articles contained in The Millennial Critic infringe upon its copyrights, listing the titles of 44 articles as they appear in The Millennial Critic. *See* First Moore Decl., Ex. 1 at ¶ 7. But simply stating that these 44 articles constitute copyright infringement is conclusory and does not make it so.

RIT actually submitted the Certificate of Registration that Plaintiff produced during discovery, and which supposedly covers the works that RIT allegedly infringed by publishing The Millennial Critic. *See* First Moore Decl. ¶ 14-15, Ex. 3. The Certificate of Registration lists the titles of 48 film reviews that Mr. Kauffmann contributed to The New Republic in 1999, but these titles are different from the titles identified in the Complaint. *Compare* First Moore Decl., Ex. 1 at ¶ 7, *with* First Moore Decl., Ex. 3. So it is not clear which film reviews, if any, listed on the Certificate of Registration were copied in The Millennial Critic. Nor has Plaintiff even put the original film reviews, or the purportedly copied film reviews, before the Court.

The Court simply cannot enter partial summary judgment for 44 supposed instances of copyright infringement based on this record. Plaintiff has not met its burden to show that there were 44 instances of copying of constituent elements of original copyrighted works.

3102597.5 2/26/2018

**A-392**

Additionally, Plaintiff also has not shown, as a matter of law, that it owns a valid copyright for the original works that were allegedly infringed (had Plaintiff even set forth or identified which original works were infringed). Taking Plaintiff at its word that the original works at issue here include at least some of the 48 film reviews contributed by Mr. Kauffmann to The New Republic in 1999 that are listed on the singled Certificate of Registration produced in discovery, *see* First Moore Decl., Ex. 3, the undisputed material evidence shows that The New Republic owns the copyrights for these works as works made for hire under 17 U.S.C. § 101(2).

As set forth above, Plaintiff has conceded that the 1999 film reviews were "specially ordered or commissioned" within the meaning of 17 U.S.C. § 101(2). *See* Sec. I(A), *supra*. Moreover, the 2004 Letter—the authenticity of which is not disputed—satisfies the writing requirement, even though it was written after creation of the works. *See* Sec. I(B)-(C), *supra*. Moreover, the plain language of the 2004 Letter sets forth evidence that the parties always had an "oral understanding," even prior to creation of the 1999 film reviews, that "all articles [Mr. Kauffmann] ha[d] written for *The New Republic* ha[d] been 'works made for hire,' as that term is defined under the US Copyright laws." *See* Myer Decl., Ex A. By signing the letter, Mr. Kauffmann expressly "confirm[ed] . . . that the above understanding of [The New Republic's] business relationship with [him was] correct." *Id.* Thus, Plaintiff is not entitled to partial summary judgment because it cannot show that it owns a valid copyright for the works at issue.

Even if Plaintiff's various submissions—which, as previously described, are either immaterial, conclusory, conjecture, speculation, and/or lack a basis in fact or personal knowledge—were sufficient to demonstrate disputed issues of material fact, Plaintiff still could not prevail on its cross-motion. There would still be disputed issues of material fact on the copyright ownership issue, requiring findings of fact.

27

Plaintiff has not—and cannot—show that it owned valid copyrights for the original works allegedly infringed as a matter of law.  At a minimum, the plain language of the 2004 Letter, taken together with prior transfers of copyrights from The New Republic to Mr. Kauffmann and prior permission to republish granted by The New Republic to Mr. Kauffmann, provide sufficient evidence from which a trier of fact could find that The New Republic owned the copyrights for the 1999 film reviews as works made for hire.  *See Beatie v. City of N.Y.*, 123 F.3d 707, 710-11 (2d Cir. 1997) ("a trial court's function is . . . to determine whether, drawing all reasonable inferences from the evidence presented in favor of the non-moving party, a fair-minded jury could find in the non-moving party's favor") (internal citations omitted).  The theories posed by Plaintiff (*e.g.* that there was no meeting of the minds on the 2004 Letter or that Mr. Kauffmann must have believed that he owned the copyrights for the 1999 film reviews), even if not speculative or lacking a basis in fact or personal knowledge, would require findings of fact and credibility determinations of evidence and witnesses.  Thus Plaintiff's cross-motion for partial summary judgment on copyright infringement should be denied.

## CONCLUSION

For the foregoing reasons, RIT respectfully requests that this Court grant its motion for summary judgment and deny Plaintiff's cross-motion for partial summary judgment.

February 26, 2018                    BOND, SCHOENECK & KING, PLLC

   _/s/Mary P. Moore_____
    Mary P. Moore, Esq.
    Jeremy P. Oczek, Esq.
    350 Linden Oaks, Third Floor
    Rochester, New York 14625
    Telephone:  (585) 362-4700
    Email:  mmoore@bsk.com
    Email:  jpoczek@bsk.com
    *Attorneys for Defendant/Third-Party Plaintiff*
    *Rochester Institute of Technology*

3102597.5 2/26/2018