# 18-2404

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆ ◆

THE ESTATE OF STANLEY KAUFFMANN,

*Plaintiff-Appellant,*

—against—

ROCHESTER INSTITUTE OF TECHNOLOGY,

*Defendant-Third-Party-*
*Plaintiff-Appellee,*

—against—

ROBERT J. CARDULLO,

*Third-Party-Defendant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

KENNETH P. NORWICK
NORWICK & SCHAD
110 East 59th Street
New York, New York 10022
(212) 751-4440

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Standards of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    The Decision Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

STATEMENT OF ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . 16

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    I.  THIS COURT'S REASONING AND HOLDING
       IN PLAYBOY REQUIRES REVERSAL HERE . . . . . . . . . . . . . . . . . . 18

    Initial Ownership of Copyright . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    'Work Made for Hire' Under the 1976 Act . . . . . . . . . . . . . . . . . . . . . . . 19
    The Law in the Second Circuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Applying the Law to this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    II.  THE 2004 LETTER IS NOT A LEGALLY-ENFORCEABLE
       'AGREEMENT,' 'UNDERSTANDING,' OR 'MEETING OF THE
       MINDS' . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    The Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 28
    The Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

TABLE OF CONTENTS, CONTINUED

III.  THE CRUCIAL CLAUSE OF THE 2004 FORM LETTER IS
AMBIGUOUS,  REQUIRING REVERSAL OF THE DECISION
BELOW ON THAT ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . .    37

False Factual Premise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    38
Legal Impossibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39
Previously Transferred Copyrights . . . . . . . . . . . . . . . . . . . . . . . . . . .    39

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..    40

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41

ii

# TABLE OF AUTHORITIES

<u>Cases</u>

<u>16 Casa Duse, LLC</u> **v.** <u>Merkin</u>, 791 F.3d 247 (2d Cir. 2015) . . . . . . . . . . . . . .   1

<u>Blanch v. Koons</u>, 467 F.3d 244, 249 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . .   1

<u>Estate of Stanley Kauffmann v. R.I.T.</u>, 2017 U.S. Dist. LEXIS
    14947 (S.D.N.Y. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1. 12

<u>Express Indus. & Terminal Corp. v. State Dept. Of Trans.</u>, 93 N.Y.584
    (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

<u>Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.</u>, 716 F.3d
    302  (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23-24

<u>Giunta v. Dingman</u>, 893 F.3d 73 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . .   35

<u>Goodis v. United Artists Television</u>, 425 F.2d 397(2d Cir. 1970) . . . . . . .   32-33

<u>Luis Hirsch y Cia. Sociedad Anonima v. Rosenblatt Casing Co.</u>,
    418 F.2d 1300 (2d Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

<u>Morris v. Business Concepts, Inc.</u>, 259 F.3d 65 (2d Cir. 2001),
    amended, 283 F.2d 502 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . .   33

<u>Pimpinello v. Swift & Co.</u>, 253 N.Y. 159  (NY 1930) . . . . . . . . . . . . . . .. .   35-36

<u>Playboy Enterprises, Inc. v. Dumas</u>, 831 F.Supp. 295 (S.D.N.Y. 1993) . .   2, 20-21

<u>Playboy Enterprises, Inc. v. Dumas</u>, 53 F.3d 549 (2d Cir. 1995) . . . . . .   passim

<u>Schiller & Schmidt, Inc. v. Nordisco Corp.</u>, 969 F.2d 410
    (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2, 20

-

TABLE OF AUTHORITIES, CONTINUED

Stanacard, LLC v. Rubard, LLC., 2016 U.S. Dist. LEXIS 15721
(S.D.N.Y. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States Fire Ins. Co. v. General Reinsurance Corp., 949 F.2d 569
(2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 37

Urbont v. Sony Music Entertainment, 100 F.Supp.3d 342 (S.D.N.Y. 2015) . . 24

Urbont v. Sony Music Entertainment, 831 F.3d 80 (2d Cir. 2016). . . . . . . . . . 24

Statutes

Copyright Act of 1909 (17 U.S.C., repealed) . . . . . . . . . . . . . . . . . . . passim

Copyright Act of 1976 (17 U.S.C.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

28 U.S.C. 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. 1338 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## JURISDICTIONAL STATEMENT

This is an action for copyright infringement under the U.S. Copyright Act (17 U.S.C.) that was brought by plaintiff-appellant The Estate of Stanley Kauffmann (the "Estate") in April 2017 in the Southern District of New York.  (JA 12-64)  The District Court had original jurisdiction pursuant to 28 U.S.C. 1338.   On August 7, 2018, the Western District of New York, to which the case had been transferred, 2017 U.S. Dist. LEXIS 14947 (S.D.N.Y. 2017) , entered Summary Judgment dismissing the case.  (JA 607)   On August 14, 2018, the Estate filed its Notice of Appeal to this Court.  (JA 608)   This Court has jurisdiction over this appeal pursuant to 28 U.S.C. 1291.

## PRELIMINARY STATEMENT

Standards of Review

The standards of review for this appeal are as follows:

1.  "We review a district court's grant of summary judgment de novo." Blanch v. Koons, 467 F.3d 244, 249 (2d Cir. 2006), quoted in 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 254 (2d Cir. 2015) -- both copyright cases.

2.  "[T]he determination of whether a contract is ambiguous -- and thus whether parol may be considered -- is a threshold question of law for the court." [Citations omitted].  On appeal, we are free to examine the issue of ambiguity de novo. . . ."  United States Fire Ins. Co. v. General Reinsurance Corp., 949 F.2d 569, 571-572 (2d Cir. 1991).

The Case

The Copyright Act of 1976 ("the 1976 Act") provides that a freelance con-
tribution to a magazine can be treated as "work made for hire," so that the maga-
zine and not the author would own the copyright in the work, only if a) the work is
"specially ordered or commissioned" and b) the parties "expressly agree in a writ-
ten instrument signed by them that the work shall be considered a work made for
hire."  17 U.S.C. 101(2)   However, the Act does not say whether, to be legally ef-
fective, the writing has to be executed before the work is created or whether it can
be executed after creation.

In September 1993, following an extensive bench trial, a court in S.D.N.Y.
explicitly followed a ruling by the Seventh Circuit (Schiller & Schmidt, Inc. v.
Nordisco Corp., 969 F.2d 410 (7th Cir. 1992)) and held that the writing had to
precede the work's creation.  (Playboy Enterprises, Inc. v. Dumas, 831 F.Supp.
295 (S.D.N.Y. 1993))  In that case, the individual work-specific writings at issue
were executed essentially simultaneously with the creation of each separate work
but the court ruled they could not be given effect.

On appeal to this Court, the Court expressed substantial agreement with the
reasoning of the Seventh Circuit and the district court.  But this Court went on to
invoke a hypothetical from the Nimmers that "some of the paperwork remained

2

not fully executed until after creation of the subject work," and it repeated the Nimmers' conclusion that "perhaps this rule needs further testing in the crucible of fact patterns by future cases." Immediately thereafter, this Court declared: "We agree. In the fact pattern of this case -- [i.e., where the work-specific writings were executed essentially simultaneously with creation] -- we will assume that the writing requirement can be met by a writing executed after the work is created . . . . " Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 559 (2d Cir. 1995) (emphasis added) ("Playboy").

Fast-forwarding 23 years, in the case now on appeal the court below ignored this Court's call for a "crucible" of future cases on the "when" issue and simply assumed, without any analysis or even discussion, that a blanket "all articles" writing executed 46 years after the creation of the first covered work satisfied this Court's "in the fact pattern of this case" (simultaneous writings) express holding. (The decision below is set forth in the Special Appendix and in the Joint Appendix at pages 598-606.) The legal viability of that unexplained and unsupported (but dispositive) assumption by the court below is the central issue on this appeal.

If this Court affirms that assumption by the court below, the second issue on appeal concerns the court's ipse dixit conclusion, again without any analysis or discussion, that the writing at issue was "unambiguous" as a matter of law – even

3

though, among other problems, it contained a legal impossibility -- which conclusion, it held, precluded any consideration of all the evidence showing that the writing did <u>not</u> reflect their actual agreement. Based on that conclusion, the court below granted summary judgment giving full legal effect to that writing.

## <u>STATEMENT OF THE CASE</u>

<u>Factual Background</u>

<u>Stanley Kauffmann</u> (1916-2013) was a distinguished and highly respected (by many revered) critic, author, teacher, and what is now called a "public intellectual." During his seven-decade career he authored numerous books, hosted a public television program, and contributed countless articles and columns to many publications, including Harper's, Saturday Review, Commentary, Partisan Review, Yale Review, Horizon, and (most prolifically) The New Republic ("TNR") (JA 516)[1].

Mr. Kauffmann submitted pieces, including but not limited to a regular column of film criticism, to TNR from 1958 until he died in 2013, a period of 55 years. Except for a form letter that was sent to him by TNR in early 2004 -- in the 46th year of that relationship and in his 88th year -- there is no indication in the

---

[1] As a default, this brief will refer to RIT's formal response to the Estate's Rule 56 Statement of Undisputed Facts – and especially those facts that RIT does not dispute – for factual assertions in the brief. That response is at JA 515-532.

record that TNR and Mr. Kauffmann ever discussed, much less reached agreement on, the copyright ownership of all those pieces. That form letter is the subject of this appeal.

Moreover, it is undisputed on this appeal that Mr. Kauffmann, and only he, was the sole owner of all those copyrights until (at least) that 2004 form letter was sent.[2] It is also undisputed that during those prior 46 years he (as copyright owner) entered into numerous agreements authorizing the republication of those pieces, all without any objection from TNR. Except for that 2004 form letter, TNR never communicated in any way to Mr. Kauffmann or his representatives -- either before or after that letter -- that it claimed any ownership interest in any of those copyrights, and three years later it effectively renounced the essence of the letter. (JA 529)[3]

---

[2] Unfortunately, RIT below repeatedly suggested – without quite saying – that Mr. Kauffmann was not the sole owner of all the copyrights covering all his contributions to TNR prior to the 2004 form letter. On that issue, it is indisputable – even by RIT – that a) TNR transferred to Mr. Kauffmann the copyrights to his pieces prior to 1978 and b) the 1976 Act required a "work made for hire" writing for a work to be so considered, which concededly did not exist prior to 2004. RIT's suggestion that Mr. Kauffmann did not own all the copyrights to his TNR pieces prior to 2004 is factually and legally false.

[3] Not only did TNR never say or do anything that would indicate that it believed the form letter had legal (or other) effect, that 2007 publishing agreement clearly evidences that, assuming it ever intended the form letter to have effect, three years later it changed its position on the "work made for hire" status of Mr. Kauffmann's contributions to it.

5

Between (roughly) 1958 and 1978 TNR regularly transferred to Mr. Kauff-mann the copyrights in all his pieces for it that it secured in its own name in accordance with the then-prevailing practice of the magazine industry under the 1909 Copyright Act. [4] Those transfers of copyright can only mean that TNR understood and intended that Mr. Kauffmann was the rightful owner thereof.

That 2004 letter is reproduced in full on the following page:

---

[4] The underlying law and industry practice are discussed more fully at pages 32-33 below.



**THE NEW REPUBLIC**

*Leon Wieseltier*

March 22, 2004

Stanley Kauffmann
Penthouse C
10 West 15th Street
New York, NY 10011

Dear Stanley,

Like many publishing companies, *The New Republic* is working to expand into the web and
related technologies, and in so doing, afford you maximum exposure. We've had a wonderful
relationship with you over the years and see this expansion as a great opportunity to further
promote you and your talents for our mutual benefit. Recent Supreme Court decisions have made
it necessary that we explicitly confirm the terms under which you write for *The New Republic*.

Thus, in the interest of responsibly managing our business, we are making efforts to memorialize
in writing all of our agreements with our writers, including freelance contributors. Our agreement
with you has always been an oral understanding, and among other things we do want to ensure
that we are not violating your rights in any way. To that end, we'd like to confirm with you our
understanding of our past relationship with you, as well as our relationship with you and your
contributions to *The New Republic* going forward.

We have always understood that you have been writing articles for *The New Republic* as a
freelance contributor. We have also always understood in doing business with you that, in light of
our regular monthly compensation arrangement with you, all articles you have written for *The
New Republic* have been "works made for hire," as that term is defined under the US Copyright
laws. We'd like to confirm with you that the above understanding of our business relationship
with you is correct, but also that the above understanding will remain in effect as to any future
articles you write for *The New Republic*, unless and until we and you both agree otherwise in
writing.

Please acknowledge your agreement with us about this by so indicating with your signature
below.

Many thanks.

Date: _March 24, 2004_

Sincerely,

Agreed: _____

Leon Wieseltier
Literary Editor

Author Signature _____

13138

That letter never once mentioned that the legal effect of Mr. Kauffmann signing it would be to transfer to TNR the 46-years' worth of copyrights that he concededly owned to that point – indeed, it never uses the word "ownership." Also, it does not even try to explain its legalistic reference to "work made for hire." Further issues presented by the 2004 form letter are discussed below at pages 36-39.

Leon Wieseltier was from 1983 to 2014 the Literary Editor of TNR. As such, he was Mr. Kauffmann's editor for work submitted by him to the magazine during that period. The 2004 letter was signed by him. In a declaration in the court below he swore in relevant part: "I have been shown a 2004 letter from me to Mr. Kauffmann. Although I have no specific memory of that letter or of drafting or signing or sending it, I do recall that I was asked by my superiors at the Magazine to send such letters and that I did so as requested as a matter of course . . . . With respect to that letter, and more generally, a) I never discussed with Mr. Kauffmann (orally or in writing) the copyright ownership of his contributions to the Magazine; b) with the apparent exception of that letter, I never used the phrase 'work made for hire' (or any variation of it) in any communication with Mr. Kauffmann; and c) in fact, the phrase 'work made for hire' (or any variation of it) is not in my vocabulary and I do not know what it means." (JA 322)

Robert Marx was for the last five decades of Mr. Kauffmann's life his close friend and confidant. As such, he was intimately familiar with Mr. Kauffmann's oeuvre and career. Mr. Kauffmann's Will named Mr. Marx the Executor of his Estate. In that capacity, Mr. Marx authorized the commencement of this action. (JA 516)

.    In a declaration below, Mr. Marx swore: "I can confirm that Stanley always understood -- and proceeded to act on that understanding -- that he owned and controlled all his writings. Specifically, over all those decades, he repeatedly authorized numerous republications of much of his writings, including especially his writings in The New Republic magazine, and to my knowledge he never doubted that he had the full legal right to do so and never hesitated (or sought permission of anyone else) to grant those authorizations."   (JA 520)

During most if not all of Mr. Kauffmann's career as a writer, he was repre-sented by the Brandt & Brandt (later Brandt & Hochman) literary agency. Henry Thayer, an agent at that agency, has sworn: "Based on my review of B&H's files, my work with Mr. Brandt, my own interactions with Mr. Kauffmann, and my ser-vice as his agent, I can state that B&H always understood that Mr. Kauffmann owned the copyrights in all his contributions to The New Republic magazine ('TNR') and that it consistently acted on that understanding. For example, B&H

9

handled for Mr. Kauffmann numerous book contracts and licenses for the publication (and other use) of his TNR pieces and in all those dealings Mr. Kauffmann was treated as the sole copyright owner of all that work. Based on our files and my own direct involvement, I can state that B&H never received any indication from anyone else, including TNR, inconsistent with that understanding or that we needed to clear any of those dealings with anyone else, including TNR." (JA 523)

In late 2015, two years after Mr. Kauffmann's death at 97, his Estate discovered that the publishing arm of defendant Rochester Institute of Technology ("RIT") had published a book entitled <u>The Millennial Critic: Stanley Kauffmann on Film: 1999-2009</u> ("the Infringing Book")[5] which declared itself "the first posthumous collection of film criticism by the late Stanley Kauffmann (1916-2013)" and which contained 141 separate pieces written by Mr. Kauffmann that originally appeared in TNR.[6]

RIT has never claimed in this case that it had any legal right to publish those pieces, although it did claim that it published them in reliance on (false, forged,

---

[5] At various times below RIT purported to object to references to its book as "the Infringing Book." But because RIT never claimed below that its publication of the book was lawful, it is undisputed that that publication infringed the copyrights covering the 141 Kauffmann pieces in it, with the only question being who owned those copyrights.

[6] A full rendition of RIT's publication of the Infringing Book is set forth in the Estate's Complaint. (JA 12-64)

10

and fraudulent) assurances allegedly made to it by one <u>Robert Cardullo</u>, a notorious plagiarist, liar, and forger, among other similar attributes.  (The Complaint in this case (JA 12-64) describes in detail Cardullo's history and reputation, and after RIT asserted third-party claims against him he wrote to counsel for both sides admitting his shameless dishonesty and theft in inducing RIT to publish the Infringing Book . (JA 517)[7]

Believing it owned the underlying copyrights, the Estate challenged that publication and sought from RIT the "documents" it claimed it relied on in publishing the Infringing Book.  But RIT's General Counsel, <u>Robert (Bobby) Colon</u>, refused to provide those documents without a duly-issued subpoena for them, thus in effect daring the Estate to sue.  (JA 519)  (RIT did say that it was withdrawing the Infringing Book, although copies of it continue to be available for purchase on the internet, although not necessarily directly from RIT.)

<u>The Litigation</u>

After RIT effectively dared it to sue, the Estate registered with the U.S. Copyright Office its claim to own the copyrights in 44 of the pieces included in

---

[7] In one of those letters (JA 297), Cardullo wrote: "So let me declare that I am fully guilty of all the charges against me and that RIT was duped by me in this affair. . . .  I make all of these statements not to exonerate myself but to absolve RIT Press of most its [sic] responsibility in this matter.  Yes, the Press could have checked on me and determined that I was a bad 'investment,' but I initiated the deception and must take responsibility for that."

the Infringing Book (all published in 1999) and in April 2016 commenced this action for copyright infringement in the S.D.N.Y.  (In January 2017, Judge Buchwald, crediting RIT's assertion that it could only claim against Cardullo in the W.D.N.Y., transferred the case to that district.  Estate of Stanley Kauffmann v. R.I.T, 2017 U.S. Dist. LEXIS 14947 (S.D.N.Y. 2017))

In its Complaint, the Estate alleged that it owned those copyrights. RIT's Answer -- dated February 10, 2017 -- did not affirmatively dispute or assert any defenses addressed to that allegation.  (JA 65-78)

In November 2017, RIT served a subpoena on TNR, and TNR's response included the 2004 form letter along with the 2007 publishing agreement that TNR sent to Mr. Kauffmann in which TNR disclaimed any claim to the copyrights in Mr. Kauffmann's contributions to it.  (JA 529)  Although aware of this Court's opinion in Playboy, in December 2017 RIT moved for summary judgment asserting that the 2004 form letter – which explicitly applied to "all articles" by Mr. Kauffmann for publication in TNR and which was sent 46 years after the first of those articles was created – required judgment as a matter of law that TNR and not the Estate owned the infringed copyrights.  (JA 81-224)  Although TNR was aware of this litigation, and submitted an innocuous declaration to it, it never asserted any such ownership in the case, or otherwise.

12

The Estate cross-moved for partial summary judgment on liability on the grounds that a) the 2004 form letter was ineffective as a matter of law under Playboy, b) the ostensible "agreement" contained in the letter was otherwise unenforceable, and c) RIT had withdrawn (JA 225-226) all other defenses to the Estate's claims of infringement. (JA 227-360)

The motions were fully briefed and oral argument was heard on July 26, 2018. Eleven days later the court rendered its nine-page "Decision and Order" (JA598-606), and Judgment (JA 607) was entered the next day.

The Decision Below

The decision's entire discussion of the applicability to this case of this Court's treatment of the "when" issue in Playboy – i.e., "In the fact pattern of this case, we will assume that the writing requirement of §101(2) can be met by a writing executed after the work is created" -- was contained in a single sentence: "Moreover, The Estate has failed to come forward with case law that supports its arguments that the 44 articles at issue first published in 1999 were not, as a matter of law, works for hire because the agreement purportedly memorialized a pre-existing understanding going back 46 years."

And, separately, the decision rejected the Estate's arguments that the "agreement" ostensibly contained in the 2004 form letter was otherwise unen-

13

forceable as follows: "The Estate attacks the letter agreement on a number of fronts: the fact that agreement encompassed works authorized by Kaufmann over a 46 year period; the fact that THE NEW REPUBLIC gave to Kaufmann the copyrights for works published under the 1909 Copyright Act; an affidavit from the letter's author stating he did not understand the phrase "works made for hire"; an affidavit from a close friend of Kauffmann's stating, inter alia, that Kauffmann believed he owned the copyright to all his writings; evidence that Kauffmann licensed his writings that had been published in THE NEW REPUBLIC to others; and arguments that Kauffmann, at age 88 at the time of the letter, with a sick wife, trusted his editor, Leon Wieseltier, and would have signed anything requested, even without understanding the ramifications.  Significantly, at oral argument, both sides agreed that the letter was on its face a contract and that New York law controlled."  (As discussed below, the Estate contends that the letter, whether "on its face" or otherwise, does not constitute a legally-cognizable, legally-enforceable "contract.")

The Decision continued:  However, neither side ever addressed what the Court would characterize as the 'elephant in the room,' the parol evidence rule. The 2004 letter agreement purports to memorialize in writing a preexisting oral contract, evidently dating back to when Kauffmann started writing for THE NEW

14

REPUBLIC in 1958. <u>On its face, it is unambiguous</u> . . . " (emphasis added).

The bottom-line result of the court below's August 2018 ruling is the retro-active "transfer" of the copyright ownership of every piece contributed by Mr. Kauffmann to TNR since 1958, numbering in the thousands, even though a) he indisputably was the sole owner of all those copyrights to that point; b) TNR had previously affirmatively transferred to Mr. Kauffmann a great many of those copy-rights; and c) the letter purported to apply to pieces that as a matter of statutory law could not be treated as "work made for hire" because they concededly were not "specially ordered or commissioned" by TNR, the statutory prerequisite for such treatment.  Crucially, on that issue, RIT explicitly did not dispute that "[i}n addition to his regular column of film criticism in The New Republic, Mr. Kauff-mann also frequently submitted to it miscellaneous other pieces -- essentially one-offs -- that he originated himself without the impetus of The New Republic.  He also at various times submitted to it theater and book criticism."  (JA 528)   Al-though not eligible for "work made for hire" treatment under the 1976 Act, those pieces are included in the sweep of "all articles" in the 2004 letter.)

## <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

1.   Whether the court below's assumption without discussion that a purported blanket "work made for hire" writing that covers works that were created as long as 46 years before constitutes reversible error in light of <u>Playboy</u>'s reasoning and  holding on the "when" issue: "In the fact pattern of this case, we will assume that the writing requirement of §101(2) can be met by a writing executed after the work is created"?

2.   Whether a purported "agreement" that merely recites, in part falsely, that "We have always understood in doing business with you that, in light of our regular monthly compensation arrangement with you, all articles you have written for *The New Republic* have been 'works made for hire,' as that term is defined under the US copyright laws," is enforceable under this Court's holding concerning the necessity of an underlying "agreement" and "understanding" as well as the law's requirement of a "meeting of the minds"?

3.   Whether a purported "agreement" that ostensibly treats as "work made for hire" works that are statutorily ineligible for such treatment is as a matter of law "unambiguous" and legally enforceable?

4.   Whether a purported "agreement" that ostensibly transfers to a magazine as retroactively-declared "work made for hire" copyrights that the magazine pre-

16

viously conveyed to the author is as a matter of law "unambiguous" and legally enforceable?

## SUMMARY OF ARGUMENT

Addressing the issue of <u>when</u> the Copyright Act's required "work made for hire" writing had to be executed to be effective, this Court, in <u>Playboy</u>, largely agreed with prior cases that held that the writing had to be executed <u>before</u> the work was created.  However, expressly influenced by the Nimmers' hypothetical that such a rule could thwart situations where "some of the paperwork remained not fully executed until after creation of the subject work," and in a case where the work-specific writings were executed essentially <u>simultaneously</u> with the creation of each subject work, this Court held: "<u>In the fact pattern of this case</u>, we will assume that the writing requirement of *§101(2)* can be met by a writing executed after the work is created." (emphasis added)   In the Argument that follows, we demonstrate that the court below's giving effect -- albeit without analysis or discussion – to a purported blanket "work made for hire" writing that was executed 46 years after the first covered work was created violates this Court's reasoning and holding in <u>Playboy</u>.

The court below also refused even to consider any of the underlying facts and circumstances that show beyond dispute that the parties never did in fact "agree" –

17

as required by the 1976 Act and this Court's holding in <u>Playboy</u> – that all of Mr. Kauffmann's pieces for TNR were to be owned and controlled by TNR, declaring without analysis or discussion that the purported agreement was "unambiguous" as a matter of law. In the Argument that follows, we demonstrate that that conclusion is exquisitely wrong and that the purported agreement is ambiguous in multiple respects, thus requiring consideration of all those underlying facts and circumstances.

## **ARGUMENT**

### **I. THIS COURT'S REASONING AND HOLDING IN PLAYBOY REQUIRES REVERSAL HERE**

<u>Initial Ownership of Copyright</u>

Under both the 1909 and 1976 Copyright Acts, to quote the latter, "Copyright in a work protected under this title vests initially in the author or authors of the work." 17 U.S.C. 201(a). This means, at least "initially," that Mr. Kauffmann was the owner of the copyrights in all his writings, including those for TNR. As discussed immediately below, the Act created a limited exception for "work made for hire."

'Work Made for Hire' Under the 1976 Act

In enacting the 1976 Copyright Act, Congress sought to protect freelance authors and other creators from the predatory practices of publishers that prevailed under the 1909 Act whereby those entities could unfairly (usually retroactively) declare freelance works "work made for hire" solely for their own profit. For that reason, the 1976 Act restricted the situations where works could be considered "work made for hire" and it imposed a strict requirement of a "written instrument" confirming that the work (singular in the Act) at issue should be treated as "work made for hire." Thus, no longer could a publisher simply declare, ipse dixit -- including many years or even decades after creation -- that it "owned" all the free-lance creator's work as "work made for hire." Instead, as pertinent here, Congress imposed this immutable condition: a work could only be treated as "work made for hire" "if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. 101(2) (emphasis added).

The Law in the Second Circuit

The "written instrument" requirement presented issues of interpretation that had to be resolved by the courts. Probably the most vexing such issue was when the writing had to be executed – before, or simultaneously with, or after the cre-

19

ation of the work, including (as here) many decades after creation? Also, if after creation, does the use of the singular ("the work") in the statute allow for retro-active "blanket" "work made for hire" treatment – e.g., (as here) covering all prior contributions of the author to the publisher?

In 1992, the Seventh Circuit, in Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410 (7th Cir. 1992), became the first -- and until the S.D.N.Y. and this Court weighed-in a few years later -- the only court to address the "when" issue. That court declared a black-letter unambiguous rule: the writing required by the Act "must precede the creation of the property in order to serve its purpose of identifying the (noncreator) owner unequivocally." Id. at 413. But then came the seminal case of Playboy Enterprises, Inc. v. Dumas, which generated two district court and two Second Circuit decisions.[8]

In that case, Playboy paid a freelance artist by check following his delivery and Playboy's acceptance of each assigned work and the artist (or others for him) endorsed those checks, each of which (as here relevant) contained a "legend" con-firming the "work made for hire" status of the work. (Thus, each subject "writing" in that case applied to a specific identified work – as distinct from a blanket "all

---

[8] Possibly gratuitous disclosure: the Estate's undersigned counsel in this case represented Playboy in that litigation, which began in 1991 and which (finally) concluded in 1998.

works" instrument, as here.)  Playboy argued that the check-endorsements constit-

uted the "work made for hire" "writing" required by the 1976 Act.  A major issue

in the case was whether those work-specific check-endorsements -- issued essent-

ially immediately after each work was created and delivered -- met the "written

instrument" requirement of the Act.

Following an extensive bench trial, Playboy's position was resoundingly re-

jected.  On the "when" issue – whether the writing can be signed <u>after</u> the work is

created – the court set forth the Seventh Circuit's rationale in <u>Schiller</u> and then

held:

> This logic strikes the court as sound. This court therefore holds
> on the basis of the statutory scheme, the legislative history, and
> the reasoning of Judge Posner, that a writing is required prior to
> the creation of a work in order for the work to be considered a
> work made for hire within the meaning of *17 U.S.C. § 101(2)*.
> Accordingly, this court finds that none of the check legends in
> this case were a sufficient writing within the meaning of the
> 1976 Act to make the Nagel pieces work made for hire for Play-
> boy, because all of the writings came after the creation of the
> works.

831 F.Supp. 295, 315 (S.D.N.Y. 1993).

Playboy appealed to this Court, and on the "when" issue the Court largely

agreed with the Seventh Circuit and the district court but then added a limited and

carefully nuanced exception.  Because the Circuit's explicit holding could not be

21

more crucial to the adjudication of this appeal, we will quote extensively from the

opinion here, with selected passages emphasized (sometimes doubly):

> We agree with the Seventh Circuit that the writing requirement was
> created, in part, to make the ownership of intellectual property rights
> clear and definite. The Supreme Court, in *Community for Creative
> Non-Violence v. Reid*, 490 U.S. 730, 750, . . . . (1989) ("CCNV"),
> stated that one of Congress's goals in creating the work-for-hire
> provisions of the 1976 Act was to "ensure predictability through
> advance planning." In *CCNV,* the Court rejected the petitioner's
> argument that independent contractors should be considered "em-
> ployees" under *§101(1)* if their works were "actually controlled" by
> the hiring party. That interpretation, the Court reasoned, would
> "thwart" the purpose of *§ 101* because it "leaves the door open for
> hiring parties, who have failed to get a full assignment of copyright
> rights from independent contractors falling outside the subdivision
> (2) guidelines, to unilaterally obtain work-made-for-hire rights years
> after the work has been completed." Id. (quoting Hamilton, *Com-
> missioned Works as Works Made for Hire Under the 1976 Copyright
> Act: Misinterpretation and Injustice*, 135 U. Pa. L. Rev.1281, 1304
> (1987)).

This Court then continued:

> Likewise, Congress's goal of "predictability" would be thwarted if a
> hiring party and an independent contractor could enter into a work-
> for-hire agreement years after a work was created. Prior to execution
> of such an agreement, the parties, as well as third parties, would act
> with the understanding that the independent contractor was the "auth-
> or" of the work. Only after the parties agreed retroactively that the
> work was made for hire would the hiring party somehow become the
> "author." We also question whether Congress intended that a work
> could have two separate "authors"-- one during the first phase of its
> existence, and another after a work-for-hire agreement were executed.
> We therefore find that the 1976 Act requires that the parties agree
> before the creation of the work that it will be a work made for hire.

22

And then this Court continued:

> We are not convinced, however, that the actual writing memorializing the agreement must be executed before the creation of the work.  <u>The Nimmers make a convincing argument in their treatise on copyrights that such a requirement could itself create uncertainty</u>. They argue:
>
> > One can [] imagine claims involving parties each of whom knew of the unanimous intent among all concerned that the work for hire doctrine would apply, **notwithstanding that some of the paperwork remained not fully executed until after creation of the subject work.  In that [] circumstance, the bright line rule could frustrate the intent of the parties, and cloud rather than serve the goal of certainty.**
>
> 1 *Nimmer § 5.03[B][2][b]* (1994) (emphasis added). They conclude that "<u>perhaps this rule needs further testing in the crucible of fact patterns by future cases</u>." *Id.*  We agree.  **<u>In the fact pattern of this case</u>, we will assume that the writing requirement of *§ 101(2)* can be met by a writing executed after the work is created, if the writing confirms a prior agreement, either explicit or implicit, made before the creation of the work**.  That leaves us with three questions: 1) whether the language of the legends was sufficient to meet the writing requirement of *§ 101(2)*; 2) <u>if so, whether Playboy and Nagel **understood** at the time the works were created that the works were made for hire</u>. . . .

53 F.3d 549, 559 (2d Cir. 1995) (emphasis added).

This Court's decision in <u>Playboy</u> was the first in this Circuit to disapprove the kind of four-decades later "writing" urged below by RIT and adopted by the court below.  In addition, in 2013 the Court reiterated in <u>Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc</u>., 716 F.3d 302, 315 (2d Cir. 2013): "[T]he

23

Agreement appears to create an 'employee for hire' relationship, but the Agreement could not render Ghost Rider a 'work made for hire' *ex post facto*, even if the extrinsic evidence shows the parties had the intent to do so."  And in <u>Urbont v. Sony Music Entertainment</u>, 100 F.Supp.3d 342, 353 (S.D.N.Y. 2015), the court quoted extensively from <u>Friedrich</u>, <u>supra</u>, to make the same point.  (That decision was reversed in part on other grounds, 831 F.3d 80 (2d Cir. 2016.)  See also to the same effect, <u>Stanacard, LLC v. Rubard, LLC.</u>, 2016 U.S. Dist. LEXIS 15721 (S.D.N.Y. 2016).

<u>Applying the Law to this Case</u>

To recap the applicable law: This Court in <u>Playboy</u> limited its ultimate holding to "the fact pattern of this case" -- <u>i.e.</u>, work-specific writings that immediately followed the creation of the work.  Also, the Court stated unequivocally: "<u>We agree with the Seventh Circuit that the writing requirement was created, in part, to make the ownership of intellectual property rights clear and definite</u>."  Further, this Court declared that the law must prevent a publisher from being able "to unilaterally obtain work-made-for-hire rights years after the work has been completed."  Further, the Court made clear: "<u>We also question whether Congress intended that a work could have two separate 'authors'-- one during the first phase of its existence, and another after a work-for-hire agreement were executed</u>."

24

Unfortunately, the decision below utterly flouts those explicit judicial declarations by this Court. The decision is flatly inconsistent with the goal of "clean and definite" ownership of the relevant copyrights, and it necessarily establishes that all those copyrights had one "owner" from 1958 through 2004 (Mr. Kauffmann) and another "owner" beginning in 2004 (at least until 2007) (TNR). In fact, the court below's holding that TNR – and not Mr. Kauffmann – always owned the copyrights to all his pieces for TNR necessarily means that all of Mr. Kauffmann's prior licenses authorizing the republication by others of those pieces were void, unlawful, and infringing of TNR's (now declared) copyrights in those pieces. This is exactly the result this Court wanted to avoid in <u>Playboy.</u>.

Also: No case – certainly no case cited by RIT – has come close to upholding a purported retroactive "blanket" ("all works") "work made for hire" writing, as here; and no case – and certainly no case cited by RIT – has come close to upholding a purported retroactive "work made for hire" writing that was set forth in a form letter that neither the sender nor the recipient understood, as here; and no case – and certainly no case cited by RIT – has come close to upholding a purported retroactive "work made for hire" writing that looked back more than four decades, as here.

25

Although the court below did not deem the "when" issue as needing separate analysis or discussion and simply assumed that this Court's "in the fact pattern of this case" actually means "whenever executed, even decades later," even RIT acknowledged that the "when" issue required separate discussion – and persuasion – apart from the actual contents of the writing.  For example, RIT acknowledged at the oral argument on July 26 that the "when" issue was a separate issue that had to be addressed separately.  As RIT's counsel put it:

> But there have been other cases in other district courts, which we
>
> cited to, where the memorialization occurred years after. None 44
>
> years after.  But again, plaintiff has not cited to a single case
>
> anywhere saying that there is some time period after which, you
>
> know, if you haven't made a memorialization by this time, it's no
>
> good any more. No Court has said after ten years, after five years.
>
> And, again -- and your Honor obviously recognizes this -- the only
>
> works at issue here were created within five years of this writing so
>
> we are not dealing with works from the '60s or '70s or '80s.

 (JA 578)

But on the "when" issue the court below's decision held only that the Estate "failed to come forward with case law" that supported its argument that the letter

26

could not be given effect "solely because the agreement purportedly memor-

ialized a preexisting understanding going back 46 years," thus simply <u>assuming</u>

that <u>Playboy</u> affirmatively approved purported "work made for hire" writings

"whenever executed."  The decision also shifted the burden on this issue away

from RIT, the proponent of the writing, to the Estate, the opponent**.**  (On that issue,

we note that RIT proffered at best two out-of-state district court decisions that did

not actually discuss the "when" issue.  As a result, if <u>Playboy</u> doesn't conclusively

answer that issue here, the issue is manifestly one of first impression in this Cir-

cuit.

    <u>Playboy</u> requires a) the reversal of the court below's holding giving effect to

a blanket "work made for hire" writing spanning 46 years and b) the entry of sum-

mary judgment for the Estate on the issue of RIT's infringement of the Estate's

copyrights applicable to the Kauffmann pieces published in the Infringing Book.

(Apart from its reliance on the form letter, RIT withdrew all other defenses to the

Estate's claims of infringement. (JA 225-226)

## II.  THE 2004 LETTER IS NOT A LEGALLY-ENFORCEABLE 'AGREEMENT,' 'UNDERSTANDING,' OR 'MEETING OF THE MINDS'

Using an active verb and not a passive noun, the relevant provision of the 1976 Copyright Act requires that the parties "<u>expressly agree</u> in a written instrument signed by them that the work shall be considered a work made for hire."  17 U.S.C. 101(2) (emphasis added).  This Court, in <u>Playboy</u>, in interpreting and applying that provision, imposed two further crucial requirements: first, it required that the "writing confirms a <u>prior agreement</u>, either explicit or implicit, <u>made before the creation of the work</u>," and second, that the parties "**understood** at <u>the time the works were created</u> that the works were made for hire."  53 F.3d 549, at 559 (emphasis added).   And, of course, in all cases involving a claimed "agreement" the law requires a "meeting of the minds" for an enforceable agreement to be found.

<u>The Relevant Facts</u>

Without discussion, and relying entirely on a single self-referential clause in a long convoluted sentence in the form letter, the court below declared that these requirements were met here.  The record proves the opposite.  Here are the undisputed facts:

1.  The sender (and ostensible author) of the 2004 letter, Mr. Wieseltier, Mr. Kauffmann's longtime editor, swore that he "never discussed with Mr. Kauffmann

28

(orally or in writing) the copyright ownership of his contributions to the Magazine" and that the phrase 'work made for hire' (or any variation of it) is not in my vocabulary and I do not know what it means."  (JA 525)

2.   The recipient of the letter, Mr. Kauffmann, almost certainly also had no idea what that phrase meant.  As Mr. Marx has sworn, "In all that time [four-plus decades], I can't remember [Mr. Kauffmann] ever uttering the word 'copyright,' much less the phrase 'work made for hire.'  I seriously doubt that he had any comprehension of what those terms entailed."  (JA 525)

3.   The phrase is exquisitely legalistic in nature – consisting of a direct quotation from and wholly dependent on an understanding of an arcane federal statute, with no attempt whatever to explain its meaning or consequences.

4.   The recipient of the letter, Mr. Kauffmann, was 88-years-old at the time. (JA 526)

5.   At the time the 2004 form letter was sent, Mr. Kauffmann "trusted Mr. Wieseltier implicitly and would have signed anything he asked him to sign, even without reading or understanding it."  (JA 526)

6.   At that time, as sworn by Mr. Marx, Mr. Kauffmann's wife Laura was entering the early stages of dementia and he had no time for or interest in such (to him) unimportant matters as a letter that Mr. Wieseltier asked him to sign as a

29

matter of routine paperwork.  (JA 526)

7.  From 1958 until his death at 97 in 2013 -- a period of 55 years -- Mr. Kauffmann contributed a wide variety of pieces to TNR, including but not limited to a regular column of film criticism.  (JA 528)

8.  During that entire 55-year period, TNR and Mr. Kauffmann never discussed, either orally or in writing, much less reached agreement concerning, the copyright ownership of those pieces.  (JA 519, 520, 523, 525)[9]

9.  During that entire 55-year period TNR never once communicated to Mr. Kauffmann -- not orally, or in writing, or otherwise -- that it owned any copyrights in the pieces he submitted to it. (JA 519, 520, 523, 525)

10.  During that entire 55-year period, TNR never once objected to the countless times Mr. Kauffmann authorized the republication by others of any of those pieces in his own name and as the sole copyright owner thereof.  (JA 519, 520, 523, 525)

11.  In his declaration, Mr. Marx has sworn: "I can confirm that Stanley always understood -- and proceeded to act on that understanding -- that he owned and controlled all his writings.  Specifically, over all those decades, he repeatedly

---

[9] Tellingly, the form letter does not claim any actual communication between TNR and Mr. Kauffmann, only asserting an "oral understanding," whatever that means.

30

authorized numerous republications of much of his writings, including especially his writings for The New Republic magazine, and to my knowledge he never doubted that he had the full legal right to do so and never hesitated (or sought permission of anyone else) to grant those authorizations."  (JA 520)

12.  Beginning in 1966, eight years after he began submitting pieces to TNR and 38 years before the 2004 Form Letter, Mr. Kauffmann regularly authorized the republication in book form of such pieces.  (JA 521)

13   Each of those books contains a notice that the copyright owner of the contents of the book is Stanley Kauffmann.  None of those books contains any suggestion that anyone else, including The New Republic, had any copyright ownership interest in any of those contents.  (JA 522)

14.  Mr. Kauffmann's literary agent, Henry Thayer, swore in a declaration below: "Based on my review of B&H's files, my work with Mr. Brandt, my own interactions with Mr. Kauffmann, and my service as his agent, I can state that B&H always understood that Mr. Kauffmann owned the copyrights in all his contributions to The New Republic magazine ('TNR') and that it consistently acted on that understanding.  For example, B&H handled for Mr. Kauffmann numerous book contracts and licenses for the publication (and other use) of his TNR pieces and in all those dealings Mr. Kauffmann was treated as the sole copyright owner of

31

all that work.  Based on our files and my own direct involvement, I can state that

B&H never received any indication from anyone else, including TNR,  inconsistent

with that understanding or that we needed to clear any of those dealings with

anyone else, including TNR."  (JA 523)

15.   In addition to his regular column of film criticism in TNR, Mr. Kauff-

mann also frequently submitted to it miscellaneous other pieces -- essentially one-

offs -- that he originated himself without the impetus or expectation of TNR.  He

also at various times submitted to it theater and book criticism.  (JA 528)

16.   Prior to the 2004 form letter, Mr. Kauffmann executed numerous agree-

ments authorizing others to publish or otherwise use individual pieces he wrote for

TNR.  (JA 529)

17.   TNR regularly – almost entirely while the Copyright Act of 1909, which

was in effect through December 31, 1977, was the applicable law – transferred to

Mr. Kauffmann the copyrights to his contributions that it obtained when it copy-

righted the entire relevant issue of the magazine.  JA 529-30)

18.   TNR's regular and routine practice of  transferring to Mr. Kauffmann the

copyrights in his contributions flows from the "indivisibility" of copyright under

the 1909 Copyright Act.  As explained by this Court in 2001, referring to its 1970

holding in Goodis v. United Artists Television, 425 F.2d 397, 400 (2d Cir. 1970):

"In <u>Goodis</u>, we examined whether, under the prior Copyright Act of 1909, notice of

copyright by a magazine was sufficient to obtain a valid copyright on behalf of the

author of an individual work contained in the magazine, and concluded that it was.

. . . Unlike the current Copyright Act, the prior Act mandated indivisibility of

copyright which meant that if the author did not obtain a copyright in his work,

publication would put the work into the public domain. We said in <u>Goodis</u> that we

were 'loath to bring about the unnecessarily harsh result of thrusting the author's

product into the public domain,' . . . when it was clear from the magazine's copy-

right notice that the author did not intend such a result." <u>Morris v. Business Con-</u>

<u>cepts, Inc.</u>, 259 F.3d 65, 72-73 (2d Cir. 2001), amended in unrelated ways, 283

F.2d 502 (2d Cir. 2002).

19.  As approved by <u>Goodis</u> and reiterated by <u>Morris</u>, TNR's practice of ob-

taining in its own name and then routinely transferring to its contributors the copy-

rights in their contributions served both to preserve for the contributors and to then

transfer to them those copyrights, which practice obviously reflected and was moti-

vated by its recognition of and respect for the fact that those contributors were the

rightful owners of those copyrights.  (JA 530)

20.  When Mr. Kauffmann authorized the republication of pieces he sub-

mitted to The New York Times, the paper required that such republication ack-

nowledge that The Times was the owner of the copyrights in those pieces.  (JA 522)

21.  TNR never imposed any such requirement and never objected when Mr. Kauffmann authorized republication of his pieces for it in his own name and as the sole copyright owner thereof.  (JA 522)

All of those undisputed facts, we submit, conclusively establish that Mr. Kauffmann and TNR did not – at the time each ("all") of his thousands of pieces were created – "agree," "understand," have a "meeting of the minds," that all those pieces would be owned and controlled by TNR and not him, as found by the court below.

But, in fairness, we should also acknowledge the evidence in the record that supports the conclusion that the parties "agreed" at the time of Mr. Kauffmann's creation of each piece that those pieces were to be owned and controlled by TNR, and not him.  Actually, however, as even RIT will concede, there is no such evidence – none – especially in light of the undisputed fact that Mr. Kauffmann wrote pieces that were not "specially ordered or commissioned," the statutory prerequisite for "work made for hire" treatment.

34

The Applicable Law

It is axiomatic that to be enforceable – to be given legal effect – a purported "agreement" must reflect a "meeting of the minds" by the asserted parties to it. As this Court recently reiterated, "Generally, courts look to basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." Giunta v. Dingman, 893 F.3d 73, 79 (2d Cir. 2018), quoting Express Indus. & Terminal Corp. v. State Dept. Of Trans., 93 N.Y.584, 589 (1999).

To repeat: All of the available evidence in the record establishes that there was no "meeting of the minds" at the time the works were created that TNR owned and controlled all those works and there is not a shred of evidence to the contrary. In short, with the aberrational exception of the 2004 form letter – 46 years into their relationship --TNR always acted as if Mr. Kauffmann was the rightful owner of all copyrights in his writings for TNR and it never asserted otherwise.

Two seminal non-copyright high appellate decisions further reinforce the conclusion that the 2004 form letter simply cannot be found to be a legally-sufficient, legally-enforceable, "agreement" for the purposes of the 1976 Act. In Pimpinello v. Swift & Co., 253 N.Y. 159, 164 (NY 1930), the New York Court of Appeals declared that an instrument signed by the plaintiff should not be enforced be-

35

cause a) he (mistakenly) relied on his "trusted lawyer" in signing it, and b) "[i]t was not to have been expected by the plaintiff that, as a natural consequence of his reliance upon the word of his attorney, relating to the contents of the instrument, a writing which in no wise expressed his will would be executed by him."

And in <u>Luis Hirsch y Cia. Sociedad Anonima v. Rosenblatt Casing Co.,</u> 418 F.2d 1300, 1302 (2d Cir. 1969), this Court similarly refused to give effect to a document concededly signed by the party in question. As the Court explained: "Certainly, it is the rule that in the absence of fraud or deceit, a party is bound by his acceptance of a term even if his acquiescence is naive and uninformed. But considering all the circumstances of this case -- the unusual nature of the letter proposed by Hirsch y Cia., the role played by Julius Hirsch as a good faith but misleading adviser, the virtual certainty that Rosenblatt would have discovered the irregularity of Hirsch's proposals -- it cannot be said that there was a meeting of the minds on this term when Rosenblatt had no understanding of what he was accepting. [Citation omitted]."

These cases require the same conclusion here.

## III. THE CRUCIAL CLAUSE OF THE 2004 FORM LETTER IS AMBIGUOUS, REQUIRING REVERSAL OF THE DECISION BELOW ON THAT ISSUE

If, and only if, this Court finds that the timing of the 2004 form letter is consistent with the reasoning and holding of Playboy, the court below's holding that the letter was "unambiguous" as a matter of law must be addressed. That holding, according to the court, prevented it from even considering all of the undisputed underlying facts set forth in full above.

This Court has proclaimed the applicable law as follows:

"[T]he determination of whether a contract is ambiguous -- and thus whether parol may be considered -- is a threshold question of law for the court." [Citations omitted]. On appeal, we are free to examine the issue of ambiguity de novo. . . .

As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. As we reiterated . . . '[a] word or phrase is ambiguous when it is capable of more than a single meaning "'when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'"

United States Fire Ins. Co. v. General Reinsurance Corp., 949 F.2d 569, 571-572 (2d Cir. 1991).

Without discussion or analysis, the court below, essentially ipse dixit, declared the 2004 form letter "unambiguous." For multiple reasons, that declaration

is demonstrably wrong.

False Factual Premise

Here is the entire factual premise for the letter's assertion of "work made for hire" treatment for "all" of Mr. Kauffmann's pieces for TNR: "We have also always understood in doing business with you that, in light of our regular monthly compensation arrangement with you, all articles you have written for The New Republic have been 'works made for hire,' as that term is defined under the US Copyright laws." (supra, p. 7; emphasis added). However, it is undisputed that that factual premise is simply false, because it is undisputed that among those "all articles" were many that were not created pursuant to any "regular monthly compensation arrangement" and thus were not "specially ordered or commissioned" by TNR.

So, what "meaning" should be given to the letter's false factual assertion that "all articles" are covered by its purported "work made for hire" sweep: 1) Does it mean literally "all articles," including those that concededly were not created pursuant to any prior "compensation arrangement" or the applicable "US Copyright laws"?  Or 2) does it only mean those articles that were created  consistent with that premise?  Surely this is an ambiguity that, alone, requires reversal of the court below's (unexplained) conclusion to the contrary.

38

Legal Impossibility

The 2004 form letter purports to "confirm" that Mr. Kauffmann and TNR "agreed" prior to the creation of each of his pieces for TNR over the previous 46 years that those pieces were "work made for hire" "<u>as that term is defined under the US Copyright laws</u>."

But, with respect to many of those pieces, it is undisputed that that alleged "agreement" is legally impossible. This is because those pieces were concededly not "specially ordered or commissioned," the Act's statutory prerequisite for "work made for hire" treatment. So, what "meaning" should be given to the letter's legal impossibility with respect to its "work made for hire" sweep: 1) Does it mean literally "all articles," including those that concededly cannot legally be treated as "work made for hire" under the 1976 Act? Or 2) does it <u>only</u> mean those articles that are consistent with "the US Copyright laws"? Surely this legal impossibility constitutes an ambiguity that, alone, requires reversal of the court below's (unexplained) conclusion to the contrary.

Previously Transferred Copyrights

It is an undisputed fact in this case that TNR routinely transferred to Mr. Kauffmann (roughly) all of the copyrights covering all his pieces for TNR during the 20 years 1958-1978. So, with respect to that 20 years of accumulated copy-rights (a little less than half of the 46 years preceding the 2004 form letter), the

question becomes: Does the 2004 form letter's reference to "all articles" mean that TNR was taking back – reneging on – its prior transfer of those copyrights?  Or does it <u>only</u> mean those copyrights that were not previously transferred to Mr. Kauffmann?  Here too, this is an ambiguity that, alone, requires reversal of the court below's (unexplained) conclusion to the contrary.

<u>CONCLUSION</u>

For all of the foregoing reasons, the Judgment of the court below should be vacated and this Court should order entry of partial judgment for the Estate establishing RIT's liability for copyright infringement as alleged in the Complaint, together with such other relief as the Court deems just.

Dated: October 1, 2018

Respectfully submitted,

By: <u>s/ Kenneth P. Norwick</u>
    Kenneth P. Norwick

NORWICK & SCHAD
110 East 59th Street
New York, NY  10022
Telephone: (212) 751-4440
Facsimile: (212) 604-9997
E-Mail: ken@norwickschad.com

*Attorney for Plaintiff Estate of Stanley Kauffmann*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

The undersigned hereby certifies, pursuant to Federal Rule of Appellate

Procedure 32, that the foregoing brief complies with the type volume limitation set

forth in Federal Rules of Appellate Procedure 32(a) and (7)(B)(i), in that the brief

uses the Times New Roman 14 point font and contains no more than 13,000

words.

Specifically, in accordance with Federal Rule of Appellate Procedure 32(g),

the WordPerfect word-count tool indicates that the brief contains 9,332 words all

inclusive.

Dated: October 1, 2018

/s/ Kenneth P. Norwick
　　　Kenneth P. Norwick

# SPECIAL APPENDIX

## TABLE OF CONTENTS

PAGE

Decision and Order of the Honorable Charles J. Siragusa,
   dated August 6, 2018 .......................................... SPA-1

Judgment Appealed From, dated August 7, 2018 .................... SPA-10

# SPA-1

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF NEW YORK

---

THE ESTATE OF STANLEY KAUFFMANN,

                                        Plaintiff,

          -vs-

ROCHESTER INSTITUTE OF TECHNOLOGY,

                                        Defendant.          DECISION & ORDER

---
                                                           17-CV-6061-CJS-MWP

ROCHESTER INSTITUTE OF TECHNOLOGY,

                    Third Party Plaintiff,

          -vs-

ROBERT J. CARDULLO,

                    Third Party Defendant.

---

### APPEARANCES

For Plaintiff/Third Party Plaintiff:        Kenneth P. Norwick, Esq.
                                            Norwick Schad & Goering
                                            110 East 59th Street 29th Floor
                                            New York, NY 10022
                                            (212) 751-4440


For Defendant:                              Mary Patricia Moore, Esq.
                                            Bond, Schoeneck & King, PLLC
                                            Avant Building
                                            200 Delaware Avenue Suite 900
                                            Buffalo, NY 14202
                                            (716) 416-7037


For Third Party Defendant:                  In Default

**SPA-2**

## INTRODUCTION

**Siragusa, J.** This copyright infringement case is before the Court on the Plaintiff's and Defendant's cross-motions for summary judgment. Def.'s Mot. for Summary J., Dec. 4, 2017, ECF No. 52; Pl.'s Mot. for Summary J., Jan. 12, 2018, ECF No. 58. Defendant Rochester Institute of Technology ("RIT") has previously obtained a default against third party defendant Robert J. Cardullo. Clerk's Entry of Default, May 16, 2017, ECF No. 40. This case was originally filed in the Southern District of New York and by Memorandum and Order entered on January 20, 2017, ECF No. 25, was transferred to this Court. For the reasons stated below, the Court grants RIT's motion for summary judgment, ECF No. 52, with respect to The Estate's copyright infringement claim and Kauffmann's cross-motion for summary judgment, ECF No. 58, is denied.

## BACKGROUND

Plaintiff Stanley Kauffmann ("Kauffmann") was an author of numerous movie reviews primarily for THE NEW REPUBLIC, "an independent journal of opinion promoting novel solutions to the challenges of our time," and founded in 1914, with its principle office in New York City. About, THE NEW REPUBLIC (https://newrepublic.com/pages/about) accessed on Jul. 24, 2018.

At issue in this case is the republication of 141 of those reviews in a book authored by third party defendant Robert J. Cardullo ("Cardullo") and published by an entity belonging to RIT. The book is entitled *The Millennial Critic: Stanley Kauffmann on Film: 1999-2009*. The Estate of Stanley Kauffmann ("the Estate") claims that 44 of those reviews violated Kauffmann's copyright in them.[1] RIT claims that Kauffmann did not own the copyright to those works in Cardullo's book, since he and THE NEW REPUBLIC agreed in 2004 that all the reviews

---

[1] The Estate would have pursued claims on all 141 articles, but only 44 of them are registered, a prerequisite for suit. 17 U.S.C. § 412.

# SPA-3

Kauffman wrote for the journal were a "work made for hire" as defined in the Copyright Act of 1976. 17 U.S.C. § 101.

The complaint lists the 44 allegedly infringing articles written by Kauffman as follows:

1. "Shakespeare in Love"
2. "Hurlyburly"
3. "The Thin Red Line"
4. "Affliction"
5. "Private Confessions"
6. "Dr. Akagi"
7. "The Children of Heaven"
8. "The Dreamlife of Angels"
9. "Devil's Island"
10. "EdTV"
11. "The Winslow Boy"
12. "A Midsummer's Night's Dream"
13. "Tea with Mussolini"
14. "Star Wars"
15. "Besieged"
16. "Eternity and a Day"
17. "An Ideal Husband"
18. "Autumn Tale"
19. "My Son the Fanatic"
20. "The Gambler"
21. "Lucie Aubrac"·
22. "West Beirut"·
23. "American Beauty"·
24. "Breakfast of Champions"·
25. "Jakob the Liar"
26. "Three Kings"
27. "The Straight Story"
28. "Bringing Out the Dead"
29. "Rosetta"
30. "The Insider"
31. "Ride with the Devil"
32. "Sweet and Lowdown"
33. "The End of the Affair"
34. "Natural Born Killers"
35. "Grand Illusion"
36. "D'Artagnan's Daughter"
37. "Greed"
38. "Photographer"
39. "Close Up 1927-1933"
40. "Projections 9"
41. "The Death of Film"
42. "American Film Audiences"
43. "Stanley Kubrick"[2]
44. "Marcello Mastroianni."

Compl. ¶ 7. Although the complaint does not state when the articles were published by THE NEW REPUBLIC, RIT states in its memorandum of law that the 2004 letter signed by Kauffmann and his editor at the paper, "although dated after the articles at issue were first published by THE NEW REPUBLIC in 1999, demonstrates that the parties intended, even prior to creation of the articles, that they were 'works made for hire.'" RIT's Mem. of Law 7, Dec. 4, 2017, ECF No. 52-16.

---

[2] Possibly a reference to "Kubrick: A Sadness," by Stanley Kauffmann in *The New Republic* (Aug. 16, 1999), *available at* https://newrepublic.com/article/131189/kubrick-sadness (last accessed Jul. 23, 2018).

**SPA-4**

### STANDARD OF LAW

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, ... demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and "the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a) (2015). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (citation omitted).

The burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Id.* at 249. "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(c)(1). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

### DISCUSSION

The facts are mostly undisputed; however, the inferences to be drawn from them are highly disputed. The Estate's claim of infringement, and RIT's defense, rely principally on the

letter revealed in discovery that was sent by Leon Wieseltier, Literary Editor of THE NEW REPUB-

LIC to Stanley Kauffman, dated March 22, 2004. Because of the letter's central importance

to the resolution of the motion and cross motion for summary judgment, the Court will quote

it in its entirety:

> March 22, 2004
>
> Stanley Kauffmann
> Penthouse C
> 10 West 15th Street
> New York, NY ·10011
>
> Dear Stanley,
>
> Like many publishing companies, *The New Republic* is working to expand into the web and related technologies, and in so doing, afford you maximum exposure. We've had a wonderful relationship with you over the years and see this expansion as a great opportunity to further promote you and your talents for our mutual benefit. Recent Supreme Court decisions have made it necessary that we explicitly confirm the terms under which you write for *The New Republic*.
>
> Thus, in the interest of responsibly managing our business, we are making efforts to memorialize in writing all of our agreements with our writers, including freelance contributors. Our agreement with you has always been an oral understanding, and among other things we do want to ensure that we are not violating your rights in any way. To that end, we'd like to confirm with you our understanding, of our past relationship with you, as well as our relationship with you and your contributions to *The New Republic* going forward.
>
> We have always understood that you have been writing articles for *The New Republic* as a freelance contributor. We have also always understood in doing business with you that, in light of our regular monthly compensation arrangement with you, all articles you have written for *The New Republic* have been "works made for hire," as that term is defined under the US Copyright laws. We'd like to confirm with you that the above understanding of our business relationship with you is correct, but also that the above understanding will remain in effect as to any future articles you write for *The New Republic*, unless and until we and you both agree otherwise in writing.
>
> Please acknowledge your agreement with us about this by so indicating with your signature below.

## SPA-6

Many thanks,                          Date: <u>March 24, 2004</u>

Sincerely,                            Agreed:   <u>  ✓  </u>

/s/ Leon Wieseltier                   Author Signature: <u>/s/ Stanley Kauffmann</u>

Leon Wieseltier
Literary Editor

Letter from Leon Wieseltier to Stanley Kauffmann (Mar. 22, 2004) *attached to* Myer Decl. as Ex. A, ECF No. 52-15 ("letter agreement"). The parties agree that the letter on its face is a contract and that Kauffmann signed the agreement in the space provided.

RIT relies heavily on the letter to establish that Kauffmann's reviews written for THE NEW REPUBLIC were works for hire. The Copyright Act of 1976 defines a "work made for hire" as "a work specially ordered or commissioned for use as a contribution to a collective work..., if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101. It defines a "collective work" as "a work, such as a periodical issue..., in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." *Id*. The Copyright Act further states that:

> In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

17 U.S.C. § 201(b). RIT therefore argues that as works made for hire, the articles published by it in Cardullo's book do not infringe any copyright owned by Kauffmann, or the Estate.

The Estate attacks the letter agreement on a number of fronts: the fact that agreement encompassed works authorized by Kaufmann over a 46 year period; the fact that THE NEW REPUBLIC gave to Kaufmann the copyrights for works published under the 1909 Copyright Act;

**SPA-7**

an affidavit from the letter's author stating he did not understand the phrase "works made for hire"; an affidavit from a close friend of Kauffmann's stating, *inter alia*, that Kauffmann believed he owned the copyright to all his writings; evidence that Kauffmann licensed his writings that had been published in THE NEW REPUBLIC to others; and arguments that Kauffmann, at age 88 at the time of the letter, with a sick wife, trusted his editor, Leon Wieseltier, and would have signed anything requested, even without understanding the ramifications. Significantly, at oral argument, both sides agreed that the letter was on its face a contract and that New York law controlled.

However, neither side ever addressed what the Court would characterize as the "elephant in the room," the parol evidence rule. The 2004 letter agreement purports to memorialize in writing a preexisting oral contract, evidently dating back to when Kauffmann started writing for THE NEW REPUBLIC in 1958. On its face, it is unambiguous. Both parties agree that since he started writing for the journal, "all articles [he has] written for The New Republic have been 'works made for hire," as that term is defined under the US Copyright laws." Letter at 1. By signing the letter, and checking the line "agreed," Kauffmann assented to that understanding. Therefore, on its face, the letter contains all the terms necessary for a contract: offer, acceptance, consideration, mutual assent, and an intent to be bound. *See Kavitz v. IBM*, 458 Fed. Appx. 18, 19 (2d Cir. 2012) ("To establish the existence of an enforceable agreement under New York law, which the parties agree applies here, there must be 'an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound.' *Civil Serv. Employees Ass'n, Inc. v. Baldwin Union Free Sch. Dist*., 84 A.D.3d 1232, 924 N.Y.S.2d 126, 128 (2d Dep't 2011) (internal quotation marks omitted)).

**SPA-8**

Viewing the Letter as a contract, and having found that its terms are unambiguous, the Estate's submission of extrinsic evidence regarding the Letter is admissible only if it is permitted under the parol evidence rule. That rule is well established under New York law:

> [A]bsent fraud or mutual mistake, where the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations between the parties offered to contradict or modify the terms of their writing. (*Fogelson v. Rackfay Constr. Co.*, 300 N.Y. 334, 90 N.E.2d 881; *Thomas v. Scutt*, 127 N.Y. 133, 27 N.E. 961.) Although at times this rule may seem to be unjust, "on the whole it works for good" (*Mitchill v. Lath*, 247 N.Y. 377, 380, 160 N.E. 646) by allowing a party to a written contract to protect himself from "perjury, infirmity of memory or the death of witnesses." (*Thomas v. Scutt*, 127 N.Y. 133, 142, 27 N.E. 961, *supra*; *see, generally*, Richardson, Evidence [10th ed.], §§ 601–634.)

*Marine Midland Bank-S. v. Thurlow*, 53 N.Y.2d 381, 389 (1981). In a case relied upon by both parties, the district court addressed a situation where the terms of the agreement (proved only by an endorsement on a payment check) were not always clear. In that case, the district court held that "there should be evidence of the oral agreement which the one-line written statement memorializes." *Playboy Enterprises, Inc. v. Dumas*, 831 F. Supp. 295, 308 (S.D.N.Y.), *opinion modified on reargument,* 840 F. Supp. 256 (S.D.N.Y. 1993), and *aff'd in part, rev'd in part,* 53 F.3d 549 (2d Cir. 1995). No such problem is present here. The 2004 letter sets out the agreement clearly and, unlike the *Playboy* case, uses the term of art in the Copyright Act: "work[s] made for hire."

Moreover, The Estate has failed to come forward with case law that supports its arguments that the 44 articles at issue first published in 1999 were not, as a matter of law, works for hire solely because the agreement purportedly memorialized a preexisting understanding going back 46 years.

- 8 -

# SPA-9

## CONCLUSION

Based on the foregoing, RIT's motion for summary judgment, ECF No. 52, is granted with respect to The Estate's copyright infringement claim on the 44 registered articles reproduced in the book *The Millennial Critic: Stanley Kauffmann on Film: 1999-2009"* and detailed above in the Background section of this decision. Kauffmann's cross-motion for summary judgment, ECF No. 58, is denied. The Clerk is directed to enter judgment for RIT. RIT may have until September 30, 2018, to move for a default judgment against third party defendant Cardullo. If no such motion is made by then, the Clerk is directed to close this case.

IT IS SO ORDERED.

Dated:   August 6, 2018
          Rochester, New York

          ENTER:

                              /s/ Charles J. Siragusa
                              CHARLES J.   SIRAGUSA
                              United States District Judge

**SPA-10**

AO 450 (Rev. 11/11)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

Western  District of  NY

| | |
|---|---|
| THE ESTATE OF STANLEY KAUFFMANN, | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   17-CV-6061-CJS-MWP |
| ROCHESTER INSTITUTE OF TECHNOLOGY, | ) |
| *Defendant* | ) |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____ recover costs from the plaintiff *(name)* _____
_____ .

☒ other:   RIT's motion for summary judgment is granted with respect to The Estate's copyright infringement claim on the 44 registered articles reproduced in the book The Millennial Critic: Stanley Kauffmann on Film: 1999-2009". Kauffmann's cross-motion for for summary judgment is denied. The Clerk is directed to enter judgment for RIT.  .

This action was *(check one)*:

☐ tried by a jury with Judge _____ presiding, and the jury has rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision was reached.

☒ decided by Judge   Charles J. Siragusa _____ on a motion for summary judgment in favor of RIT.  .

Date:   08/07/2018 _____

*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*